FILED

FEB 11 2008

RICHARD W. W.
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1 | CHRISTINE H. CHANG
  | **Name and Address**
2 | 341 TIDEWAY DR. #214
3 | ALAMEDA, CA 94501
4 |
5 | **UNITED STATES DISTRICT COURT**
6 | **NORTHERN DISTRICT OF CALIFORNIA**
7 |
8 | Case No. C07-3981 MJJ
9 | CHRISTINE H. CHANG
10 | **Plaintiff / Petitioner**     **Document Name:**
11 | **VS.**
12 | PLAINTIFF CHRISTINE CHANG'S
13 | MCKESSON HBOC, INC     OPPOSITION TO DEFENDANTS
14 | **Defendant / Respondent**     JOHN HAMMERGREN, PAUL
15 | KIRINCIC, JERRY WARREN
16 | AND DONNA DRAHER'S MOTION
17 | TO DISMISS AMENDED
18 | COMPLAINT
19 |
20 |
21 | EXHIBITS A THRU I
22 |
23 |
24 |
25 |
26 |
27 |
28 |

**Exhibit A**

1  Ronald S. Kravitz (CA State Bar No. 129704)
   Edward S. Zusman (CA State Bar No. 154366)
2  Christopher J. Clifford (CA State Bar No. 157772)
   ZELLE, HOFMANN, VOELBEL & GETTE LLP
3  500 Sansome Street, Suite 400
   San Francisco, CA 94111
4  Tel: 415-693-0700
   Fax: 415-693-0770
5
   Peter S. Myers (CA State Bar No. 115113)
6  Kevin Urbatsch (CA State Bar No. 168380)
   THE MYERS LAW FIRM
7  260 California Street, Suite 801
   San Francisco, CA 94111
8  Tel: 415-951-8100
   Fax: 415-951-9700
9
   Attorneys for Plaintiff
10 CHRISTINE CHANG

11                    UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13                      **C  99      5075**

14 CHRISTINE CHANG, on behalf of the    )
   McKesson HBOC Profit Sharing Investment )   Case No.
15 Plan and its participants,            )
                                         )   **CLASS ACTION**
16            Plaintiff,                 )
                                         )   **COMPLAINT FOR BREACH OF**
17 vs.                                   )   **FIDUCIARY DUTY [ERISA §§ 404, 409**
                                         )   **and 502(a)2] AND CO-FIDUCIARY**
18 McKESSON HBOC, INC.; McKESSON         )   **LIABILITY [ERISA § 405]**
   HBOC PROFIT SHARING INVESTMENT        )
19 PLAN FIDUCIARIES; HBO & COMPANY       )
   PROFIT SHARING AND SAVINGS PLAN       )
20 FIDUCIARIES; and THE CHASE            )
   MANHATTAN BANK,                       )
21                                       )
              Defendants.                )
22 _____)

23

24

25

26

27

28

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700

1    Plaintiff Christine Chang, on behalf of the McKesson HBOC Profit Sharing Investment

2  Plan (the "PSI Plan") and its participants, sues McKesson HBOC, Inc. (the "Company" or

3  "McKesson HBOC"); the McKesson HBOC Profit Sharing Investment Plan Fiduciaries (the

4  "McKesson Plan Fiduciaries"); the HBO & Company Profit Sharing and Savings Plan

5  Fiduciaries (the "HBOC Plan Fiduciaries"); and The Chase Manhattan Bank ("Chase").

6                          **JURISDICTION AND VENUE**

7       1.    This action for relief is brought pursuant to Section 502 of the Employee

8  Retirement Income Security Act ("ERISA") [29 U.S.C. §1132].

9       2.    Venue lies in the United States District Court for the Northern District of

10  California because the PSI Plan is administered in this District; some or all of the fiduciary

11  breaches for which relief is sought occurred in this District; one or more of the Defendants may

12  be found in this District, and the named Plaintiff resides within this District.

13                              **PARTIES**

14       3.    At all relevant times, plaintiff Christine Chang was an employee of the Company

15  and a "participant" within the meaning of ERISA Section 3(7) [29 U.S.C. §1002(7)] in the PSI

16  Plan.

17       4.    At all relevant times, the PSI Plan was and continues to be an "employee pension

18  benefit plan" within the meaning of ERISA Section 3(2)(A) [29 U.S.C. §1002(2)(A)].

19       5.    Plaintiff is informed and believes that Defendant McKesson HBOC is a Delaware

20  corporation qualified to do business in California, with principal offices located within this

21  District. At all relevant times, the Company served as the plan "administrator" for the PSI Plan

22  within the meaning of ERISA Section 3(16)(A) [29 U.S.C. §1002(16)(A)] and as a "fiduciary"

23  of the PSI Plan within the meaning of ERISA Section 3(21) [29 U.S.C. §1002(21)(A)].

24       6.    The Defendants designated as "McKesson Plan Fiduciaries" are those individuals

25  or other entities who served as plan "administrators" for the PSI Plan within the meaning of

26  ERISA Section 3(16)(A) [29 U.S.C. §1002(16)(A)], and/or as "fiduciaries" of the PSI Plan

27  within the meaning of ERISA Section 3(21) [29 U.S.C. §1002(21)(A)]. The McKesson Plan

28  Fiduciaries include, but may not be limited to, the members of the Company's Board of

1  Directors who established the PSI Plan's investment policy, and the individuals identified in the

2  Summary Plan Description as members of the PSI Plan's Employee Benefits Committee. Each

3  "McKesson Plan Fiduciary" will be identified during the discovery process of this lawsuit and

4  served with legal process. Plaintiff expressly reserves the right to name the individual fiduciaries

5  in an amendment to this Complaint.

6       7.     The Defendants designated as "HBOC Plan Fiduciaries" are individuals or other

7  entities who served as plan "administrators" for the HBO & Company Profit Sharing and

8  Savings Plan (the "prior HBOC Plan" or the "HBOC Plan") within the meaning of ERISA

9  Section 3(16)(A) [29 U.S.C. §1002(16)(A)], and/or as "fiduciaries" of the HBOC Plan within

10  the meaning of ERISA Section 3(21) [29 U.S.C. §1002(21)(A)]. The HBOC Plan was merged

11  into the McKesson PSI Plan on or about April 1, 1999. The "HBOC Plan Fiduciaries" include,

12  but may not be limited to, the members of HBO & Company's Board of Directors prior to its

13  merger with McKesson, who established the HBOC Plan's investment policy, and the

14  individuals identified in publicly filed documents as members of the HBOC Plan's Employee

15  Benefits Administrative Committee. Each "HBOC Plan Fiduciary" will be identified during the

16  discovery process of this lawsuit and served with legal process. Plaintiff expressly reserves the

17  right to name the individual fiduciaries in an amendment to this Complaint.

18       8.     Defendant Chase is identified in the PSI Plan's Summary Plan Description as the

19  "Trustee" of the McKesson PSI Plan. As the Trustee of the PSI Plan, Chase is a "fiduciary" of

20  the PSI Plan within the meaning of ERISA Section 3(21) [29 U.S.C. §1002(21)(A).

21                              **FACTUAL BACKGROUND**

22       9.     McKesson HBOC, Inc. is described in its public filings as a leading healthcare

23  supply management company in North America.

24       10.     On January 12, 1999, the Company, formerly McKesson Corporation, completed

25  a merger with HBO & Company, a leading health care information technology company. The

26  combined entity became McKesson HBOC, Inc.

27

28

1    11.    The Company is the sponsor of the McKesson HBOC Profit Sharing Investment

2  Plan (the "PSI Plan"). The PSI Plan is an "employee pension benefit plan" under ERISA and

3  can also be characterized as a "401(k) plan" under the Internal Revenue Code.

4    12.    Generally, the PSI Plan permits participants to defer a portion of their

5  compensation into the PSI Plan and associated Trust. The Company "matches" up to the first

6  6% of each participant's salary deferral contribution by contributing solely Company stock.

7    13.    In addition to the Company matching contributions solely in Company stock, the

8  Company also makes a supplemental contribution to the PSI Plan, again consisting solely of

9  Company stock, based on the age and length of service of the participant. This supplemental

10  contribution in Company stock, which began in 1997, is referred to as the "Retirement Share

11  Plan" in the PSI Plan's Summary Plan Description. According to publicly filed documents, this

12  supplemental contribution solely in Company stock was to replace a portion of the retirement

13  benefits Company employees lost or otherwise expected to receive under a defined benefit

14  retirement plan the Company unilaterally terminated in 1996.

15    14.    In addition to the matching contribution and the "supplemental Retirement Plan

16  Share" contribution, the Company also makes a further contribution it designates in the

17  Summary Plan Description as the "PSIP-Plus" contribution. Again, this "PSIP-Plus"

18  contribution consists solely of Company stock.

19    15.    Defendants McKesson and the McKesson Plan Fiduciaries established the PSI

20  Plan's investment policy. The result of this investment policy is that the PSI Plan held

21  substantial amounts of assets in publicly-traded Company stock up to and through the filing of

22  this action. Upon information and belief, 100% of the value of assets contributed by the

23  Company and held by the PSI Plan (other than each participant's salary deferrals) was held in

24  Company stock prior to and at the time of the fiduciary breaches complained of in this action.

25    16.    Prior to the January 12, 1999 merger with McKesson, HBOC also sponsored its

26  own 401(k) Plan. The HBO & Company Profit Sharing and Savings Plan (the "prior HBOC

27  Plan") permitted participants to invest in HBOC common stock, which was publicly traded prior

28  to the merger. Upon information and belief, over 30% of the assets in the prior HBOC Plan

1    were held in HBOC shares, representing a value of over $75 million at the time of the January
2    12, 1999 merger.

3        17.    The HBOC Plan Fiduciaries established the prior HBOC Plan, and enabled the
4    Plan participants to invest in HBOC common stock.

5        18.    On or about April 1, 1999, the prior HBOC Plan was merged into the PSI Plan.

6        19.    Pursuant to the January 12, 1999 merger of the companies and the subsequent
7    April 1, 1999 merger of the two plans, participants in the prior HBOC Plan received .37 shares
8    of McKesson stock allocated to their account for each HBOC share they held.

9        20.    The foregoing background demonstrates that the participants in the PSI Plan, as
10   it existed as of April 1, 1999 (including former HBOC employees who became participants
11   under the merged PSI Plan as of April 1, 1999), had a vital interest in the share value of the
12   Company common stock in order to adequately save for their retirement, because the
13   investment policy of the PSI Plan was heavily weighted in Company stock. Because the
14   Company's defined benefit plan was terminated in 1996, upon information and belief, the PSI
15   Plan represented the only "qualified retirement plan" maintained by the Company for the benefit
16   of its employees.

17       21.    Participants in the PSI Plan had no right to direct the sale of Company stock held
18   in their PSI Plan accounts (other than a limited right beginning when a participant reached age
19   55 or when their age plus service exceeded age 65).

20       22.    During the course of calendar year 1999, the Company, in a series of public
21   announcements, admitted and acknowledged that it engaged in a course of improper business
22   conduct consisting of improper, illegal and abusive accounting practices that materially
23   misrepresented the financial condition of the Company.

24       23.    On April 28, 1999, to the dismay of PSI Plan participants (including former
25   HBOC employees who began participating in the merged PSI Plan as of April 1, 1999), the
26   Company publicly announced and acknowledged that revenues for the Company had been
27   improperly recorded in violation of generally accepted accounting principles, and that Fiscal
28   Year 1999 financial results would be restated downward.

1    24.    On May 25, 1999, the Company publicly disclosed that the accounting

2  improprieties were even broader in scope than initially thought; that "additional instances of

3  improper revenue recognition [had] been found" (according to a Company Press Release); and

4  that Company financial statements would be further revised downward for the three prior Fiscal

5  Years to reflect the improper, illegal and abusive accounting practices.

6    25.    On June 21, 1999, the Company announced wholesale changes to its

7  management team because of the accounting scandal.  The Chairman of the Board was

8  summarily removed and dismissed as an employee.  The Chief Executive Officer/President and

9  the Chief Financial Officer resigned.  Within the Company's Information Technology Unit

10  (formerly HBOC before the January 12, 1999 merger), the CEO/President, the Chief Financial

11  Officer/Controller, the Senior Vice President/General Counsel, and the Senior Vice

12  President/Head of Enterprise Sales were dismissed for cause after an Audit Committee had

13  undertaken an investigation of the accounting improprieties.

14    26.    On July 14, 1999, the Company announced restated financial results for Fiscal

15  Years 1997-1999, which downwardly revised the financial condition of the Company from what

16  had been previously reported.  The Company, in a publicly disclosed Company Press Release,

17  admitted to serious accounting improprieties, including:  (a) improperly recognizing income; (b)

18  backdating contracts; (c) misrepresenting products as Year 2000 compliant; and (d) under-

19  reporting expenses.

20    27.    The Company's foregoing announcements and admissions seriously impacted the

21  Company stock, and the assets held by the PSI Plan.  At the time of the merger on January 12,

22  1999, the Company stock was trading at close to $90.00 per share.  When the Company initially

23  admitted and disclosed the accounting improprieties (April 28, 1999), the Company's share

24  value declined almost 50%, from approximately $65.00 to $35.00 per share.

25    28.    As of the time of the filing of this action, the value of the Company stock is

26  approximately $20.00 per share.

27    29.    The PSI Plan has, therefore, incurred losses of millions of dollars because of the

28  matters outlined in this Complaint.  The account balance of each PSI Plan participant (including

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700

COMPLAINT                                                                                            3105453          5

1  former HBOC employees now participating in the merged plans) has declined significantly

2  because of the foregoing events.

3       30.    The Defendants served as fiduciaries, as defined in ERISA, of the prior HBOC

4  Plan and the PSI Plan during the time the foregoing events transpired.

5       31.    As fiduciaries of the prior HBOC Plan and the PSI Plan, the Defendants, and

6  each of them, were responsible for managing and investing prior HBOC Plan assets and PSI

7  Plan assets, and owed a duty of loyalty exclusively to the Plan participants.

8       32.    As fiduciaries of the prior HBOC Plan and the PSI Plan, the Defendants, and

9  each of them, were responsible under ERISA Section 404 to discharge their duties solely in the

10  interest of the participants and beneficiaries and for the exclusive purpose of providing benefits

11  to the participants and their beneficiaries.

12       33.    As fiduciaries of the prior HBOC Plan and the PSI Plan, the Defendants, and

13  each of them, were responsible under ERISA Section 404 to discharge their duties prudently,

14  with the care, skill, prudence and diligence under the circumstances then prevailing that a

15  prudent man acting in like capacity and familiar with such matters would use in the conduct of

16  an enterprise of a like character and with like aims.

17       34.    Plaintiff alleges that the illegal, improper and abusive accounting practices that

18  occurred at the Company (and at HBOC prior to its merger with the Company), which resulted

19  in the loss of millions of dollars to the PSI Plan, was information the Defendants, and each of

20  them, as fiduciaries of the prior HBOC Plan and the PSI Plan, either knew; should have known

21  through the exercise of reasonable due diligence; or are considered to have known by operation

22  of law.

23       35.    The investment policy initiated and maintained by Defendants McKesson, the

24  McKesson Plan Fiduciaries, and The Chase Manhattan Bank, under which a substantial

25  percentage of the PSI Plan assets were held and maintained in shares of Company stock when

26  the Company was engaged in a pattern of illegal, improper and abusive accounting practices,

27  constitutes violations of ERISA's fiduciary duties under ERISA Sections 404 and 405.

28

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700          COMPLAINT                                                          3105453    6

1    36.    The investment policy initiated and maintained by Defendant HBOC Plan

2  Fiduciaries prior to the merger of the prior HBOC Plan with the PSI Plan on April 1, 1999,

3  under which HBOC Plan assets were held and maintained in shares of HBOC publicly traded

4  stock when HBOC was engaged in a pattern of illegal, abusive and improper accounting

5  practices, constitutes violations of ERISA's fiduciary duties under ERISA Sections 404 and

6  405.

7                              **FIRST CLAIM FOR RELIEF**

8        **[Claim for relief under ERISA Sections 404, 409 and 502(a)(2)
          against McKesson, the McKesson Plan Fiduciaries, and The Chase**
9        **Manhattan Bank]**

10    37.    Plaintiff realleges and incorporates paragraphs 1 through 36 as though fully set

11  forth herein.

12    38.    ERISA Section 502(a)(2) permits a plan participant to seek relief under ERISA

13  Section 409 by bringing an action on behalf of a plan.

14    39.    ERISA Section 409 provides in pertinent part that any person who is a fiduciary

15  with respect to a plan who breaches any of his responsibilities, obligations or duties imposed by

16  Title 1 of ERISA shall be personally liable to make good to the plan any losses resulting from

17  each breach.

18    40.    By establishing and maintaining the PSI Plan investment policy in which all

19  contributions, other than participant "salary deferrals," were invested in Company stock, while

20  the Company was actively engaged in a pattern of illegal, abusive and improper accounting

21  practices, McKesson, the McKesson Plan Fiduciaries and The Chase Manhattan Bank breached

22  the fiduciary duties they owed to the PSI Plan and its participants under ERISA Sections

23  404(a)(1)(A) and 404(a)(1)(B).

24    41.    By failing to adequately and diligently investigate the potential effect of the

25  HBOC merger on the value of the McKesson shares held by the PSI Plan, Defendants

26  McKesson, the McKesson Plan Fiduciaries and The Chase Manhattan Bank breached the

27  fiduciary duties they owed to the PSI Plan and its participants under ERISA Sections

28  404(a)(1)(A) and 404(a)(1)(B).

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700        COMPLAINT                                               3105453    7

1    42.    As a result of the fiduciary breaches committed by McKesson, the McKesson

2    Plan Fiduciaries, and The Chase Manhattan Bank, the PSI Plan has sustained losses in the

3    millions of dollars for which such Defendants are legally obligated to restore to the PSI Plan

4    pursuant to ERISA Section 409.

5         WHEREFORE, Plaintiff prays for relief as set forth below.

6                    **SECOND CLAIM FOR RELIEF**

7    **[Claim for relief under ERISA Sections 404, 409 and 502(a)(2)**
     **against the HBOC Plan Fiduciaries]**

8

9    43.    Plaintiff realleges and incorporates paragraphs 1 through 42 as though fully set

10   forth herein.

     44.    By establishing and maintaining an investment policy for the prior HBOC Plan in

11   which participants could invest in HBOC common stock during a period when HBOC was

12   actively engaged in a pattern of improper accounting practices, HBOC Plan Fiduciaries

13   breached the fiduciary duties they owed to participants under ERISA Sections 404(a)(1)(A) and

14   404(a)(1)(B).

15   45.    By failing to disclose to McKesson, the McKesson Plan Fiduciaries or The Chase

16   Manhattan Bank at the time of the merger of the prior HBOC Plan with the PSI Plan on or

17   about April 1, 1999, that the prior HBOC Plan had invested a substantial percentage of its

18   assets in a publicly traded company that was engaged in a pattern of improper, illegal and

19   abusive accounting practices, the HBOC Plan fiduciaries breached the fiduciary duties they

20   owed to all participants under the merged plan pursuant to ERISA Sections 404(a)(1)(A) and

21   404(a)(1)(B).

22   46.    As a result of the fiduciary breaches committed by the HBOC Plan Fiduciaries,

23   the PSI Plan has sustained losses in the millions of dollars for which such Defendants are legally

24   obligated to restore to the PSI Plan pursuant to ERISA Section 409.

25        WHEREFORE, Plaintiff prays for relief as set forth below.

26

27

28

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700

1    **THIRD CLAIM FOR RELIEF**

2    **[Co-Fiduciary Liability under ERISA Section 405]**

3    47.    Plaintiff realleges and incorporates paragraphs 1 through 46 as though fully set

4    forth herein.

5    48.    ERISA Section 405 generally provides that in addition to any liability a fiduciary

6    may have under any other part of Title 1 of ERISA, a fiduciary with respect to a plan also shall

7    be liable if: (a) he participates knowingly in, or knowingly undertakes to conceal, an act or

8    omission of another fiduciary, knowing the other fiduciary's act or omission is a breach; (b) by

9    failing to comply with ERISA Section 404(a)(1) in the administration of his specific

10    responsibilities that give rise to his fiduciary status, he enables another fiduciary to commit a

11    breach; or (c) he has knowledge of a breach by another fiduciary, and fails to make reasonable

12    efforts under the circumstances to remedy the breach.

13    49.    The facts outlined in this Complaint demonstrate that the various fiduciaries who

14    are Defendants in this action either had knowledge of the fiduciary breaches committed and

15    failed to take reasonable efforts to remedy the breaches, or by acts or omissions, concealed

16    relevant information, which constituted breaches of fiduciary duty, in violation of ERISA

17    Section 405.

18    50.    As a result of Defendants' acts and omissions that violate ERISA Section 405,

19    Defendants caused the PSI Plan to sustain losses in the millions of dollars, which Defendants are

20    legally obligated to restore to the Plan.

21    WHEREFORE, Plaintiff prays for relief as set forth below.

22    **CLASS ACTION ALLEGATIONS**

23    51.    This action is brought by the plaintiff, Christine Chang, on behalf of, and in her

24    representative capacity as a participant in, the merged PSI Plan. ERISA Sections 502(a)(2) and

25    409 expressly authorize a civil enforcement action by a PSI Plan participant on behalf of the PSI

26    Plan against Defendant fiduciaries.

27    52.    Plaintiff Chang represents the class of participants who were damaged by the

28    fiduciary acts and breaches outlined herein. Upon a recovery on behalf of the PSI Plan in this

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700

COMPLAINT    3105453    9

1   action, those specific participants who will share in the recovery must be identified so that

2   benefits may be restored by having additional amounts allocated to the accounts of appropriate

3   PSI Plan participants.

4          53.    This action also is brought as a class action under Rule 23 of the Federal Rules

5   of Civil Procedure on behalf of the following PSI Plan participants:

> All participants in the PSI Plan, including participants under the prior
> HBOC Plan which was merged into the PSI Plan on April 1, 1999, who
> maintained an account balance under the PSI Plan as of April 27, 1999,
> and who had not received a distribution from the PSI Plan as of April 27,
> 1999.

10         54.    The class in this matter is composed of, at a minimum, thousands of persons in

11  numerous and various locations throughout the United States where the Company transacts

12  business.

13         55.    The number of class members is so large that the joinder of all its members is

14  impracticable.

15         56.    Plaintiff's claims are typical of the claims of the members of the class.  Plaintiff is

16  an adequate representative of the members of the class.

17         57.    Plaintiff has retained competent counsel, experienced in class and ERISA

18  litigation and intends to prosecute this action vigorously.

19         58.    Plaintiff's interests are not antagonistic to or in conflict with the interests Plaintiff

20  seeks to represent as class representative.

21         59.    A class action is superior to the other available methods for the fair and efficient

22  adjudication of this controversy because, among other things, joinder of all members of the class

23  is impracticable and the named Plaintiff's claim is typical of the claim of all class members.

24  Furthermore, as the damage suffered by some of the individual members of the class may be

25  relatively small, the expense and burden of individual litigation makes it impracticable for

26  members of the class individually to enforce their rights.  Plaintiff knows of no difficulty that

27  could be encountered in the management of this litigation that would preclude its maintenance

28  as a class action.

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700

COMPLAINT                                                                                    3105453        10

1    60.    Numerous common issues of law and fact exist in this matter within the meaning

2    of Rule 23(a) of the Federal Rules of Civil Procedure, and the common issues predominate over

3    questions affecting only individual members within the meaning of Rule 23(b)(1)(B)(3).  These

4    issues include, without limitation:

5         (a)    Whether the Defendants breached their fiduciary duties under ERISA to

6    invest PSI Plan assets in a prudent manner; and

7         (b)    Whether Defendants failed to adequately and diligently investigate the

8    merits of the HBOC acquisition as it may have affected the value of McKesson shares held by

9    the PSI Plan.

10    WHEREFORE, Plaintiff, on behalf of the PSI Plan and its participants, prays for relief as

11    follows:

12    A.    That judgment be entered for the Plaintiff on behalf of the PSI Plan and its

13    participants, determining that Defendants have breached their fiduciary duties owed to the PSI

14    Plan and its participants;

15    B.    That Defendants restore to the PSI Plan the losses sustained by the Plan due to

16    the breach of fiduciary duty, in an amount to be proven at trial;

17    C.    That an appropriate class of participants under the PSI Plan be designated by the

18    Court to receive the amounts restored to the PSI Plan by the Defendant fiduciaries;

19    D.    That the court award attorney fees to class counsel, if, as and when a common

20    fund is created, in accordance with the laws and rules governing class actions under Rule 23 of

21    the Federal Rules of Civil Procedure; and

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

ZELLE, HOFMANN,
VOELBEL & GETTE LLP
500 Sansome Street, Suite 400
San Francisco, CA 94111
(415) 693-0700

COMPLAINT                                                            3105453        11

1      E.      For such further relief that this court deems just and proper to protect the

2   legitimate rights of the Plaintiff and class members.

3   Dated: 24 November 1999                 Respectfully submitted,

4                                            ZELLE, HOFMANN, VOELBEL & GETTE LLP

5

6                                            Ronald S. Kravitz

7                                            Edward S. Zusman
                                             Christopher J. Clifford
8
                                             THE MYERS LAW FIRM
9                                            Peter S. Myers
                                             Kevin Urbatsch
10
                                             ATTORNEYS FOR PLAINTIFF
11                                           CHRISTINE CHANG

12

13

14                                           Attorneys for Plaintiff CHRISTINE CHANG

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit B**

Ronald S. Kravitz
LINER YANKELEVITZ
SUNSHINE & REGENSTREIF, L.L.P.
601 Montgomery Street, Suite 900
San Francisco, CA 94111
Tel: 415.438.4321
Fax: 415.434.4689

Steven J. Ross
LAW OFFICES OF STEVEN J. ROSS
1886 Beach Avenue, Suite 1
Atlantic Beach, FL 32233
Tel: 904.249.8799
Fax: 904.247.2322

Attorneys for Plaintiff JOSEPH DOLLIVER
as class plaintiff for the HBOC
SUB-CLASS and
Attorneys for Plaintiffs CHRISTINE
CHANG and JAMES HUFFMAN as class
plaintiffs for the MCKESSON SUB-CLASS

J. Brian McTigue
Bruce F. Rinaldi
THE MCTIGUE LAW FIRM
5513 Connecticut Avenue
Suite 220
Washington, DC 20015
Tel: 202-364-6900
Fax: 202-364-9960

Ellen M. Doyle
MALAKOFF DOYLE & FINBERG, P.C.
437 Grant Street, Suite 200
Pittsburg, PA 15219
Tel: 412-281-8400
Fax: 412-281-3262

Attorneys for Plaintiff ALBERT ADAMS as
class plaintiff for the HBOC SUB-CLASS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE MCKESSON HBOC, INC. ERISA LITIGATION | ) ) ) ) ) ) ) ) ) ) | **Case No. C00-20030 RMW**<br><br>**CLASS ACTION** |

## CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY

## UNDER ERISA

## TABLE OF CONTENTS

NATURE OF THE ACTION .................................................... 1

JURISDICTION AND VENUE ................................................. 3

PARTIES .................................................................. 3

   The Plaintiffs ......................................................... 3

   The Defendants ....................................................... 4

      HBOC Plan Fiduciaries and the Bases for Their Fiduciary Status ............ 4

         Defendant HBOC. ........................................... 4

         Defendant HBOC Administrative Committee ...................... 5

         Defendants: The "Individual HBOC Administrative Committee
         Members" ................................................... 5

         Defendants: HBOC Board of Directors ........................... 7

         Defendants: The "Individual HBOC Board Members" .............. 8

         Defendants HBOC Plan Fiduciaries DOES 1-20 ................... 10

      McKesson Plan Fiduciaries and the Bases for Their Fiduciary Status ........ 11

         Defendant McKesson, Inc. .................................... 11

         Defendants: The "Pre-Merger Individual McKesson Board
         Members" .................................................. 11

         Defendants: The "Post-Merger Individual McKesson Board
         Members" .................................................. 13

         Defendants McKesson Plan Fiduciaries ROES 1-20. . ............. 16

         Defendant McKesson Plan. ................................... 16

FACTUAL BACKGROUND .................................................17

I.      The HBOC Plan: Its History, Structure and Plan Terms ...................17

II.     Accounting Irregularities Artificially Inflate the Share Price of
        HBOC Company Stock ............................................21

III.    The HBOC Plan Fiduciaries Breach Their Duties ......................24

IV.     The McKesson Plan: Its History, Structure and Plan Terms ...............31

        A.    Salary-Deferral Contributions ...............................32

        B.    McKesson "Company Contributions," Including Matching
              Contributions .............................................32

        C.    McKesson Plan Becomes Overly Concentrated in McKesson
              Company Stock ...........................................33

V.      The Original Proposed Transaction between McKesson and HBOC, and
        McKesson's Due Diligence .......................................35

        A.    July 1998--Deloitte Advises McKesson Plan Fiduciary (Defendant
              McKesson) of the HBOC Accounting Problems ..................36

        B.    July 13, 1998–McKesson Plan Fiduciaries, Including Defendants the Pre-
              Merger Individual McKesson Board Members, Are Informed of HBOC's
              Questionable Accounting Practices and Determine Not to Proceed with the
              Merger ..................................................41

VI.     August 1998–Analysts Report Financial Problems at HBOC ..............42

VII.    October 1998: McKesson Proposes to Acquire HBOC and Conducts Limited Due
        Diligence .....................................................44

VIII.   October 1998–McKesson Plan Fiduciaries (Defendants McKesson and the Pre-
        Merger Individual McKesson Board Members) Advise that Problems with
        HBOC's Financial Accounting Uncovered in July 1998 Still Plagued HBOC . . 44

IX.     McKesson and Its Officers and Board Of Directors Know That The "Fairness
        Opinion" Is Incomplete .........................................47

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
Case No. C00-20030 RMW

X.      McKesson Plan Fiduciaries Know of Substantial Risk Factors Inherent to the
        Merger, Including Those Disclosed in the November 27, 1998 Joint Proxy . . . . 48

XI.     January 12, 1999: The Corporate Merger Is Effected . . . . . . . . . . . . . . . . . . . . . . 52

XII.    April 1, 1999: The Merger of the HBOC Plan into the McKesson Plan . . . . . . . 53

XIII.   The Public Disclosures Show That HBOC's and McKesson's Financial Results
        Are Materially Misstated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

XIV.    The Law under ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

COUNT ONE:      On Behalf of the Former HBOC Plan
                Claim for Relief Against Defendant the HBOC Administrative Committee
                and Defendants the Individual HBOC Administrative Committee
                Members, Including Gilbertson and Bergonzi, for Violation of ERISA
                § 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

COUNT TWO:      On Behalf of the Former HBOC Plan
                Claim for Relief Against Defendant HBOC, Defendant the HBOC
                Administrative Committee and Defendants the Individual HBOC
                Administrative Committee Members, Including Gilbertson and Bergonzi,
                for Violations of ERISA §§ 406 and 407 . . . . . . . . . . . . . . . . . . . . . . . . . 62

COUNT THREE:    On Behalf of the Former HBOC Plan
                Claim for Relief Against Defendant HBOC, Defendant the HBOC Board
                and Defendants the Individual HBOC Board Members, Including
                Defendant McCall, for Violation of ERISA § 404 . . . . . . . . . . . . . . . . . 64

COUNT FOUR:     On Behalf of the Former HBOC Plan
                Claim for Relief Against All HBOC Plan Fiduciaries for Co-Fiduciary
                Liability in Violation of ERISA § 405, and Against HBOC under Agency
                Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

COUNT FIVE:     On Behalf of the Former HBOC Plan
                Claim for Relief Against Defendant the HBOC Administrative Committee,
                Defendants the Individual HBOC Administrative Committee Members,
                Including Defendants Rumsey and Kappel, for Violation of ERISA
                § 404(a)(1)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

COUNT SIX:          On Behalf of the Former HBOC Plan
                    Claim for Relief Against Defendant Gilbertson for Violation of ERISA
                    § 404 and for Remedial and Equitable Relief under ERISA § 409 . . . . . 72

COUNT SEVEN:        On Behalf of the McKesson Plan
                    Claim for Relief Against the Pre-Merger Individual McKesson Board
                    Members for Breach of Fiduciary Duty in Violation of ERISA § 404 for
                    the Pre-Merger Period (before January 12, 1999) . . . . . . . . . . . . . . . . . . 76

COUNT EIGHT:        On Behalf of the McKesson Plan
                    Claim for Relief Against the Post-Merger Individual McKesson Board
                    Members for Breach of Fiduciary Duty in Violation of ERISA § 404 for
                    the Post-Merger/Pre-Announcement Period (January 12, 1999-April 20,
                    1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

COUNT NINE:         On Behalf of the McKesson Plan
                    Claim for Relief Against the Post-Merger Individual McKesson Board
                    Members for Breach of Fiduciary Duty in Violation of ERISA § 404 for
                    the Post Announcement Period (the Period After April 28, 1999) . . . . . 93

COUNT TEN:          On Behalf of the McKesson Plan
                    Claim for Relief Against Defendant McKesson for Breach of Fiduciary
                    Duty in Violation of ERISA § 404, and for Liability under Agency
                    Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

COUNT ELEVEN:       On Behalf of the McKesson Plan
                    Claim for Breach of Fiduciary Duty Against the Pre-Merger Individual
                    McKesson Board Members and the Post-Merger Individual McKesson
                    Board Members for Maintaining McKesson Company Stock as an
                    Investment Option for Participant Salary-Deferral Contributions, in
                    Violation of ERISA § 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

COUNT TWELVE:       On Behalf of the McKesson Plan
                    Claim for Relief Against the McKesson Plan Fiduciaries for Co-Fiduciary
                    Liability under ERISA § 405(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

COUNT THIRTEEN: On Behalf of the McKesson Plan
Claim for Relief Against Defendant Charles McCall for Violation of
ERISA § 404 and for Remedial and Equitable Relief under
ERISA § 409 ............................................. 108

CLASS ACTION ALLEGATIONS ............................................. 111

PRAYER FOR RELIEF ..................................................... 116

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3
                                          )    Case No. C00-20030 RMW
4                                         )
   IN RE MCKESSON HBOC, INC. ERISA        )    CONSOLIDATED AMENDED
5  LITIGATION                             )    COMPLAINT FOR BREACH OF
                                          )    FIDUCIARY DUTY UNDER ERISA
6                                         )
   _____       )    CLASS ACTION
7                                         )
                                          )
8                                         )

9

10         Plaintiffs Christine Chang and James Huffman, on behalf of the McKesson Profit Sharing

11  Investment Plan and its participants and beneficiaries, and Plaintiffs Joseph Dolliver and Albert

12  Adams, on behalf of the former HBO & Company Profit Sharing and Savings Plan and its

13  participants and beneficiaries, in conformance with the pleading requirements set out in *Concha*

14  *v. London,* 62 F.3d 1493, 1502-03 (9th Cir. 1995), allege the following on information and

15  belief:

16                              **NATURE OF THE ACTION**

17         1.      This is a class action brought under the Employee Retirement Income

18  Security Act of 1974, as amended, 29 U.S.C. § 1001 et. sq. ("ERISA") alleging breaches of

19  fiduciary duty by the defendants, as hereinafter more specifically enumerated and described.

20  This action arises out of the events prior to and following the January 12, 1999 merger of HBO &

21  Company ("HBOC") into McKesson, Inc. ("McKesson") (the "Corporate Merger"), and involves

22  two ERISA plans and the investment of assets under those plans in the publicly-traded securities

23  of each sponsor.

24         2.      Prior to the Corporate Merger, HBOC sponsored the HBO & Company

25  Profit Sharing and Savings Plan (the "HBOC Plan"). Certain of the defendants, as hereinafter

26  enumerated and described, permitted the HBOC Plan and its participants to, *inter alia,* acquire

27  publicly-traded HBOC shares ("HBOC Company Stock") for more than adequate consideration

28  and at a time when such an investment was no longer prudent. HBOC Company Stock became an

1 imprudent investment not later than the twelve month period ending March 31, 1997 when

2 HBOC, with the knowledge of at least some of the fiduciaries of the HBOC Plan, failed to report

3 its true financial condition, materially inflating HBOC's revenues and net income. Such actions,

4 in permitting the HBOC Plan and its participants to wrongfully acquire HBOC Company Stock,

5 violated the fiduciary duties certain of the enumerated defendants had under ERISA.

6        3.    Prior to and after the Corporate Merger, McKesson sponsored the

7 McKesson Profit-Sharing Investment Plan (the "McKesson Plan"). Prior to and after the

8 Corporate Merger, certain defendants, as hereinafter enumerated and described, permitted the

9 McKesson Plan participants to acquire publicly-traded McKesson shares ("McKesson Company

10 Stock"), and certain defendants continued to authorize the contribution of McKesson Company

11 Stock to the McKesson Plan, and to authorize that the McKesson Plan continue to hold and

12 invest a significant percentage of McKesson Plan assets in McKesson Company Stock at a time

13 when it was no longer prudent to do so, all in violation of ERISA. The contributions made by

14 McKesson in the form of McKesson Company Stock over the life of the McKesson Plan

15 generally are not "purchases or sales" by the McKesson Plan or its participants which would

16 entitle the participants to relief under the securities litigation which is being coordinated with this

17 ERISA action. As such, the McKesson Plan participants rely on their rights ERISA to recover the

18 losses they suffered.

19        4.    The HBOC Plan was merged into the McKesson Plan on or around April

20 1, 1999. The breaches by the fiduciaries of the HBOC Plan which are alleged in the Complaint

21 all occurred prior to the plan merger, between March 31, 1966 and April 1, 1999. The breaches

22 by the fiduciaries of the McKesson Plan which are alleged in the Complaint began prior to the

23 Corporate Merger and continued even *after* McKesson made its initial announcement on April

24 28, 1999 concerning certain accounting irregularities which had occurred at HBOC. Such

25 accounting irregularities perpetrated by senior management at HBOC, including by certain

26 defendants herein named, continued at HBOC and McKesson after the Corporate Merger on

27 January 12, 1999.

28

1

### JURISDICTION AND VENUE

2        5.    This action for relief is brought pursuant to the civil enforcement

3    provisions of ERISA § 502 [29 U.S.C. § 1132.] This Court has subject matter jurisdiction over

4    this action pursuant to ERISA § 502(e)(1) [29 U.S.C. § 1132(e)(1)].

5        6.    Venue lies in the United States District Court for the Northern District of

6    California because the McKesson Plan is administered in this District; some or all of the

7    fiduciary breaches for which relief is sought occurred in this District; one or more of the

8    Defendants may be found in this District, and certain of the named Plaintiffs reside within this

9    District.

10    ### PARTIES

11    ### The Plaintiffs

12        7.    **Plaintiff Christine Chang.** At all relevant times, plaintiff Christine Chang

13    was an employee of McKesson and a "participant" within the meaning of ERISA § 3(7) [29

14    U.S.C. §1002(7)] in the McKesson Plan.  She is a member and representative of the class of

15    McKesson Plan participants whose accounts under the McKesson Plan were invested in

16    McKesson Company Stock and whose accounts suffered losses hereunder.

17        8.    **Plaintiff James Huffman.** At all relevant times, plaintiff James Huffman

18    was an employee of McKesson and a "participant" within the meaning of ERISA § 3(7) [29

19    U.S.C. §1002(7)] in the McKesson Plan.  He is a member and representative of the class of

20    McKesson Plan participants whose accounts under the McKesson Plan were invested in

21    McKesson Company Stock and whose accounts suffered losses hereunder.

22        9.    **Plaintiff Joseph Dolliver.** At all relevant times, plaintiff Joseph Dolliver

23    was an employee of HBOC and a "participant" within the meaning of ERISA § 3(7) [29 U.S.C.

24    §1002(7)] in the HBOC Plan.  He is a member and representative of the class of HBOC Plan

25    participants whose accounts under the HBOC Plan were invested in HBOC Company Stock and

26    whose accounts suffered losses hereunder.

27        10.    **Plaintiff Albert Adams.**  At all relevant times, plaintiff Albert Adams

28

1   was an employee of HBOC and a "participant" within the meaning of ERISA § 3(7) [29 U.S.C.

2   §1002(7)] in the HBOC Plan. He is a member and representative of the class of HBOC Plan

3   participants whose accounts under the HBOC Plan were invested in HBOC Company Stock and,

4   after the Corporate Merger, in McKesson Company Stock, and whose accounts suffered losses

5   hereunder.

6          11.    Plaintiffs Chang and Huffman, as "participants" in the McKesson Plan, are

7   authorized and empowered pursuant to ERISA § 502(a)(2) [29 U.S.C. §1132(a)(2)] to prosecute

8   this action on behalf of the McKesson Plan and its participants and beneficiaries, and to obtain

9   appropriate legal, monetary and equitable relief and remedies under ERISA § 409(a) [29 U.S.C.

10   §1109(a)]. Plaintiffs Dolliver and Adams, as "participants" in the HBOC Plan, are authorized

11   and empowered pursuant to ERISA § 502(a)(2) [29 U.S.C. 1132(a)(2)] to prosecute this action

12   on behalf of the HBOC Plan and its participants and beneficiaries, and to obtain appropriate

13   legal, monetary and equitable relief and remedies under ERISA § 409(a) [29 U.S.C. § 1109(a)].

14                              **The Defendants**

15   **HBOC Plan Fiduciaries and the Bases for Their Fiduciary Status**

16          12.    **Defendant HBOC.**

17                 a.    HBOC is sued in its capacity as a fiduciary of the HBOC Plan. The

18   fiduciary status of HBOC arises, *inter alia*, by the fact that HBOC was a "Named Fiduciary" of

19   the HBOC Plan (HBOC Plan Document § 1.63); that HBOC had the responsibility and authority,

20   among other things, to appoint the HBOC Plan Trustee and the individual members of the HBOC

21   Administrative Committee, to monitor their performance and to communicate such information

22   to the Trustee and the Administrative Committee as each needed for the proper performance of

23   its duties (HBOC Plan Document § 11.1); and that HBOC had the authority to act in lieu of the

24   Administrative Committee as it deemed appropriate and desirable (HBOC Plan Document § 1.6).

25   As a result of such express authority, and by virtue of any actions it exercised and functions it

26   undertook in furtherance of such authority during all relevant time frames, HBOC was a fiduciary

27   within the meaning of ERISA § 3(21)(a).

28                 b.    HBOC was also the sponsor of the HBOC Plan and the Controlling

1    Company of the HBOC Plan. Prior to January 12, 1999, HBOC was a corporation whose

2    securities were publicly traded on the NASDAQ. On January 12, 1999, HBOC merged with a

3    subsidiary of McKesson. The Corporate Merger resulted in HBOC becoming a wholly owned

4    subsidiary of McKesson and the delisting of HBOC's securities. As of the Corporate Merger,

5    Defendant HBOC changed its name to McKesson Information Solutions, Inc. HBOC continues

6    in existence under the name McKesson Information Solutions, Inc. and is sometimes identified

7    by McKesson as its Information Technology Business Unit or the "ITBU" of McKesson. HBOC

8    is one of the country's largest healthcare information management and healthcare software

9    companies.

10              13.    **Defendant HBOC Administrative Committee.** Defendant HBOC

11   Administrative Committee was identified in the Plan Document as a Named Fiduciary of the

12   HBOC Plan and had complete control over the administration of the HBOC Plan (HBOC Plan

13   Document §§ 1.63 and 10.3) as well as the authority to establish and select various investment

14   funds as investment options under the HBOC Plan, including the HBOC Stock Fund which

15   invested in HBOC Company Stock. (HBOC Plan Document § 7.2) The members of the HBOC

16   Administrative Committee were appointed by and served at the pleasure of the HBOC Board of

17   Directors. (HBOC Plan Document § 10.1(a) and (b))

18              14.    **Defendants: The "Individual HBOC Administrative Committee**

19   **Members."**   The following individual defendants were fiduciaries of the HBOC Plan as a result

20   of their membership on the HBOC Administrative Committee, a Named Fiduciary and the

21   "administrator" of the HBOC Plan during all relevant time-frames. (HBOC Plan Document §§

22   1.6 and 1.63) The fiduciary status of the Individual HBOC Administrative Committee Members

23   is further confirmed, *inter alia*, by the authority expressly provided to each of them under the

24   HBOC Plan, including, without limitation, (a) the authority to establish and select various

25   investment funds as investment options under the HBOC Plan, including the HBOC Stock Fund

26   which invested in HBOC Company Stock (HBOC Plan Document § 7.2); (b) the responsibility

27   for establishing and carrying out a funding policy consistent with HBOC Plan objectives (HBOC

28   Plan Document § 10.8(a)); and, (c) the responsibility for performing the fiduciary functions

1    allocated to the Investment Committee under the HBOC Plan Document, insofar as the

2    Individual HBOC Administrative Committee Members served as members of and comprised the

3    Investment Committee unless HBOC specified otherwise (see HBOC Plan Document §§ 1.53

4    and 10.8). As a result of such express authority, and by virtue of any actions exercised and

5    functions undertaken in furtherance of such authority during all relevant time frames, each of the

6    following Individual HBOC Administrative Committee Members was a fiduciary within the

7    meaning of ERISA § 3(21)(a):

8                    a.    **Defendant Jay P. Gilbertson.**    Defendant Jay P. Gilbertson

9    ("Gilbertson") was the Chief Financial Officer ("CFO") and Treasurer of HBOC from 1993 and

10   the President and Co-Chief Operating Officer of HBOC from December of 1997. Gilbertson was

11   also HBOC's Principal Accounting Officer and Secretary. Beginning in 1997 Defendant

12   Gilbertson was one of HBOC's five Executive Officers, and with Defendants Charles M. McCall

13   and Albert J. Bergonzi, one of the three members of HBOC's "Office of the President."

14   Defendant Gilbertson reported to Defendant McCall, the Chairman and CEO of HBOC.

15   Defendant Gilbertson was a member of the HBOC Administrative Committee and a fiduciary of

16   the HBOC Plan beginning no later than 1995. Defendant Gilbertson signed the HBOC Plan's

17   11-K Annual Reports in 1995, 1997 and 1998 as a member of the HBOC Administrative

18   Committee. Gilbertson resigned from HBOC on or about November 13, 1998. Gilbertson

19   participated in the accounting irregularities engaged in by members of HBOC management,

20   including Defendant Bergonzi, which caused HBOC to fail to report on its accounting books and

21   records its true financial condition, including its true income and revenues for the years 1996,

22   1997, 1998 and the first quarter of 1999, resulting in Gilbertson permitting the HBOC Plan to

23   imprudently invest in HBOC Company Stock.

24                   b.    **Defendant Albert J. Bergonzi.**    Defendant Albert J. Bergonzi

25   ("Bergonzi") served as HBOC Executive Vice President-Sales from 1995 to 1996, and served as

26   President, Enterprise Solutions, HBOC from 1996, and HBOC President and Co-Chief Operating

27   Officer from December 1997. Beginning in 1997, Defendant Bergonzi reported to McCall, and,

28   along with Defendants McCall and Gilbertson, composed the "Office of the President" of HBOC.

1    Defendant Bergonzi was a member of the HBOC Administrative Committee beginning on or

2    about November 13, 1998. Upon Defendant Gilbertson's resignation from HBOC on or about

3    November 13, 1998, Mr. Bergonzi succeeded to all of the responsibilities held by Defendant

4    Gilbertson, including Gilbertson's responsibilities as a member of the HBOC Administrative

5    Committee. Following the Corporate Merger, Mr. Bergonzi continued as HBOC's President and

6    Chief Executive Officer, and became an executive Vice President of McKesson. Bergonzi

7    participated in the accounting irregularities engaged in by other members of HBOC management,

8    including Gilbertson, which caused the income and revenues of HBOC to be overstated for the

9    years 1996, 1997, 1998, and the first quarter of 1999, and artificially inflated the value of HBOC

10   Company Stock. Bergonzi was fired for cause by McKesson and/or HBOC on or about June 18,

11   1999, after the accounting irregularities came to light.

12                        c.       **Defendant E. Christine Rumsey.** Defendant E. Christine Rumsey

13   ("Rumsey") was a member of the HBOC Administrative Committee from no later than 1994

14   until the HBOC Plan merged with the McKesson Plan on April 1, 1999. Thereafter, Defendant

15   Rumsey became Senior Vice President, Human Resources and Administration, for McKesson.

16   Defendant Rumsey was a fiduciary of the HBOC Plan by reason of her membership on the

17   HBOC Administrative Committee.

18                        d.       **Defendant Michael L. Kappel.** Defendant Michael L. Kappel

19   ("Kappel") was a member of the HBOC Administrative Committee from no later than 1994 until

20   the HBOC Plan merged with the McKesson Plan on April 1, 1999. Defendant Kappel was a

21   fiduciary of the HBOC Plan by reason of his membership on the HBOC Administrative

22   Committee.

23                        15.      **Defendant HBOC Board of Directors.** The Defendant HBOC

24   Board of Directors (the "HBOC Board") was a Named Fiduciary under the HBOC Plan

25   Document § 1.63 with the authority to appoint, remove and appoint successors to the HBOC

26   Administrative Committee, the HBOC Investment Committee, and the Trustee, and to monitor

27   their performances, and to communicate such information "as each needs for the proper

28   performance of its duties." (HBOC Plan Document § 11.1(a))

1          16.    **Defendants: The "Individual HBOC Board Members."** The following

2   defendants were fiduciaries of the HBOC Plan by reason of their membership on the HBOC

3   Board of Directors during the HBOC class period (from March 31, 1996-April 1, 1999). The

4   fiduciary status of the Individual HBOC Board Members arises, *inter alia*, by virtue of the fact

5   that (a) the HBOC Board was a Named Fiduciary of the HBOC Plan (HBOC Plan Document

6   §1.63); (b) the HBOC Board members had the authority and responsibility to appoint and to

7   remove the members of the HBOC Administrative Committees (also a Named Fiduciary of the

8   HBOC Plan), and to monitor their performance (HBOC Plan Document 11.1); and (c) the HBOC

9   Board members had the authority and responsibility to communicate such information to the

10  Trustee, the HBOC Administrative Committee and the HBOC Investment Committee as each

11  needed for the proper performance of their duties. (HBOC Plan Document 11.1) As a result of

12  such express authority, and by virtue of any actions exercised and functions undertaken in

13  furtherance of such authority during all relevant time frames, each of the following Individual

14  HBOC Board Members was a fiduciary within the meaning of ERISA § 3(21)(a):

15          a.    **Defendant Charles W. McCall.** Defendant Charles W. McCall

16  ("McCall") became a member of the HBOC Board, as well as the President and the Chief

17  Executive Officer ("CEO") of HBOC in 1991. McCall became Chairman of the Board of HBOC

18  on February 10, 1998. He remained a member of HBOC's Board and HBOC's President after

19  the Corporate Merger. As of the Corporate Merger, Defendant McCall became Chairman of the

20  McKesson Board of Directors and an officer/employee of McKesson, from which positions he

21  was dismissed on June 21, 1999, soon after the accounting irregularities engaged in by HBOC's

22  management were first disclosed by McKesson. Defendant McCall was aware of the accounting

23  irregularities engaged in by members of HBOC management, including Defendants Gilbertson

24  and Bergonzi, which caused the income and revenues of HBOC to be overstated for the years

25  1996, 1997, 1998, and through March 31, 1999, artificially inflating the value of HBOC

26  Company Stock acquired by the HBOC Stock Fund.

27          b.    **Defendant Alfred C. Eckert III.** Defendant Alfred C. Eckert

28

1    ("Eckert") was a member of the HBOC Board of Directors from 1990 until the Corporate Merger

2    on January 12, 1999. Thereafter, Defendant Eckert became a member of the Board of Directors

3    of McKesson and Chairman of the Compensation Committee of the Board of Directors of

4    McKesson. Defendant Eckert was a fiduciary of the HBOC Plan by reason of his membership on

5    the HBOC Board of Directors.

6                 c.     **Defendant Alton F. Irby III.** Defendant Alton F. Irby ("Irby")

7    was a member of the HBOC Board of Directors from 1990 until the Corporate Merger on

8    January 12, 1999. Thereafter, Defendant Irby became a member of the Board of Directors of

9    McKesson and of the Compensation Committee of the Board of Directors of McKesson.

10   Defendant Irby was a fiduciary of the HBOC Plan by reason of his membership on the HBOC

11   Board of Directors.

12                d.     **Defendant Gerald E. Mayo.** Defendant Gerald E. Mayo

13   ("Mayo") was a member of the HBOC Board of Directors from 1991 until the Corporate Merger

14   on January 12, 1999. Thereafter, Defendant Mayo became a member of the Board of Directors

15   of McKesson and of the Audit Committee of the Board of Directors of McKesson. Defendant

16   Mayo was a fiduciary of the HBOC Plan by reason of his membership on the HBOC Board of

17   Directors.

18                e.     **Defendant James V. Napier.** Defendant James V. Napier

19   ("Napier") was a member of the HBOC Board of Directors from 1981 until the Corporate Merger

20   on January 12, 1999. As of the Corporate Merger, Defendant Napier became a member of the

21   Board of Directors of McKesson and of the Audit Committee of the Board of Directors of

22   McKesson. Defendant Napier was a fiduciary of the HBOC Plan by reason of his membership on

23   the HBOC Board of Directors.

24                f.     **Defendant Holcombe T. Green, Jr.** Defendant Holcombe T.

25   Green, Jr. ("Green")  was a member of the HBOC Board of Directors from 1987 until February

26   28, 1998. He was President and Chief Executive Officer of HBOC from January, 1990 to

27   January, 1991 and the Chairman of the Board of HBOC from January, 1991, until February 10,

28

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
0090017/001/ 2639v2                              9                          Case No. C00-20030 RMW

1    1998.  Defendant Green was a fiduciary of the HBOC Plan by reason of his membership on the

2    HBOC Board of Directors.

3            g.      **Defendant Philip A. Incarnati.**  Defendant Philip A. Incarnati

4    ("Incarnati")  was a member of the HBOC Board of Directors from 1990 until the Corporate

5    Merger.  Defendant Incarnati was a fiduciary of the HBOC Plan by reason of his membership on

6    the HBOC Board of Directors.

7            h.      **Defendant Donald C. Wegmiller.**  Defendant Donald C.

8    Wegmiller ("Wegmiller") was a member of the HBOC Board of Directors from 1988 until the

9    Corporate Merger on January 12, 1999.  Defendant Wegmiller was a fiduciary of the HBOC Plan

10   by reason of his membership on the HBOC Board of Directors.

11           i.      **Defendant Charles E. Thoele.**  Defendant Charles E.Thoele

12   ("Thoele") was a director of HBOC from 1987 until March 14, 1997.  Defendant Thoele was a

13   fiduciary of the HBOC Plan by reason of his membership on the HBOC Board of Directors.

14           j.      **Defendant M. Christine Jacobs.**  Defendant M. Christine Jacobs

15   ("Jacobs") was a director of HBOC from 1998 until the Corporate Merger on January 12, 1999.

16   Thereafter, Defendant Jacobs became a member of the Board of Directors of McKesson.

17   Defendant Jacobs was a fiduciary of the HBOC Plan by reason of her membership on the HBOC

18   Board of Directors.

19           17.     HBOC, the HBOC Board, the HBOC Administrative Committee, the

20   Individual HBOC Administrative Committee Members, and the Individual HBOC Board

21   Members may collectively be referred to herein as the **"HBOC Plan Fiduciaries."**

22           18.     **Defendants HBOC Plan Fiduciaries DOES 1-20** are fiduciaries of the

23   HBOC Plan whose exact identities will be ascertained through discovery. They may include, but

24   not be limited to, members of the HBOC Plan Investment Committee, if one was appointed

25   under the terms of the HBOC Plan; additional members of the HBOC Administrative Committee

26   during relevant time-frames; other Individual HBOC Board Members; and other HBOC Plan

27   Fiduciaries as they are identified.

28

1    **McKesson Plan Fiduciaries and the Bases for their Fiduciary Status**

2           19.    **Defendant McKesson, Inc.**  McKesson, Inc. is sued in its capacity as a

3    fiduciary of the McKesson Plan. The fiduciary status of McKesson arises, *inter alia,* (a) by virtue

4    of the fact that McKesson served as the Named Fiduciary and "plan administrator" of the

5    McKesson Plan with "discretionary authority to control and manage the operation and

6    administration of the Plan" (McKesson Plan Document § 13.1) and (b) insofar as McKesson had

7    the express authority under the McKesson Plan to determine whether Company Contributions to

8    the McKesson Plan would be made in the form of cash or in McKesson Company Stock.

9    (McKesson Plan Document § § 4.3(a) and 6.3(a))

10           Defendant McKesson is a Delaware corporation qualified to do

11    business in California, with principal offices located within this District. McKesson as it exists

12    today was formed by the merger of McKesson and HBOC on or about January 12, 1999. At such

13    time, McKesson acquired HBOC and, at first, changed its name to McKesson HBOC, Inc.

14    HBOC continued in existence and became a subsidiary of McKesson HBOC, Inc.  McKesson

15    HBOC, Inc. has since changed its name back to McKesson, and will be referred to as

16    "McKesson" in this Complaint.

17           20.    **Defendants: The "Pre-Merger Individual McKesson Board**

18    **Members."**  The defendants designated as the "Pre-Merger Individual McKesson Board

19    Members" are those individuals who served as fiduciaries of the McKesson Plan *before*

20    McKesson merged with HBOC on January 12, 1999. They are fiduciaries of the McKesson Plan

21    *before* January 12, 1999 by virtue of being members of the McKesson Board of Directors and/or

22    members of the Compensation Committee of the McKesson Board *before* January 12, 1999.

23    Compensation Committee members (all of whom were Board Members) were fiduciaries of the

24    McKesson Plan because, *inter alia*, they were granted express responsibility and authority under

25    the terms of the McKesson Plan for "the selection of Trustees and investment advisers and

26    managers, and for the overall investment Policy of the [McKesson] Plan" (McKesson Plan

27    Document § 13.2), and insofar as the members of the Compensation Committee were named

28    fiduciaries under the McKesson Master Trust (McKesson Master Trust § 6.1(a)) with authority

1    and responsibility to "implement the investment policies of the Board of Directors." (McKesson

2    Master Trust § 6.3 ) McKesson Board Members (which include all Compensation Committee

3    members) were fiduciaries of the McKesson Plan, *inter alia*, by virtue of the fact that McKesson

4    Board Members had "the authority and responsibility for the determination of the investment

5    policies and guidelines to be implemented by the Compensation Committee" (McKesson Master

6    Trust §§ 6.2 and 6.3). McKesson Master Trust § 7.5 indemnified the Master Trustee for investing

7    assets in accordance with directions, insofar as the "Board of Directors and the Compensation

8    Committee" bore "full responsibility for the diversification of Trust Fund assets." (McKesson

9    Master Trust § 2.14 defined the "Trust Fund" to mean, "collectively, *all of the assets* held by the

10   Master Trustee under this Master Trust." (emphasis added)) McKesson Company Stock was part

11   of "all of the assets" held by the Master Trustee and therefore part of the Trust Fund established

12   by the McKesson Master Trust.

13           All the Pre-Merger Individual McKesson Board Members named as Defendants

14   under this paragraph were members of the Compensation Committee of the McKesson Board of

15   Directors, with the exception of Defendants Seelenfreund and Pulido, who nonetheless are

16   fiduciaries by virtue of their membership on the Board of Directors alone. The fiduciary authority

17   of the Compensation Committee and the Board Members, and hence of each of the Pre-Merger

18   Individual McKesson Board Members herein named, included responsibility and authority over

19   the investment of Company Contributions under the ESOP portion of the McKesson Plan as well

20   as the selection of McKesson Company Stock as an investment alternative for participant salary-

21   deferral contributions. The Pre-Merger Individual McKesson Board Members named in this

22   action are:

23           a.      **Defendant Tully M. Friedman.** Defendant Tully M.

24   Friedman was a director of McKesson from 1992 through the January 12, 1999 Corporate

25   Merger. He also served on the Compensation Committee of the McKesson Board before the

26   January 12, 1999 Corporate Merger.

27           b.      **Defendant John M. Pietruski.** Defendant John M.

28

1  Pietruski was a director of McKesson before the January 12, 1999 Corporate Merger with

2  HBOC, and he was the Chairman of the Compensation Committee of McKesson prior to the

3  January 12, 1999 Corporate Merger.

4                              c.        **Defendant Carl S. Reichardt.** Defendant Carl S. Reichardt was a

5  director of McKesson from 1996 through the January 12, 1999 Corporate Merger. He also served

6  on the Compensation Committee of the McKesson Board before the January 12, 1999 Corporate

7  Merger.

8                              d.        **Defendant Alan Seelenfreund.** Defendant Alan

9  Seelenfreund was Chairman of the Board of Directors of McKesson from 1988 until the January

10  12, 1999 Corporate Merger. After the Corporate Merger, Seelenfreund was a director of

11  McKesson.

12                              e.        **Defendant Mark A. Pulido.** From 1996 and prior to the

13  Corporate Merger, and continuing until July 15, 1999, Defendant Mark A. Pulido ("Pulido") was

14  a director of McKesson. Defendant Pulido became McKesson's Chief Operating Officer and a

15  Director in 1996, a member of the Executive Committee of the McKesson Board, and on April 1,

16  1997, McKesson's Chief Executive Officer.  He resigned his positions at McKesson effective

17  July 15, 1999.  Defendant Pulido was one of the principal McKesson officers and directors who

18  reviewed HBOC's financial condition prior to the Corporate Merger.  In that role, Defendant

19  Pulido became aware in July 1998 of the improper accounting practices at HBOC.

20                  21.        **Defendants: The "Post-Merger Individual McKesson Board**

21  **Members."** The defendants designated as the "Post-Merger Individual McKesson Board

22  Members" are those individuals who served as fiduciaries of the McKesson Plan *after* McKesson

23  merged with HBOC on January 12, 1999. They are fiduciaries of the McKesson Plan *after*

24  January 12, 1999 by virtue of being members of the McKesson Board of Directors and/or

25  members of the Compensation Committee of the McKesson Board *after* January 12, 1999.

26  Compensation Committee members (all of whom were Board Members) were fiduciaries of the

27  McKesson Plan because, *inter alia,* they were granted express responsibility and authority under

28  the terms of the McKesson Plan for "the selection of Trustees and investment advisers and

1  managers, and for the overall investment Policy of the [McKesson] Plan" (McKesson Plan

2  Document § 13.2), and insofar as the members of the Compensation Committee were named

3  fiduciaries under the McKesson Master Trust (McKesson Master Trust § 6.1(a)) with authority

4  and responsibility to "implement the investment policies of the Board of Directors." (McKesson

5  Master Trust § 6.3 )  McKesson Board Members (which include all Compensation Committee

6  members) were fiduciaries of the McKesson Plan, *inter alia*, by virtue of the fact that McKesson

7  Board Members had "the authority and responsibility for the determination of the investment

8  policies and guidelines to be implemented by the Compensation Committee." (McKesson Master

9  Trust §§ 6.2 and 6.3)  McKesson Master Trust § 7.5 indemnified the Master Trustee for investing

10  assets in accordance with directions, insofar as the "Board of Directors and the Compensation

11  Committee" bore "full responsibility for the diversification of Trust Fund assets." (McKesson

12  Master Trust § 2.14 defined the "Trust Fund" to mean, "collectively, *all of the assets* held by the

13  Master Trustee under this Master Trust." (emphasis added))  McKesson Company Stock was

14  part of "all of the assets" held by the Master Trustee and therefore part of the Trust Fund

15  established under the McKesson Master Trust.

16           All the Post-Merger Individual McKesson Board Members named as

17  Defendants under this paragraph were members of the Compensation Committee of the

18  McKesson Board of Directors, with the exception of Defendants Seelenfreund, McCall, Mayo,

19  Napier and Pulido, who nonetheless are fiduciaries by virtue of their membership on the Board of

20  Directors alone. The fiduciary authority of the Compensation Committee and the Board

21  Members, and hence of each of the Post-Merger Individual McKesson Board Members herein

22  named, included responsibility and authority over the investment of Company Contributions

23  under the ESOP portion of the McKesson Plan as well as the selection of McKesson Company

24  Stock as an investment alternative for participant salary-deferral contributions. The Post-Merger

25  Individual McKesson Board Members named in this action are:

26           a.    **Defendant Charles W. McCall.** Defendant Charles W. McCall

27  became Chairman of the Board of Directors of McKesson as a result of and subsequent to the

28  Corporate Merger, until he was dismissed as Chairman on June 21, 1999. He subsequently

1   resigned from the McKesson Board of Directors. Prior to the Corporate Merger, he had been

2   president, CEO, and a director of HBOC.

3              b.    **Defendant Alfred C. Eckert.** Defendant Alfred C. Eckert became

4   a director of McKesson at the time of the January 12, 1999 Corporate Merger, and a member and

5   Chairman of the Compensation Committee of the McKesson Board of Directors. Prior thereto, he

6   had served as a member of the Board of Directors of HBOC from 1990 through the Corporate

7   Merger.

8              c.    **Defendant Alton F. Irby.** Defendant Alton F. Irby became a

9   director of McKesson at the time of the January 12, 1999 Corporate Merger and a member of the

10  Board's Compensation Committee. Prior thereto, he had served as a member of the Board of

11  Directors of HBOC from 1990 through the Corporate Merger.

12             d.    **Defendant Gerald E. Mayo.** Defendant Gerald E. Mayo became

13  a director of McKesson at the time of the Corporate Merger. Prior thereto, he had served as a

14  member of the Board of Directors of HBOC from 1991 through the Corporate Merger.

15             e.    **Defendant James V. Napier.** Defendant James V. Napier became

16  a director of McKesson at the time of the Corporate Merger. Prior thereto, he had served as a

17  member of the Board of Directors of HBOC from 1990 through the Corporate Merger.

18             f.    **Defendant Alan Seelenfreund.** Defendant Alan Seelenfreund

19  was a director of McKesson after the Corporate Merger. Prior thereto, he was Chairman of the

20  Board of Directors of McKesson from 1988 until the Corporate Merger.

21             g.    **Defendant Carl S. Reichardt.** Defendant Carl S. Reichardt was a

22  director of McKesson from 1996 through the Corporate Merger, and has been a director of

23  McKesson since the Corporate Merger. He also served on the Compensation Committee of the

24  McKesson Board, having served in that capacity both before and after the January 12, 1999

25  Corporate Merger.

26             h.    **Defendant Tully M. Friedman.** Defendant Tully M. Friedman

27

28

1   was a director of McKesson from 1992 through the Corporate Merger, and has been a director of

2   McKesson since the Corporate Merger. He also serves on the Compensation Committee of the

3   McKesson Board, having served in that capacity both before and after the January 12, 1999

4   Corporate Merger.

5

6                        i.      **Defendant Mark A. Pulido.** After the Corporate Merger, and

7   continuing until July 15, 1999, Defendant Mark A. Pulido ("Pulido") was a director of

8   McKesson. Before that time, Defendant Pulido became McKesson's Chief Operating Officer and

9   a Director in 1996, a member of the Executive Committee of the McKesson Board and on April

10  1, 1997 McKesson's Chief Executive Officer.  He resigned his positions at McKesson effective

11

12  July 15, 1999. Defendant Pulido was one of the principal McKesson officers and directors who

13  reviewed HBOC's financial condition prior to the Corporate Merger.  In that role, Defendant

14  Pulido became aware in July 1998 of the improper accounting practices at HBOC.

15                      22.     McKesson, the "Pre-Merger Individual McKesson Board Members" and

16  the "Post-Merger Individual McKesson Board Members" may hereinafter be referred to as the

17

18  **"McKesson Plan Fiduciaries."**

19                      23.     **Defendants McKesson Plan Fiduciaries ROES 1-20.**  Additional

20  McKesson Plan Fiduciaries may be identified during the discovery process of this lawsuit and

21  served with legal process.  Plaintiffs expressly reserve the right to name additional individual

22  McKesson Plan Fiduciaries in an amendment to this Complaint.

23

24                      24.     **Defendant McKesson Plan.** Defendant McKesson Plan is a pension plan

25  under ERISA maintained for the employees of McKesson.  Prior to April 1, 1999, it did not

26  cover employees of HBOC.  On April 1, 1999, employees of HBOC became members of the

27  McKesson Plan as a result of the merger of the HBOC Plan into the McKesson Plan.  Defendant

28

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA

1  McKesson Plan is named as a nominal defendant in order to facilitate the requested relief which

2  would flow to the McKesson Plan and allocated (a) to the accounts of participants in the HBOC

3
   Plan who invested in the HBOC Company Stock before the HBOC Plan was merged into the
4
5  McKesson Plan, and (b) to the accounts of the McKesson Plan participants (other than former

6  HBOC Plan participants) who suffered losses by virtue of the imprudent investment in

7  McKesson Company Stock.

8                                    **FACTUAL BACKGROUND**

9  **I.    The HBOC Plan: Its History, Structure and Plan Terms**

10              25.    At all relevant times, the HBOC Plan was an "employee pension benefit

11  plan" within the meaning of ERISA § 3(2)(A) [29 U.S.C. §1002(2)(A)]. The HBOC Plan was

12  created April 1, 1980 and was sponsored by HBOC. HBOC was the Controlling Company under

13  the terms of the HBOC Plan. A substantial portion of the HBOC Plan assets were invested in

14  HBOC Company Stock during the time the fiduciary breaches complained of herein occurred.

15  The HBOC Plan was maintained until April 1, 1999, at which time it was merged into the

16  McKesson Plan. At such time, participants in the HBOC Plan became participants in the

17  McKesson Plan.

18              26.    The HBOC Plan was created and administered pursuant to a written plan

19  document ("HBOC Plan Document"). The HBOC Plan Document at all times relevant to this

20  Complaint is the HBOC Plan Document as amended and restated on December 16, 1994,

21  together with respective Amendments thereto, dated December 29, 1995, September 8, 1997, and

22  March 31, 1999.

23              27.    The "Purpose" of the HBOC Plan, according to the HBOC Plan

24  Document, was to "recognize the contributions . . . by employees and to reward those

25  contributions by providing eligible employees with an opportunity to accumulate savings for

26  their future security." (HBOC Plan Document, Statement of Purpose, ¶ B., p.1)

27              28.    As a defined contribution pension plan, the HBOC Plan was not insured

28  by the federal pension benefit guaranty insurance program of Title IV of ERISA, 29 U.S.C.

1  § 4001, *et seq.*

2            29.     The HBOC Plan Document which governed the HBOC Plan identified

3  HBOC and the HBOC Administrative Committee as Named Fiduciaries of the HBOC Plan,

4  within the meaning of ERISA § 402(a)(2) [29 U.S.C. §1102(a)(2)]. (HBOC Plan Document

5  § 1.63)

6            30.     The HBOC Plan Document stated that the HBOC Plan was to be qualified

7  under §401(k) of the Internal Revenue Code. This permitted the HBOC Plan to be funded in part

8  by employees designating a portion of their salaries on a pre-tax basis to be contributed by

9  HBOC into the HBOC Plan as "salary-deferral contributions." In addition to participant salary-

10  deferral contributions, HBOC made a matching contribution to the HBOC Plan. The value of

11  HBOC employer contributions to the HBOC Plan was deductible to HBOC as an expense, even

12  if HBOC's contributions to the HBOC Plan were not made in cash but, instead, made in HBOC

13  stock issued by HBOC. Thus, to the extent such contributions were made to the HBOC Plan in

14  HBOC Company Stock, HBOC received a tax advantage (a deduction) without any cash cost to

15  HBOC.

16            31.     The HBOC Plan Document provided that contributions to the HBOC Plan

17  by HBOC would be in cash or in non-open market transfers of stock and that, if the contribution

18  was in HBOC Company Stock, such stock could be issued directly from HBOC to the HBOC

19  Plan or purchased on the open market at a price that did not exceed the fair market value of such

20  shares.

21            32.     From January 1, 1990 until the HBOC Plan merged with the McKesson

22  Plan, HBOC matched employees' contributions to the HBOC Plan. For each $1 contributed by an

23  employee to the HBOC Plan, up to a limit of 4% of employee pay, HBOC contributed $0.75 in

24  matching contributions to the HBOC Plan.

25            33.     As of December 31, 1998 the HBOC Plan reported on the Form 5500,

26  which all pension plans are required to file annually with the Department of Labor and Internal

27  Revenue Service, that 9,589 current and former HBOC employees participated in the HBOC Plan

28  and that on that date the HBOC Plan held $249,658,188 in retirement savings on behalf of those

1    participants in eleven investment funds. The largest of these funds was the HBOC Stock Fund,

2    which held 3,066,606 shares of HBOC Company Stock valued at $87,974,789, representing 35%

3    of the HBOC Plan's total assets on December 31, 1998. The remaining assets of the HBOC Plan

4    were invested in ten mutual funds, each part of the Fidelity Mutual Fund Group. An additional

5    $2,090,295 was invested in Company Stock (HBOC common and McKesson common) by the

6    HBOC Stock Fund between December 30, 1998 and April 1, 1999, when the HBOC Plan merged

7    with the McKesson Plan.

8            34.    Upon information and belief, approximately 35% of the assets in the

9    HBOC Plan were held in HBOC Company Stock, representing a value of over $85 million of

10   HBOC Company Stock at the time of the January 12, 1999 Corporate Merger.

11           35.    The HBOC Plan's assets, pursuant to ERISA § 403(a) [29 U.S.C. §

12   1103(a)], were held in trust by Fidelity Management and Trust Company ("Fidelity"), the

13   Trustee of the Trust Fund created under the Trust Agreement between HBOC and Fidelity. The

14   HBOC Plan Document provided that "[a]ll contributions are to be paid over to the Trustee to be

15   held in the Trust Fund and invested in accordance with the terms of the HBOC Plan and the

16   Trust." (HBOC Plan Document § 7.1) As the Trustee of the HBOC Plan, Fidelity was obligated

17   under the HBOC Plan Document § 7.3(e)(1) to "make all purchases of HBOC Company Stock at

18   a price or prices which, in the judgment of the Trustee, do not exceed the fair market value of

19   such HBOC Company Stock as of the date of the purchase."

20           36.    HBOC and the HBOC Board each had the authority under the HBOC Plan

21   Document to, *inter alia*, appoint the HBOC Plan's Trustee, the Individual HBOC Administrative

22   Committee Members, and the HBOC Plan Investment Committee members, and "monitor each

23   of their performances." (HBOC Plan Document § 11.1(a)) HBOC and the HBOC Board were

24   also required to "communicate such information to the Trustee, the HBOC Administrative

25   Committee, and the HBOC Plan Investment Committee as each needs for the proper performance

26   of its duties." (HBOC Plan Document § 11.1(a)) HBOC, as the HBOC Plan's "Controlling

27   Company, was given the authority to "act in lieu of the Administrative Committee as it deems

28   appropriate or desirable." (HBOC Plan Document § 1.6)

1    37.    The HBOC Administrative Committee (and, therefore, each of the

2  Defendants designated as the Individual HBOC Administrative Committee Members) was

3  charged under the HBOC Plan Document with fulfilling the duties of plan administrator as set

4  forth in ERISA §3(16) with "complete control of the administration of the Plan. . ." (HBOC Plan

5  Document § 10.3) The Individual HBOC Administrative Committee Members were appointed by

6  and served at the pleasure of the HBOC Board of Directors. In addition, the Individual HBOC

7  Administrative Committee Members named as Defendants herein also served as the HBOC

8  Investment Committee, unless HBOC specified otherwise.  (See HBOC Plan Document § 1.53)

9  As such, the Individual HBOC Administrative Committee Members were conferred with the

10  authority to perform all additional fiduciary functions allocated to the HBOC Plan Investment

11  Committee under the terms of the HBOC Plan Document. (See HBOC Plan Document § 10.8)

12    38.    The HBOC Plan Document § 10.8 authorized the HBOC Plan Investment

13  Committee (whose functions were performed by the Individual HBOC Administrative

14  Committee Members):

15    "To establish and carry out a funding policy consistent with the Plan objectives and with
the requirements of any particular law." (HBOC Plan Document § 10.8(a)), and

16    "To take any action appropriate to ensure that the Plan assets are invested for the
17  exclusive purpose of providing benefits to participant and their beneficiaries in
accordance with the Plan and defraying reasonable expenses of administering the Plan,
18  subject to the requirement of any applicable law, [and] provide the Trustee with general
investment policy guidelines and directions to assist the Trustee respecting investments."
19  (HBOC Plan Document § 10.8(c)(3))

20    39.    The HBOC Administrative Committee and the Individual HBOC

21  Administrative Committee Members had the authority to direct the HBOC Plan Trustee to

22  establish Investment Funds and modify the investment mix of any of the Investment Funds

23  specified in the HBOC Plan Document, including the HBOC Stock Fund, without any

24  amendment to the HBOC Plan. (HBOC Plan Document §§ 7.2(a) and 7.2(b))

25    40.    By virtue of the foregoing authority conferred under the terms of the

26  HBOC Plan Document, and by such actions performed in furtherance of such authority,

27  Defendant HBOC, Defendant the HBOC Board, Defendant the HBOC Administrative

28

1  Committee, each of the Defendants designated as the Individual HBOC Administrative

2  Committee Members and each of the Defendants designated as the Individual HBOC Board

3  Members were fiduciaries of the HBOC Plan as defined under ERISA § 3(21)(a).

4          41.     Pursuant to HBOC Plan Document § 7.1, "all contributions to the

5  Plan were to be paid over to the Trustee to be held in the Trust Fund and invested in accordance

6  with the terms of the Plan and the Trust." HBOC Plan Document § 7.2(a) generally provided that

7  in accordance with instructions from the Administrative Committee, and the terms of the HBOC

8  Plan and the Trust, the Trustee was required to maintain several different Investment Funds for

9  the investment of assets of the Trust Fund, including the "HBO & Company Stock Fund which

10  shall be invested primarily in Company Stock." (HBOC Plan Document § 7.2(G))

11          42.     Under the HBOC Plan, the term "Company Stock" was defined as

12  the "voting common stock of the Controlling Company" and the term "Controlling Company"

13  was defined as HBOC. (HBOC Plan Document §§ 1.25 and 1.28) Thus, under the terms of the

14  HBOC Plan, the *only* asset which the HBOC Stock Fund could hold were shares of HBOC

15  common stock.

16  **II.     Accounting Irregularities Artificially Inflate the Share Price of HBOC Company**
          **Stock**

17

18          43.     Beginning at least in January 1995 through January 1998, HBOC's senior

19  management, including Gilbertson and Bergonzi, approved and issued a series of quarterly

20  announcements of revenue and earnings per share of common stock. Except for the first quarter

    of 1997, the announced revenue from product sales in each quarter was higher than the previous
21
    quarter. During this same time frame HBOC's stock price rose steadily and HBOC's announced
22
    results consistently met or exceeded stock analysts' predictions, except for a period when its
23
    stock declined during the first quarter of 1997.
24

25          44.     Beginning no later than the twelve month period ending March 31, 1997,

26  and continuing until April 1, 1999, in order to continue to meet projected quarterly and annual

    revenues, net income and earnings goals, HBOC misstated and failed to properly report its true
27
    financial condition and improperly recorded and inflated HBOC's revenues and net income.
28

1   The misstatements in HBOC's quarterly and year-end financial statements during this period
2   were the result of a number of improper accounting practices in violation of generally accepted
3   accounting principles ("GAAP"). These improper accounting practices were known to and/or
4   engaged in by HBOC's management, including Gilbertson, Bergonzi, as well as HBOC Board
5   member McCall.

6          45.    These improper accounting practices, which were engaged in by
7   Defendant Gilbertson and Bergonzi at the same time that Gilbertson served as a member of the
8   HBOC Administrative Committee and was under a fiduciary obligation under ERISA to act
9   solely in the interest of the participants and beneficiaries of the HBOC Plan and to exercise
10  prudence with respect to the administration and operation of the HBOC Plan, included the
11  following:

12         a.     Gilbertson, Bergonzi and other members of HBOC's management
13  responsible for HBOC's software sales concealed material contingencies related to software sales
14  contracts contained in "side letters" from HBOC's accounting staff, inflating HBOC's true
15  financial condition. Under GAAP the revenue with respect to software contracts subject to such
16  contingencies should have been deferred rather than immediately recognized by HBOC. The
17  recognition of revenue with respect to such contingent sales was contrary to HBOC's internal
18  revenue recognition polices and violated GAAP.

19         b.     In order to increase reported sales in a particular quarter,
20  Gilbertson, Bergonzi and others members of HBOC's management executed and approved sales
21  contracts in which the contract document was backdated to make it appear that the transaction
22  had occurred in a prior quarter, thereby improperly increasing HBOC revenues in the prior
23  quarter. The backdating of software contracts was contrary to HBOC's internal revenue
24  recognition polices and violated GAAP.

25         c.     Gilbertson also directed HBOC employees to reverse previous
26  entries for operating expenses and to book certain other operating expenses as charges against
27  reserves set aside for expenses related to HBOC's prior acquisition of other companies. These

28

1    improper journal entries directed by Gilbertson, which were inconsistent with GAAP, had the
2    effect of understating expenses and inflating HBOC's net income.

3        46.    As a result of the above accounting irregularities the market price of
4    HBOC Company Stock was artificially inflated beginning during the twelve month period ending
5    March 31, 1997, and continuing through April 1, 1999. The price of the HBOC Company Stock
6    prevailing on the exchanges during that period of time did not represent the fair market value of
7    HBOC Company Stock.

8        47.    That Defendants Gilbertson, Bergonzi, McCall, and Pulido either
9    participated in the scheme to artificially inflate HBOC's earnings and engaged in the accounting
10   irregularities, or otherwise knew of such a scheme, is evidenced by, *inter alia,*

11       a.    Defendants Gilbertson and Bergonzi have been indicted by the
12   United States Justice Department for criminal activities associated with directing and
13   participating in HBOC accounting irregularities. The Superceding Indictments of Gilbertson and
14   Bergonzi provide explicit details of their participation in and knowledge of the scheme to
15   manipulate earnings at HBOC. With regard to Bergonzi, the Superceding Indictment confirms
16   the scheme continued at McKesson and HBOC *after* the Corporate Merger.

17       b.    That as to Defendant Bergonzi, he was terminated *for cause* by
18   McKesson and/or HBOC on or about June 21, 1999, in conjunction with the announcements by
19   McKesson concerning the accounting irregularities.

20       c.    That Defendant McCall was removed as Chairman of the Board
21   and dismissed as an employee at McKesson on June 21, 1999, in the wake of the announcements
22   of the accounting irregularities.

23       d.    That as to Defendants McCall and Pulido, in an Atlanta Journal-
24   Constitution article dated July 21, 1999, McCall stated in the article that after the Corporate
25   Merger, Pulido knew of accounting improprieties on a $20 million contract, yet Pulido still
26   pushed to book that revenue to meet earnings projections. McCall characterized this transaction
27   as a "bad piece of business" involving a contingency sale and backdating of a contract. McCall
28   also asserted in the article that HBOC's revenue recognition policy was aggressive but legal.

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
0090017/001/ 2639v2                                23                                Case No. C00-20030 RMW

1    However, a McKesson spokesman countered that assertion in the article by stating in the article

2    that "all the restatements represent accounting improprieties and irregularities." "Irregularity" is

3    an accounting term of art which refers to intentional misstatements and omissions.

4                    e.      That as to Defendant Pulido, he was a member of the McKesson

5    Board of Directors and the CEO of McKesson during the pre-merger due diligence process, and

6    therefore was aware of all the accounting matters brought to the attention of the McKesson Board

7    and its most senior officers by the Deloitte & Touche LLP ("Deloitte") due diligence concerning

8    HBOC's accounting practices, all of which is referenced by various memorandum prepared by

9    Bear Stearns and outlined in this Complaint.

10                   f.      That as to Defendant McCall, both Bergonzi and Gilbertson

11   reported directly to him and together, they comprised the "Office of the President" when most of

12   the irregularities occurred. Books do not cook themselves, and McCall supervised Gilbertson and

13   Bergonzi, and, as reported by numerous HBOC employees, was directly involved in the contract

14   approval process and decisions concerning revenue recognition at HBOC.

15   **III.    The HBOC Plan Fiduciaries Breach Their Duties**

16                   48.     As more specifically set forth below, each of the HBOC Plan Fiduciaries

17   breached his duties in violation of ERISA by, *inter alia*, causing and/or permitting the HBOC

18   Plan to invest in new HBOC Company Stock after March 31, 1996, when they knew or should

19   have known that HBOC's accounting books and records failed to report its true financial

20   condition, that the prices at which the HBOC Plan was acquiring HBOC Company Stock was

21   greater than fair market value, and that the investment in HBOC Company Stock was not prudent

22   at such time.

23                   49.     At all times relevant to this Complaint, until he left HBOC, Gilbertson

24   knew or should have known, that HBOC's accounting books and records failed to report

25   HBOC's true financial condition, that HBOC Company Stock prices were inflated in value, and

26   the HBOC Company Stock was not a prudent new investment alternative for the HBOC Stock

27   Fund. Despite his obligations as a fiduciary of the HBOC Plan, Gilbertson failed to conduct an

28   adequate fiduciary review to determine whether HBOC Company Stock was a prudent

1    investment for the HBOC Plan, failed to disclose to the HBOC Plan and the participants the

2    problems with HBOC's accounting books and records and that HBOC Company Stock prices

3    were inflated in value, and caused the HBOC Plan to continue to offer the HBOC Stock Fund as

4    an investment alternative for HBOC Plan investments when new shares of HBOC Company

5    Stock were not a prudent investment.

6              50.    As a result of Gilbertson's failure to conduct a fiduciary review, to

7    disclose to the HBOC Plan and other HBOC Administrative Committee members that HBOC

8    failed to report HBOC's true financial condition on its accounting books and records and that the

9    prices of the HBOC Company Stock prevailing on the national exchange did not represent the

10   fair market value of shares, individual participants of the HBOC Plan did not have adequate and

11   truthful information with which to exercise "independent control," within the meaning of 29

12   C.F.R. §2550.404(c)-1(c)(2), in the selection of the HBOC Stock Fund as an investment option

13   and the Trustee continued to acquire new shares of HBOC Company Stock for the HBOC Plan

14   between March 31, 1996 and April 1, 1999 at inflated per share prices that were greater than fair

15   market value and represented more than adequate consideration for such shares.

16             51.    Between March 31, 1996 and December 31, 1998, the HBOC Plan

17   invested no less than $41,340,485 in HBOC Company Stock.

18             52.    At all times relevant to the Complaint, Defendant McCall was a member

19   of the HBOC Board, which was a Named Fiduciary of the HBOC Plan with the authority to

20   appoint and remove the members of the HBOC Administrative Committee. Defendants HBOC,

21   the HBOC Board, the Individual HBOC Board Members and McCall, as members of the

22   appointing authority, had a fiduciary obligation under the HBOC Plan Document and ERISA to

23   monitor the performance of the HBOC Administrative Committee and the Trustee to ensure that

24   the performance of the HBOC Administrative Committee and the Trustee was in compliance

25   with the terms of the HBOC Plan Document and ERISA and satisfied the needs of the HBOC

26   Plan. Among other things, this included an obligation to ensure that individual participants of

27   the HBOC Plan had adequate and truthful information to exercise "independent control," within

28   the meaning of 29 C.F.R. § 2550.404(c)-1(c)(2), in the selection of the HBOC Stock Fund as an

1   investment option, that the Trustee complied with the terms of the HBOC Plan Document, and
2   that any new shares of HBOC Company Stock acquired by the HBOC Plan for the HBOC Stock
3   Fund were at a price or prices which did not exceed the fair market value of such shares, and
4   were otherwise prudent investments.

5          53.    Defendant McCall, in his capacity as the CEO of HBOC and as a member
6   of and Chairman of the Board of HBOC and, after January 12, 1999, of McKesson, was aware
7   that the revenues and income of HBOC were materially inflated by the accounting irregularities
8   engaged in by Gilbertson, Bergonzi and other members of HBOC's management described
9   above, and that, as a result, the prices of shares of HBOC Company Stock acquired for the
10  HBOC Stock Fund were inflated in value and participants did not have adequate and truthful
11  information to exercise "independent control," within the meaning of 29 C.F.R. § 2550.404(c)-
12  1(c)(2), in the selection of the HBOC Stock Fund as an investment option.

13         54.    Defendant McCall, in his capacity as the CEO of HBOC and as a member
14  of and Chairman of the HBOC Board, also failed to communicate to the HBOC Administrative
15  Committee and Trustee information that was necessary for the proper performance of their
16  duties, including the fact that the revenues and income of HBOC were materially inflated by the
17  accounting irregularities engaged in by Gilbertson, Bergonzi and other members of HBOC's
18  management described above, and that, as a result, the prices of shares of HBOC Stock acquired
19  for the HBOC Stock Fund were inflated in value and shares of HBOC were therefore no longer a
20  prudent investment option for the HBOC Plan.

21         55.    Notwithstanding this knowledge, Defendant McCall permitted the HBOC
22  Administrative Committee, between March 31, 1996 and April 1, 1999, to continue to offer the
23  HBOC Stock Fund as an investment alternative for the investment of new HBOC Plan assets
24  when HBOC Company Stock was not a prudent investment because HBOC's financial
25  statements and accounting books and records did not disclose the true financial condition of
26  HBOC and permitted the HBOC Plan to continue to acquire new shares of HBOC Company
27  Stock for the HBOC Stock Fund at inflated per share prices that were greater than fair market
28  value and represented more than adequate consideration for such shares.

1        56.      The acts and knowledge of McCall, because he served as the CEO of

2   HBOC and as a member of and Chairman of the HBOC Board, are attributable to the HBOC

3   Board and the Individual HBOC Board Members, a Named Fiduciary of the HBOC Plan, and

4   therefore the HBOC Board and the Individual HBOC Board Members, as a result of the acts and

5   omissions of McCall: (i) failed to properly monitor the performance of the HBOC Administrative

6   Committee and the Trustee to ensure that the performance of the HBOC Administrative

7   Committee and the Trustee was in compliance with the terms of the HBOC Plan Document and

8   ERISA and satisfied the needs of the HBOC Plan; (ii) failed to assure that Plan participants were

9   given adequate and truthful information by the HBOC Administrative Committee to exercise

10   "independent control," within the meaning of 29 C.F.R. § 2550.404(c)-1(c)(2), in the selection

11   of the HBOC Stock Fund as an investment option; (iii) failed to communicate to the HBOC

12   Administrative Committee and Trustee information that was necessary for the proper

13   performance of their duties; and (iv) permitted the HBOC Administrative Committee between

14   March 31, 1996 and April 1, 1999, to continue to offer the HBOC Stock Fund as an investment

15   alternative for the investment of new HBOC Plan assets when HBOC Company Stock was

16   inflated in price and not a prudent investment.

17        57.      On November 13, 1998, HBOC announced that Defendant Gilbertson was

18   resigning all positions with respect to HBOC and that Defendant Bergonzi was assuming all of

19   the responsibilities held by Defendant Gilbertson, which included Gilbertson's responsibilities as

20   a member of the HBOC Administrative Committee.  On January 12, 1999, Bergonzi became the

21   President and Chief Executive Officer of HBOC.

22        58.      Prior to becoming a member of the HBOC Administrative Committee,

23   Bergonzi knew or should have known as a result of the accounting irregularities described in

24   Paragraph 45 of which he had knowledge and in which he participated, that the prices of HBOC

25   Company Stock were inflated in value and that the HBOC Stock Fund was not a prudent

26   investment alternative to offer to the nearly nine thousand participants of the HBOC Plan for new

27   HBOC Plan investments because HBOC's accounting books and records and financial statements

28   did not report the true financial condition of HBOC.  Despite his obligations as a fiduciary of the

1    HBOC Plan, Bergonzi failed to conduct an adequate fiduciary review to determine whether

2    HBOC Company Stock was a prudent investment for the HBOC Plan, failed to disclose to the

3    HBOC Plan and its participants that the common shares of HBOC were inflated in value, and

4    caused the HBOC Plan to continue to offer the HBOC Stock Fund as an investment alternative

5    for the investment of new assets of the HBOC Plan when new shares of HBOC Company Stock

6    were not a prudent investment because HBOC's accounting books and records and financial

7    statements did not report the true financial condition of HBOC.

8            59.    As a result of Defendant Bergonzi's failure to conduct a fiduciary review

9    and to disclose to HBOC Plan participants and the other members of the HBOC Plan

10   Administrative Committee that the prices of HBOC Company Stock prevailing on the national

11   exchanges between March 31, 1996 and April 1, 1999 did not represent the fair market value of

12   HBOC Company Stock, the HBOC Plan continued to offer the HBOC Stock Fund as an

13   investment alternative for the investment of new HBOC Plan assets, individual participants of

14   the HBOC Plan continued to invest in the HBOC Stock Fund even though they did not have

15   adequate and truthful information to exercise "independent control," within the meaning of 29

16   C.F.R. § 2550.404(c)-1(c)(2), in the selection of the HBOC Stock Fund as an investment option,

17   and the HBOC Plan continued to acquire new shares of HBOC Company Stock at inflated per

18   share prices that were more than fair market value and represented more than adequate

19   consideration for such shares.

20           60.    In connection with Corporate Merger of HBOC and McKesson on January

21   12, 1999, the HBOC Administrative Committee, the Trustee, and the Individual HBOC

22   Administrative Committee Members, including Defendants Rumsey and Kappel, caused

23   3,019,102 shares of HBOC Company Stock with a market value of $94,128,887, that were held

24   by the HBOC Stock Fund prior to the Corporate Merger, to be exchanged for 1,132,608 shares of

25   McKesson stock, notwithstanding the fact that the HBOC Plan expressly provided that only

26   shares of HBOC, and not shares of McKesson, could be held by the HBOC Stock Fund.

27           61.    Following the Corporate Merger, the HBOC Administrative Committee,

28   the Trustee, and the Individual HBOC Administrative Committee Members, including

1  Defendants Rumsey and Kappel, did not liquidate the shares of McKesson stock obtained by the
2  HBOC Plan pursuant to the Corporate Merger, but instead caused the HBOC Plan between
3  January 12, 1999 and April 1, 1999, to continue to hold McKesson shares, and to acquire an
4  additional 51,372 shares of McKesson Stock for $3,016,102, in the HBOC Stock Fund,
5  notwithstanding the fact that the HBOC Plan expressly provided that only shares of HBOC, and
6  not shares of McKesson, could be held by the HBOC Stock Fund.

7      62.    Defendant HBOC, Defendant the HBOC Board and Defendants the
8  Individual HBOC Board Members remained Named Fiduciaries of the HBOC Plan after January
9  12, 1999, with the authority to appoint and remove the members of the HBOC Administrative
10  Committee and the Trustee. In that capacity, the HBOC Board, along with Defendant HBOC and
11  Defendants the Individual HBOC Board Members, had a fiduciary obligation under the HBOC
12  Plan and ERISA to monitor the performance of the HBOC Administrative Committee and the
13  Trustee to ensure that the performance of the HBOC Administrative Committee and the Trustee
14  was in compliance with the terms of the HBOC Plan Document and ERISA, and satisfied the
15  needs of the HBOC Plan. Among other things, this included an obligation to ensure that the
16  HBOC Administrative Committee and the Trustee complied with the terms of the HBOC Plan
17  Document and that any new acquisitions of stock by the HBOC Plan were permitted by the
18  instrument governing the HBOC Plan, and were at a price or prices which did not exceed the fair
19  market value of such shares.

20      63.    Defendant HBOC, Defendant the HBOC Board and Defendants the
21  Individual HBOC Board Members permitted the HBOC Administrative Committee, the Trustee
22  and the Individual HBOC Administrative Committee Members to exchange shares of HBOC
23  Stock for McKesson Stock in the Corporate Merger, and to continue to hold and acquire between
24  January 12, 1999 and April 1, 1999 new shares of McKesson Company Stock at inflated per
25  share prices that were greater than fair market value and represented more than adequate
26  consideration for such shares, even though the HBOC Plan expressly provided that only shares of
27  HBOC, and not shares of McKesson, could be held by the HBOC Plan in the HBOC Stock Fund.

28

1                64.    Information about the specific acts and omissions of the remaining

2  Individual HBOC Administrative Committee Members, including Defendants Rumsey and

3  Kappel, with respect to the fiduciary breaches alleged in this Complaint is exclusively within the

4  possession and/or knowledge of the Defendants as fiduciaries of the HBOC Plan and is not

5  available to the Plaintiffs at this time. At such time as the Plaintiffs have had an adequate

6  opportunity to conduct discovery into the extent to which Defendants Rumsey and Kappel as

7  members of the HBOC Administrative Committee: (a) conducted a fiduciary review to determine

8  whether HBOC Company Stock was a prudent investment for the HBOC Plan; (b) knew or

9  should have known about the accounting irregularities at HBOC; (c) knew or should have known

10  that new shares of HBOC Company Stock were inflated in price and no longer a prudent

11  investment for the HBOC Plan because the financial statements of HBOC did not report the true

12  financial condition of HBOC; (d) caused the HBOC Plan to acquire new shares of HBOC

13  Company Stock at per share prices that exceeded fair market value and represented more than

14  adequate consideration for such shares; and (e) concealed from the participants of the HBOC

15  Plan facts regarding the true financial condition of HBOC and prevented participants from

16  exercising independent control over investments in the HBOC Stock Fund, Plaintiffs will amend

17  the present Complaint to allege such facts with greater specificity.

18              65.    Information about the specific acts and omissions of the remaining

19  Individual HBOC Board Members with respect to the fiduciary breaches alleged in this

20  Complaint is exclusively within the possession and/or knowledge of the Defendants as

21  fiduciaries of the HBOC Plan and is not available to the Plaintiffs at this time. At such time as

22  the Plaintiffs have had an adequate opportunity to conduct discovery into the extent to which

23  Individual HBOC Board Members: (a) knew or should have known about the accounting

24  irregularities at HBOC and that the financial statements of the company did not report the true

25  financial condition of the Company; (b) monitored the performance of the HBOC Administrative

26  Committee and the Trustee to ensure that the performance of the HBOC Administrative

27  Committee and the Trustee was in compliance with the terms of the HBOC Plan Document and

28  statutory standards, and satisfied the needs of the HBOC Plan; (c) took steps to prevent the

1  HBOC Administrative Committee from offering the HBOC Stock Fund as an investment

2  alternative for the investment of new assets of the HBOC Plan; (d) took steps to prevent the

3  HBOC Plan from acquiring new shares of HBOC Company Stock for HBOC Plan participants at

4  inflated per share prices which represented more than adequate consideration for such shares; and

5  (e) communicated such information to the Trustee, the Administrative Committee, and the

6  Investment Committee as each needed for the proper performance of its duties, Plaintiffs will

7  amend the present Complaint to allege such facts with greater specificity.

8  **IV.    The McKesson Plan: Its History, Structure and Plan Terms**

9           66.    At all relevant times, the McKesson Plan was and continues to be an

10  "employee pension benefit plan" within the meaning of ERISA § 3(2)(A) [29 U.S.C.

11  §1002(2)(A)]. The McKesson Plan has been sponsored by McKesson since 1972 and remains in

12  existence to this day.

13          67.    The governing documents under which the McKesson Plan was operated

14  and maintained at the time the breaches complained of herein occurred included a plan

15  document, the McKesson Corporation Profit Sharing Investment Plan (Restated as of January 1,

16  1997) (the "McKesson Plan Document") and the McKesson Corporation Master Trust

17  Agreement (the "McKesson Master Trust"), under which McKesson Plan assets were held and

18  invested, including McKesson Company Stock. The existence of the trust for investing plan

19  assets, and Chase Manhattan Bank as the Trustee, was acknowledged in the McKesson Plan

20  Document (see McKesson Plan Document §§ 11.2, 17.45 and 17.46). On April 1, 1999, the

21  McKesson Profit Sharing Investment Plan (Restated as of April 1, 1999) was rewritten for the

22  purposes, *inter alia*, of merging the HBOC Plan into the McKesson Plan. On information and

23  belief, the relevant sections of the McKesson Plan Document related to fiduciary responsibilities

24  were not changed when the January 1997 plan document was restated as the April 1, 1999

25  document.  The McKesson Master Trust continued to apply to the holding and investing of

26  McKesson Plan assets after April 1, 1999.

27          68.    A substantial portion of McKesson Plan and McKesson Master Trust

28  assets were invested in McKesson Company Stock. As they exist today, the McKesson Plan and

1   McKesson Master Trust include all assets transferred from the HBOC Plan, insofar as the HBOC

2   Plan was merged into the McKesson Plan on or about April 1, 1999, subsequent to the January

3   12, 1999 Corporate Merger of McKesson and HBOC. At such time, participants in the HBOC

4   Plan became participants in the McKesson Plan.

5   **A.    Salary-Deferral Contributions**

6   69.    Generally, the McKesson Plan, at all relevant times, permitted participants

7   to defer a portion of their compensation into the McKesson Plan and associated McKesson

8   Master Trust.  These contributions are generally known as the participant "salary-deferral

9   contributions." The McKesson Plan permitted basic contributions of between 2% and 6% of a

10  participant's compensation and supplemental contributions of between 6% and 10% of a

11  participant's compensation.

12  70.    McKesson Company Stock was one of the investment choices available to

13  participants for their salary-deferral contributions.

14  **B.    McKesson "Company Contributions," Including Matching Contributions**

15  .    71.    Under the McKesson Plan Document, McKesson "matched" up to the first

16  6% of each participant's salary-deferral contributions.  According to the McKesson Plan

17  Document § 4.2 (Amended and Restated January 1, 1997), this "Company Matching

18  Contribution" was a percentage of each participant's basic salary-deferral contributions, with the

19  percentage set each year by the McKesson Board of Directors after the close of the plan year.

20  According to the McKesson Plan Document § 4.2(a) (Amended and Restated April 1, 1999), the

21  level of Company Matching Contributions was changed, to a fixed 50% of an employee's salary-

22  deferral contributions to be contributed monthly, plus an additional discretionary matching

23  contribution determined by the McKesson Board or Compensation Committee after the close of

24  the plan year. The Company Matching Contribution could either be contributed in cash or in

25  McKesson Company Stock at the discretion of McKesson. On information and belief, McKesson

26  made such contributions at all times in McKesson Company Stock in lieu of cash. Any

27  contributions made in cash were converted to McKesson Company Stock and held in the

28  McKesson Master Trust in McKesson Company Stock.

1    72.    In addition to the Company Matching Contributions, McKesson also made
2  a supplemental contribution to the McKesson Plan, again consisting solely of McKesson
3  Company Stock, based on the age and length of service of the participant.  This supplemental
4  contribution in McKesson Company Stock, which began in 1997, is referred to as the
5  "Retirement Share Plan Contributions" in the McKesson Plan Document provisions. (See Article
6  6 of the McKesson Plan Document)  Therefore, the supplemental "Retirement Share
7  Contributions" under the McKesson Plan was at all relevant times made and/or invested only in
8  McKesson Company Stock.

9    73.    According to publicly-filed documents, this supplemental Retirement
10  Share Plan Contributions made or invested solely in McKesson Company Stock were to replace a
11  portion of the retirement benefits McKesson employees lost or otherwise expected to receive
12  under a defined benefit retirement plan which the McKesson unilaterally froze in 1996.

13    74.    The "Company Matching Contributions" and the "Retirement Share Plan
14  Contributions" shall collectively be referred to as the "Company Contributions," hereunder, and
15  shall generally mean all contributions made to the ESOP portion of the McKesson Plan by
16  McKesson, and contributed in or otherwise held and invested in McKesson Company Stock.

17    **C.    McKesson Plan Becomes Overly Concentrated in McKesson Company Stock**

18    75.    Upon information and belief, virtually 100% of the value of assets of the
19  McKesson Plan (other than each participant's salary-deferral contributions) was held and
20  invested in McKesson Company Stock prior to and at the time of the fiduciary breaches
21  complained of in this action. Thus, all Company Contributions were made or invested in
22  McKesson Company Stock.

23    76.    According to the Form 5500 for the McKesson Plan filed with the Internal
24  Revenue Service and the Department of Labor for the period ending March 31, 1999, McKesson
25  Company Stock comprised approximately 75% of the overall value of the McKesson Plan assets.
26  Specifically, as of the plan year ending March 31, 1999, the value of all assets held by the
27  McKesson Plan totaled $1,681,701,167, of which $1,277,441,251 was held in McKesson
28  Company Stock.

1              77.     Generally, participants in the McKesson Plan had no right to direct the sale

2  of Company Contributions made and/or invested in McKesson Company Stock and held in their

3  McKesson Plan accounts (other than a limited right beginning when a participant reached age 55

4  or when his or her age plus service exceeded age 65). Thus, participants on their own initiative

5  could not safely diversify the Company Contributions which were made and invested exclusively

6  in McKesson Company Stock

7              78.     Furthermore, because McKesson's defined benefit plan was frozen in

8  1996, the McKesson Plan represented the only active "qualified retirement plan" maintained by

9  McKesson for the benefit of its employees, again emphasizing that participants retirement

10  savings at McKesson had become almost entirely dependent upon the value of McKesson

11  Company Stock and the prudence and care of the McKesson Plan Fiduciaries.

12           79.     Defendant McKesson had discretionary authority regarding the

13  administration of the McKesson Plan and whether Company Contributions to the McKesson Plan

14  would be made in cash or McKesson Company Stock. The Pre-Merger Individual McKesson

15  Board Members and the Post-Merger Individual Board Members established and maintained the

16  McKesson Plan's investment policies and guidelines, functioned as fiduciaries in establishing

17  and maintaining such policies and guidelines, had the responsibility, among other things, to

18  monitor those investment policies and guidelines, and are legally accountable under ERISA for

19  the results associated with such authority and investment policies. The result of the McKesson

20  Plan investment policies is that the McKesson Plan held substantial amounts of assets in

21  publicly-traded McKesson Company Stock up to and through the filing of this action, and

22  continues to hold substantial amounts of McKesson Company Stock.

23           80.     The McKesson Plan Fiduciaries, and each of them, breached their duties

24  of loyalty, prudence and exclusive purpose by virtue of the facts and events herein described, and

25  as more specifically set forth in Counts Seven through Thirteen below.

26

27

28

1  V.    **The Original Proposed Transaction between McKesson and HBOC, and**
       **McKesson's Due Diligence**
2

3        81.    In mid-1998, McKesson and HBOC were aggressively pursuing
4  acquisition opportunities.

5        82.    According to a July 12, 1998 Bear Stearns memorandum, McKesson's
6  management was concerned McKesson could not maintain its historical rates of growth in
7  revenue and earnings because growth opportunities in its industry -- drug wholesaling -- by
8  acquisition or otherwise were very limited. Accordingly, McKesson was determined to expand
9  into healthcare areas related to its core supply business by acquiring or merging with another
10 company. (This July 12, 1998 memorandum, from the due diligence team to Bear Stearns'
11 Valuation Committee, is entitled "Project Titan: Merger-of-Equals Between Saturn and Apollo."
12 "Project Titan" was the code name Bear Stearns assigned to the original HBOC-McKesson
13 proposed merger, "Saturn" referred to McKesson, and "Apollo" to HBOC.)

14       83.    The July 12, 1998 Project Titan Memorandum states: HBOC "will provide
15 [McKesson] with unparalleled expertise in healthcare information, an essential element to its
16 core business. In addition, the healthcare information industry is a faster growing industry with
17 substantially higher margins derived from higher value added services than [McKesson's] core
18 business. . . ."

19       84.    HBOC's strategy had been to grow its business by acquisitions. Between
20 June 1995 and 1998, it completed eight significant acquisitions. By June 1998, HBOC had
21 determined to give consideration to expanding its acquisition strategy within healthcare services
22 outside of software and technology-based companies.

23       85.    On June 18, 1998, Defendants Pulido and McCall met to discuss a
24 possible merger of the two companies and on June 20, 1998, they preliminarily agreed on a
25 number of the structural elements of a potential business combination.

26       86.    By July 12, 1998, the managements of McKesson and HBOC had agreed
27 on the terms of a merger of the two companies, with HBOC as the surviving corporation. HBOC

28

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
0090017/001/ 2639v2                          35                          Case No. C00-20030 RMW

1  would acquire all the outstanding shares of McKesson, paying 2.426 of its shares for each

2  McKesson share. The combined company was to be renamed "HBOC-McKesson."

3        87.    Between July 1, 1998 and July 14, 1998, McKesson and its advisors

4  conducted a "due diligence" investigation of HBOC in connection with the contemplated

5  transaction.   As part of its investigation, McKesson retained its own auditors, Deloitte & Touche

6  LLP ("Deloitte"), to conduct "accounting due diligence" on HBOC (a fact nowhere disclosed in

7  the Joint Proxy).

8        88.    A July 13, 1998 Bear Stearns Memorandum to the Project Titan File from

9  Kevin Clarke and David Blume, the principal members of Bear Stearns' due diligence team,

10  entitled "Accounting Due Diligence of Apollo [HBOC]," describes some of what Deloitte did.

11  Deloitte was given access to and reviewed the audit work papers prepared by Arthur Andersen,

12  HBOC's auditor, for its audits of HBOC's 1996 and 1997 financial statements and for its reviews

13  of HBOC's first and second quarter 1998 financial statements.

14        89.    Deloitte also spoke with HBOC employees responsible for financial

15  accounting and reviewed other HBOC financial schedules. Theresa Briggs, a Deloitte partner,

16  was the senior person responsible for Deloitte's accounting due diligence work.

17  **A.**    **July 1998--Deloitte Advises McKesson Plan Fiduciary (Defendant McKesson)**

18        **of the HBOC Accounting Problems**

19        90.    The July 13 Clarke/Blume Memorandum reflects that Deloitte discovered

20  many of the problems that McKesson was forced to disclose in April, 1999.  Specifically,

21  Deloitte found that HBOC's revenue recognition practices violated GAAP, that HBOC's reserve

22  for doubtful accounts was inadequate and that HBOC had been manipulating reserves it

23  established in connection with acquisitions to improperly inflate income.

24        91.    Deloitte reported its findings to McKesson's senior officers and to Bear

25  Stearns. Specifically, the July 13 Clarke/Blume Memorandum refers to several conference calls

26  that were held on Sunday, July 12, 1998, among the following persons:

27        a.    Deloitte: Theresa Briggs, Deloitte's supervising partner;

28        b.    McKesson: Richard Hawkins, McKesson's CFO, and Heidi

1    Yodowitz, McKesson's Controller; and

2                    c.    Bear Stearns: Michael Offen, the Senior Managing Director, and
3    Kevin Clarke and David Blume, the Bear Stearns employees in charge of the firm's due
4    diligence.

5             92.    **Deloitte advises McKesson Plan Fiduciary (Defendant McKesson) that**
6    **HBOC's revenue recognition policies violated GAAP.** The July 13, 1998 Memorandum
7    states: "Apollo's [HBOC's] revenue recognition policies do not conform with GAAP with
8    respect to two of its practices." Using these improper policies, Deloitte found that HBOC had
9    improperly inflated its revenues.

10                   a.    **Improper recording of sales prior to granting of required**
11   **approvals.** Clarke and Blume recounted Deloitte's findings that, in 1996 and 1997, HBOC was
12   improperly recording sales prior to the time customers had obtained all approvals necessary to
13   purchase HBOC's products.  Deloitte told Hawkins, Yodowitz and Bear Stearns that,
14   notwithstanding HBOC's claim that it only records sales that are "done deals," many deals
15   actually were not done. Deloitte found that this practice "does not conform with GAAP." The
16   July 13, 1998 Memorandum states: "Deloitte estimates that Apollo [HBOC] recorded
17   approximately $5 - $6 million in revenues in each of 1996 and 1997 from sales of systems which
18   were not fully approved at the time the sale was recognized."

19           This practice of premature recognition of revenue when HBOC knew the customer had
20   not yet committed to the purchase was, in fact, being carried out on a much larger scale at HBOC
21   in 1996 and 1997. McKesson later restated $20 million in revenues for the twelve months ended
22   March 31, 1997 and $19 million for the twelve months ended March 31, 1998 because of
23   "contingent revenues improperly recognized."

24                   b.    **Improper recording of maintenance contract revenue.** HBOC
25   sold software systems for healthcare providers along with maintenance contracts. In these
26   situations, GAAP requires that a seller, like HBOC, allocate a percentage of the total sales price
27   (system plus maintenance) to the maintenance contract -- typically, this is 18% - 20% of the sales
28   price. GAAP also requires that the amount allocated to the maintenance contract be recognized as

1    revenue over the life of the maintenance contract; it does not allow the entire price of the

2    maintenance contract portion to be recognized immediately on sale. The July 13, 1998

3    Clark/Blume Memorandum reports that Deloitte found that HBOC violated this GAAP

4    provision, initially by not deferring any of the sales price, and subsequently by only allocating

5    3% - 5% of the sales price to the maintenance contracts.

6                c.    Deloitte determined that as of December 31, 1997 HBOC had

7    improperly recognized a total of $30 million of revenue because of these "under-deferrals," and

8    concluded that a $30 million charge would be necessary to fully correct the problem. In 1997

9    alone, Deloitte observed that HBOC's revenue and pre-tax income were inflated by $6 million to

10   $7 million through this improper practice. Deloitte reported these facts to Hawkins, Yodowitz

11   and Bear Stearns. (July 13 Clarke/Blume Memorandum)

12               93.    **Deloitte advises McKesson Plan Fiduciary (Defendant McKesson) that**

13   **HBOC's accounting for acquisition reserves violated GAAP.** The July 13, 1998

14   Clarke/Blume Memorandum also reports that Deloitte found that HBOC had established

15   "excessive" reserves in connection with acquisitions it had made and then improperly used those

16   reserves to inflate earnings by charging off current operating expenses to those reserves.

17               a.    HBOC had completed eight significant acquisitions since June

18   1995. In connection with each one, HBOC established excessive reserves and took extensive

19   write-offs. Deloitte found, and reported to Hawkins, Yodowitz and Bear Stearns, that the scope

20   and amount of these reserves and write-offs was "aggressive," and stated that "[a]s a result,

21   Apollo [HBOC] has generally over-reserved for its acquisitions." Subsequently, HBOC

22   improperly used these excess reserves to offset operating expenses. The effect was to overstate

23   HBOC's income by tens of millions of dollars. Clarke and Blume reported: "Typically, [HBOC]

24   has moved its excess acquisition reserves to its general reserve. In 1997, Q1 1998 and Q2 1998,

25   [HBOC] recorded $17 million, $8 million, and $4 - $5 million, respectively, in pre-tax income

26   from offsets of operating expenses against its general reserves." (July 13 Memorandum, p. 3)

27               b.    McKesson knew that these reserving practices were improper and

28

1  violated GAAP. During the July 12 due diligence conference calls, Hawkins acknowledged the

2  problem, stating (as the July 13 Memorandum quotes him) that these expenses "were improperly

3  charged against the reserve."

4          c.  At the time, the Securities and Exchange Commission ("SEC") was

5  focusing intense scrutiny on the improper use of acquisition reserves to increase earnings. During

6  the July 12, 1998 conference calls, Hawkins, Yodowitz, Deloitte and Bear Stearns (Clarke and

7  Blume) discussed the risk that the SEC would require restatement of HBOC's financial

8  statements because of the misuse of acquisition reserves. Hawkins said there was a risk that the

9  SEC would require restatement of HBOC's 1997 and Q1 and Q2 1998 financial statements to

10  conform with GAAP, admitting that "accounting for such costs does not conform with GAAP."

11  Theresa Briggs told McKesson and Bear Stearns that Deloitte believed that the likelihood of a

12  required restatement was "high."

13  "Typically, Apollo has moved its excess acquisition reserves to its general
reserve. In 1997, Q1 1998 and Q2 1998, Apollo recorded $17 million, $8 million
14  and $4 - $5 million in pre-tax income from offsets of operating expenses against
its general reserves. Currently, Apollo has remaining acquisition reserves of $9
15  million. Despite these facts, Rich Hawkins takes some comfort that some of these
expenses that were improperly charged against the reserve are 'duplicative'
16  expenses (e.g. Apollo charged salaries of employees to be terminated against the
reserve while they were still employed). Although accounting for such costs does
17  not conform with GAAP, Hawkins believes that this practice does not cause an
overstatement of the true 'run-rate' of the business. *Hawkins does, however, think
18  that there is a risk that the SEC could require restatement of Apollo's results to
conform with GAAP. Deloitte believes that the chance of the SEC requiring such
19  restatement is 'high.'"*

20  July 13, 1998 Clarke/Blume Memo, pp. 2-3 (emphasis added).

21       94.  **Deloitte advises McKesson Plan Fiduciary (Defendant McKesson) that**

22  **HBOC's accounts receivable were overstated in violation of GAAP.** Deloitte focused on the

23  age of HBOC's accounts receivable and the adequacy of associated reserves. According to the

24  July 13, 1998 Memorandum, Deloitte found that HBOC's receivables outstanding over 90 days

25  had increased substantially from year-end 1997 through June 1998, a fact available in publicly-

26  filed documents and highlighted in analysts reports.

27       95.  Despite the enormous increase in the over 90 day accounts receivable in

28  absolute dollars and percentage terms, and despite the product problems, HBOC had reduced its

1   accounts receivable reserve from December 1997 to June 1998 in absolute dollars and as a

2   percentage of total accounts receivable. ("During 1998, [HBOC] has reduced its accounts

3   receivable reserve rate from 5.0% to 3.9%.")

4              96.    Deloitte was concerned about the collectibility of HBOC's accounts

5   receivable over 90 days, and the validity of the sales underlying these receivables. The July 13,

6   1998 Memorandum reports:

7       "Deloitte expressed concern about the increase in A/R over 90 days, not only in regard to
        collection issues, but also because such increases at software companies can often signal
8       product problems. Customers who use software generally pay on time until they
        experience problems, and then they withhold payment in order to expedite service."
9

10  Accordingly, Deloitte told Hawkins, Yodowitz and Bear Stearns "that Apollo [HBOC]

11  requires $10 - $25 million in additional accounts receivable reserves." That is, Deloitte believed

12  that HBOC was under-reserved by between 52% and 131% as of June 30, 1998. The required

13  additional reserves were material and would have reduced HBOC's net income and earnings per

14  share. Without them, HBOC's June 30, 1998 financial statements were misleading and not in

15  conformity with GAAP.

16             97.    **McKesson Plan Fiduciary (Defendant McKesson) advises that**

17  **HBOC's balance sheet reserves are $ 40 - 55 million understated.** In their July 13, 1998

18  Memorandum, Clarke and Blume state that "based on Deloitte's assessment, [HBOC] would

19  need to increase its balance sheet reserves by approximately $40 - $55 million to adequately

20  address the above issues."

21             98.    Deloitte and McKesson understood that these increases would need

22  to be made immediately in order to bring the financial statements of the combined company into

23  compliance with GAAP. However, an adjustment of this size, *i.e.*, a $40 - $55 million reserve

24  increase, would require a similar charge to operations that would reduce pre-tax income and

25  earnings per share. Hawkins (as he told Clarke and Blume on July 12) rejected this course as it

26  would have meant the combined company, post-merger, would fail to meet analysts' earnings

27  expectations.

28

1         99.    Hawkins decided to phase in a correction of the reserves over 18 months

2 to minimize the impact on the combined companies' earnings and hide the problem. The July 13,

3 1998 Memorandum states:

4     "Hawkins (who will be [HBOC-McKesson's] CFO) plans to adjust policies on
revenue recognition immediately upon consummation of the merger and to build-
5     up the receivables reserves to a *proper* level over an 18 month time period. . . .We
note that the adjusted internal amounts are still higher. . . than the comparable pre-
6     adjusted "Street" numbers. This would suggest that the combined company could
still meet Wall Street earnings expectations." (Emphasis added.)

7

8         100.    Further, Deloitte determined that HBOC's net income for 1997 and for the

9 first six months of 1998 was significantly overstated. As reported by Clarke and Blume in the

10 July 13 Memorandum: "Based on Deloitte's assessment, [HBOC's] net income for 1997 and the

11 first six months of 1998 could each be overstated by as much as $14 million." A chart annexed to

12 the Bear Stearns July 13, 1998 Memorandum as Exhibit I (entitled "Potential Net Income Impact

13 of Apollo's [HBOC's] Accounting Policies and Practices") reflects Bear Stearns' "summary

14 estimate" of the impact on HBOC's net income as of December 31, 1997 and June 30, 1998 of

15 the specific accounting improprieties noted by Deloitte. For the year ended December 31, 1997,

16 HBOC's net income was overstated by 6.9% - 7.2% and for the six months ended June 30, 1998,

17 HBOC's net income was overstated by 6.5% - 6.8%. These amounts were relevant to the

18 accuracy of HBOC's 1997 and 1998 financial statements.

19    **B.**    **July 13, 1998–McKesson Plan Fiduciaries, Including Defendants the Pre-
Merger Individual McKesson Board Members, Are Informed of HBOC's**
20           **Questionable Accounting Practices and Determine Not to Proceed with the
Merger**
21

22         101.    On July 13, 1998, the McKesson Board met with Bear Stearns and

23 Deloitte to review the potential transaction with HBOC. Pulido, Hawkins, Yodowitz and

24 representatives of Bear Stearns and Deloitte attended. At that meeting, Deloitte and Bear Stearns

25 made presentations to the Defendants the Pre-Merger Individual McKesson Board Members

26 about the results of their due diligence investigations, including the accounting due diligence.

27 The Board was told of the problems with HBOC's financial accounting that Deloitte had

28 uncovered and that adjustments were required to bring HBOC's financial statements into

1    compliance with GAAP. The Board also was told of Deloitte's evaluation that the likelihood was

2    high that the SEC would require HBOC's financial statements to be restated.

3         102.    After this meeting, McKesson's Board determined not to proceed with the

4    merger with HBOC. This was publicly announced on July 15, 1998.

5    **VI.    August 1998–Analysts Report Financial Problems at HBOC**

6         103.    On or about August 19, 1998, before the anticipated merger was even

7    announced, the Center for Financial Research and Analysis, Inc. ("CFRA") released a report

8    available to the public, including the McKesson Plan Fiduciaries, concerning HBOC. CFRA, Inc.

9    is a leading independent financial research organization serving the investment community.

10   Though CFRA did not have the benefit of seeing Deloitte's due diligence concerning HBOC's

11   accounting practices which had been conducted in July 1998 and reported to Defendant

12   McKesson, its officers and the McKesson Board, its analysis of HBOC's financial statement

13   seems almost prescient as it relates to the matters that were later uncovered. Furthermore, their

14   findings and conclusions were based upon then existing publicly available financial statements

15   that HBOC had issued.

16        104.    The August 19, 1998 CFRA report made the following observations about

17   HBOC's financial condition and financial statements:

18         a.    That there had been steady growth in both the gross amount of

19   receivables and the length of time such receivables were outstanding. These matters called into

20   question the aggressiveness of HBOC's revenue recognition policies. CFRA stated that it was

21   "particularly concerned about the growth in HBOC's receivables because of the presence within

22   those totals of unbilled receivables."

23         b.    That there had been a significant deterioration in HBOC's cash

24   flow from operations in comparison to HBOC's reported net income. This comparison also

25   called into question HBOC's revenue recognition policies, insofar as HBOC was likely booking

26   sales and reporting them for income purposes, but not being paid for such sales because they

27   were subject to contingencies (resulting in the cash flow deterioration).

28         c.    HBOC had taken questionable special charges, including

1    acquisition related special charges, and reversing various charges it had taken in earlier years.

2    CFRA noted that "the reversal of a reserve (which implies that a company has set aside more

3    than necessary for the reserve) provides an artificial boost to earnings for the period of the

4    reversal....CFRA expressed its concerns that the Company may be bundling normal, recurring

5    operating expenses within its special charges. If HBOC has indeed taken this approach, a special

6    charge taken in a particular period could reduce the recurring operating expenses that HBOC

7    would otherwise have reported in either the current period and/or future periods."

8              105.    Each of the above accounting and financial reporting matters are in most

9    respects identical to what had been previously reported to the McKesson Board by Deloitte in

10   conducting its due diligence. Furthermore, the matters uncovered by CFRA later turned out to be

11   entirely accurate when the nature and extent of the HBOC accounting irregularities were

12   revealed, namely, employing improper revenue recognition policies and the improper

13   manipulation of acquisition reserves and utilization of special charges to reduce the normal, re-

14   curring operating expenses HBOC reported. Together, this resulted in grossly distorting HBOC's

15   actual revenue and income.

16             106.    **CFRA Report Confirms HBOC Insider Trading**. In addition to the

17   matters related to financial reporting, the CFRA Report also noted that several insiders had sold a

18   significant number of HBOC shares during 1998. Defendants Gilbertson and Bergonzi were

19   among the sellers. In fact, CFRA reported that Gilbertson had sold 132,000 shares at $55.00 per

20   share, and only had 18,720 shares remaining after such inside sales. Defendant Bergonzi had sold

21   138,400 shares at between $30.75 and $53.56 per share, leaving his holdings at only 6,184 after

22   such sales. CFRA reported that Defendants Mayo, Napier and Wegmiller (members of the

23   HBOC Board of Directors) had also sold all their holdings. In the case of Defendant Mayo, this

24   comprised 40,000 shares which were sold above $60.00 per share.

25             107.    The information reported by CFRA was developed from HBOC's financial

26   statements that had been published by HBOC. As such, it was information that the McKesson

27   Plan Fiduciaries either knew, or should have known, had they exercised the diligence required by

28   ERISA fiduciaries in the fulfillment of their fiduciary responsibilities.

**VII.    October 1998: McKesson Proposes to Acquire HBOC and Conducts Limited Due Diligence**

108.    In mid-October 1998, McKesson resurrected the transaction. On October 13, 1998, McKesson's CEO, Defendant Pulido, contacted Defendant McCall to see if HBOC was still interested in pursuing a business combination. The two agreed to pursue a business combination. However, this time, instead of HBOC being the surviving company, McKesson proposed to acquire HBOC. HBOC shareholders would receive 0.37 McKesson shares for each share of HBOC in the proposed merger. This represented an 11% premium over HBOC's closing stock price on October 16, 1998.

109.    The new transaction was substantially more favorable to McKesson than the merger proposed in July. An October 16, 1998 Memorandum from the Bear Stearns due diligence team to Bear Stearns' Valuation Committee states: "As will be noted on the attached, the revised exchange ratio, although it does represent a premium to Apollo's [HBOC's] current stock price, is nonetheless significantly more favorable to Saturn [McKesson] than was the previously agreed ratio." The attached memorandum states: "The newly agreed ratio represents a 10.2% improvement in Saturn's [McKesson's] favor . . . ."

110.    On October 16, 1998, only four days after the negotiations resumed, the McKesson Board met to review the restructured transaction. Following presentations by McKesson's management, Bear Stearns and Deloitte, including discussions of the due diligence, the McKesson Board unanimously approved the proposed transaction, subject to receipt of a written fairness opinion from Bear Stearns. The "Fairness Opinion" was received by McKesson on October 17, 1998.

**VIII.    October 1998–McKesson Plan Fiduciaries (Defendants McKesson and the Pre-Merger Individual McKesson Board Members) Advised that Problems with HBOC's Financial Accounting Uncovered in July 1998 Still Plagued HBOC**

111.    In connection with the resurrected merger, McKesson had Deloitte update its accounting due diligence of HBOC. As in July, Theresa Briggs was the Deloitte partner in charge of Deloitte's due diligence work and Kevin Clarke and David Blume were principal members of Bear Stearns' due diligence team.

1       112.    Clarke and Blume prepared a November 18, 1998 Memorandum to the

2   Project File (now called "Phoenix" instead of "Titan") entitled "Accounting Due Diligence of

3   Apollo [HBOC]" which updated their July 13, 1998 Memorandum. Because there were only

4   three days between October 13, 1998, when Pulido first broached resurrecting the merger, and

5   October 16, 1998, when McKesson's Board approved the transaction, the Board and Bear Stearns

6   principally relied on the due diligence that had been conducted in July in connection with the

7   originally proposed deal.

8       113.    The limited "bringdown" review showed that each and every accounting

9   issue uncovered by Deloitte and considered in July by all participants either remained unchanged,

10  or had become worse. The three accounting issues identified in July still existed:

11              a.    **HBOC's revenue recognition policies still violated GAAP.**

12              i.    In July, Deloitte found that HBOC had improperly recorded

13  material amounts of sales in 1996 and 1997 prior to receiving required approvals from

14  customers. As Clarke and Blume state in their November 18, 1998 Memorandum: "The status of

15  this issue remained unchanged as of October 1998."

16              ii.    In July, Deloitte found that HBOC had improperly

17  under-deferred amounts attributable to the maintenance contract portion of its sales, thereby

18  inflating revenues and profits each quarter in 1996, 1997 and 1998. By October, the situation had

19  worsened: "In July, Deloitte told us that the cumulative effect of this "under-deferral" was about

20  $30 million at December 1997 and that the impact in 1997 is an overstatement of revenues by $6

21  - $7 million (as the under-deferment at December 1996 was $23-$24 million). [McKesson] and

22  Deloitte estimate that the cumulative "under-deferral" will be approximately $32 million at

23  December 31, 1998."

24              b.    **HBOC continued to use excess acquisition reserves to inflate**

25  **income.** The same improper manipulations of acquisition reserves for 1997, Q1 1998 and Q2

26  1998 were again noted in October by Deloitte and Bear Stearns, according to Clarke and Blume's

27  November 18 Memorandum. However, now Deloitte found that for the quarter ended June 30,

28  1998, HBOC had recorded non-recurring income of $3 million from "over-reserves" made in

1   connection with earlier acquisitions – an unambiguous and intentional violation of GAAP. The
2   improper practice continued in Q3 1998.

3          c.      Further, Gilbertson told Bear Stearns that, in Q3 1998, HBOC
4   charged off approximately $8.0 million. Indeed, the SEC has alleged that, for the first three
5   quarters of 1998, "[a]t the direction of Gilbertson, HBOC employees booked certain other
6   operating expenses incurred during the quarter as charges against reserves set aside in prior
7   quarters for expenses related to HBOC's acquisition of other companies during 1997. The
8   accounting entries directed by Gilbertson were inconsistent with [GAAP] and had the effect of
9   increasing HBOC's income as shown on its financial statements for the quarter."

10         d.      The November 18, 1998 Memorandum reflects that Deloitte and
11  Bear Stearns (Clarke and Blume) again spoke with Hawkins and Yodowitz about HBOC's
12  improper use of acquisition reserves and the likelihood that the SEC would require restatement if
13  it ever found out what was going on. As in July, Hawkins acknowledged that these expenses
14  were improperly charged against reserves and there was a risk the SEC would uncover the
15  situation:

16         "Although accounting for such costs in this manner does not conform with
               GAAP, Hawkins continues to believe that this practice did not cause an
17         overstatement of the true "run-rate" of the business. He does, however,
               still think that there is a risk that the SEC could require restatement of
18         Apollo's results to conform with GAAP."

19         e.      **HBOC accounts receivable reserves still understated by $10-15**
20  **million**. While HBOC had increased its reserve from $19 million to $23 million, Yodowitz,
21  McKesson's controller, acknowledged in October that HBOC was still under-reserved by
22  approximately $10 - $15 million.

23         114.    Prior to voting to approve the Corporate Merger on October 16, 1998,
24  McKesson's Board received a presentation from Deloitte concerning the accounting issues it had
25  uncovered and the integrity of HBOC's financial statements. Deloitte communicated to the Pre-
26  Merger McKesson Board all of the improper revenue, reserve, and accounts receivable
27  accounting it had uncovered at HBOC. The Pre-Merger McKesson Board knew that, at least with
28

1    respect to the manipulation of acquisition reserves to inflate income, Deloitte believed that there
2    was a "high" likelihood that if these facts ever came to light, the SEC would require HBOC's
3    financial statements to be restated.

4             115.    Upon information and belief, after Deloitte's presentation, McKesson's
5    directors "raised questions about HBOC's 'ability to support certain of its accounting practices
6    and the likely scenario should those practices result in an SEC review.'" (This information and
7    belief is based on an August 25, 1999 letter from Cravath, Swaine and Moore to the United
8    States District Court for the Southern District of New York which purports to quote from
9    minutes of a meeting of McKesson's Board.) Despite knowing that it was highly likely that the
10   SEC would require restatement of HBOC's financial statements, McKesson's Board approved
11   the Corporate Merger.

12            116.    McKesson and its Board knew, prior to the approval of the Corporate
13   Merger, and prior to the rendering of the "Fairness Opinion," that HBOC's financial statements
14   were suspect and there was a substantial risk that the SEC would require restatement. They also
15   each knew, prior to the filing with the SEC and dissemination of the Joint Proxy, that the
16   document contained misrepresentations and omissions of relevant facts that caused the Joint
17   Proxy to be misleading.

18   **IX.   McKesson and Its Officers and Board Of Directors Know That The "Fairness
     Opinion" is Incomplete**

19           117.    As described above, Defendant McKesson and its officers and Defendants
20   the Pre-Merger Individual McKesson Board Members each knew of the issues raised by Deloitte
21   with respect to HBOC's historical financial statements and Deloitte's conclusions that they did
22   not conform with GAAP, that those financial statements were misstated, and that there was a
23   "high" risk that the SEC would require restatement.

24           118.    Bear Stearns officials discussed with McKesson's officers and its Board
25   the implications to its fairness opinion of Deloitte's accounting due diligence. Nonetheless,
26   McKesson instructed Bear Stearns to ignore the information uncovered by Deloitte. This
27   instruction is documented in Bear Stearns' January 28, 1999 Memorandum from Kevin Clarke
28

1    and David Blume to Alan Schwartz and Michael Offen, which states:

2         "In our review of the Transaction and the analyses we performed in
         connection with the Fairness Opinion we provided to McKesson in the
3         Transaction, we were instructed by McKesson to rely only on the
         information provided to us by McKesson and HBOC and not to adjust any
4         of this information based on the questions raised by Deloitte. We
         communicated to McKesson's board that we followed these instructions
5         with respect to all of the work Bear Stearns performed in connection with
         the Transaction."

6

7         119.    Bear Stearns followed the instructions and did not factor Deloitte's

8    findings into its consideration of the fairness of the merger to McKesson's shareholders.

9         120.    Pulido, Hawkins, Yodowitz and the members of McKesson's Board knew

10   that the Fairness Opinion was incomplete because it was rendered only after Bear Stearns was

11   told to and did ignore relevant information. These individuals and Bear Stearns also knew that

12   the Joint Proxy falsely stated that no instructions were given to or no limitations were placed

13   upon Bear Stearns.

14        121.    McKesson, its officers and directors knew that the Bear Stearns Fairness

15   Opinion was incomplete because it was based on Bear Stearns having ignored relevant

16   information that undermined its stated conclusion.

17   **X.    McKesson Plan Fiduciaries Know of Substantial Risk Factors Inherent to the
         Merger, Including Those Disclosed in the November 27, 1998 Joint Proxy**

18

19        122.    The proposed merger of HBOC into McKesson raised many substantial

20   and very legitimate risk factors that required the McKesson Plan Fiduciaries to re-evaluate the

21   investment policies of the McKesson Plan, both in anticipation of and after the Corporate

22   Merger. Some of these risk factors were reported in the November 27, 1998 Joint Proxy.

23             a.    **75% of Mergers Fail to Achieve Expected Results**. Reputable

24   and credible studies confirm that 70 - 75% of such mergers fail to achieve the financial results

25   contemplated by the parties before the merger, a finding that the McKesson Plan Fiduciaries

26   knew or should have known in their capacity as ERISA fiduciaries of the McKesson Plan in

27   evaluating its investment policies. See Walters, K. & Stensholt, J., "Management at Work

28   Exercise Making Mergers Work!" Business Review Weekly, 1117 April 2002 (Research

1  evidence suggests that mergers fail to add shareholder value in 75% of mergers and over half

2  actually decrease value).

3            b.      **McKesson and HBOC Were Essentially in Different**

4  **Businesses**. The high probability of the failure of this merger to achieve anticipated results was

5  significantly increased in this instance by the fact that this merger involved two companies with

6  different businesses operating in different segments of the healthcare industry. McKesson was a

7  wholesale pharmaceutical distribution company. HBOC, on the other hand, was in the computer

8  software development, sales and service business. Though they had common customers in the

9  healthcare industry, there were serious questions and concerns about the synergies of such a

10  combination of large companies. In fact, the Joint Proxy issued by McKesson and HBOC on

11  November 27, 1998 raised these concerns as among the most significant risk factors arising out

12  of the proposed merger. The Joint Proxy stated:

13            "the integration of the two companies will involve special risks because
            McKesson and HBOC currently operate in different sectors of the
14            healthcare industry. There may also be challenges in retaining the
            customers of the combined businesses. Moreover, challenges will be
15            presented in assimilating and retaining personnel. In addition, the
            integration of the operations and systems of the two companies and the
16            realization of the potential operating synergies may prove difficult, and
            may cause management's attention to be diverted from other business
17            concerns."

18            c.      **Integration Risks Magnified by Numerous Prior McKesson**

19  **and HBOC Acquisitions.** The potential difficulties in integrating the business of the two

20  companies was further exacerbated by another factor–that both McKesson and HBOC had each

21  acquired numerous other businesses and companies in the years preceding the Corporate Merger.

22  Indeed, much of HBOC's growth throughout the 1990s had occurred as a result of an acquisition

23  growth strategy. In fact, HBOC acquired not less than seven companies from the period August

24  1996 through December 1998, typically using its inflated share price as a currency to make such

25  acquisitions. McKesson also acquired not less than three companies from the period November

26  1996 through November 1998. These acquisitions were all characterized as "significant" in SEC

27  public filings, and accentuated the extent of the integration issues associated with combining

28  McKesson and HBOC. The Corporate Merger not only involved the problems of combining just

1    two large companies, but in reality the integration of over ten companies that had a separate

2    existence only two-three years prior to the January 1999 Corporate Merger.

3                    d.    **Independent Analysts Publicly Questioned HBOC's**

4    **Operations and Accounting Practices.** Publicly available information by credible sources

5    raised questions about the operations of HBOC in light of its acquisition growth strategy,

6    including HBOC's accounting practices. For example, the report issued by the Center for

7    Financial Research and Analysis in August 1998, soon before the announcement of the merger,

8    documented the recent downward trend in several of HBOC's operating and financial metrics,

9    including, without limitation, the rapid increase in accounts receivable, which logically called

10   into question HBOC's revenue recognition policies, and the improper use of acquisition reserves

11   to offset operating expenses, all matters which turned out to be accounting irregularities. The

12   CFRA Report was developed from published HBOC financial statements. (See paragraphs 103-

13   107 above for a more complete overview of the CFRA Report.)

14                    e.    **Pre-Merger–Deloitte Advises McKesson Plan Fiduciaries of**

15   **Questionable HBOC Accounting Practices.** As detailed in paragraphs 90 - 102 and in

16   paragraphs 111-116 above, prior to the Corporate Merger, McKesson's own advisors, Deloitte

17   and Bear Stearns, uncovered and reported the existence of questionable accounting practices at

18   HBOC while performing due diligence on the accounting practices at HBOC in the summer of

19   1998. That due diligence uncovered prior to the Corporate Merger several of the same accounting

20   practices which not coincidentally proved to be HBOC's undoing when the accounting

21   irregularities were announced. According to written memorandum prepared by Bear Stearns,

22   McKesson's financial advisor for the merger, these questionable accounting practices were

23   brought to the attention of the Pre-Merger Individual McKesson Board Members, who were told

24   at this time that the risk that the SEC would require a restatement of HBOC financial statements

25   was "high." Furthermore, the Deloitte information essentially mimicked the findings in the

26   CFRA Report which had been developed from HBOC's published financial statements.

27           At a minimum, Defendants McKesson and the Pre-Merger Individual McKesson Board

28

1   Members negligently dismissed these accounting matters as either irrelevant or immaterial, or as
2   something that could disregarded so the merger could proceed, but be "fixed" after the merger,
3   over an extended time period. Indeed, that is exactly what McKesson's Chief Financial Officer
4   proposed to do to address certain of the accounting problems which Deloitte uncovered.
5   However, such actions, and the absolute laxity with which Defendants treated this information
6   from Deloitte, whether or not it rises to the level and forms the basis for an allegation of
7   securities fraud, is certainly evidence of and establishes ERISA imprudence on the part of the
8   Pre-Merger Individual McKesson Board Members *in their capacity as ERISA fiduciaries*. ERISA
9   imprudence does not require a showing of intent to defraud or scienter, but rather imprudent and
10  negligent behavior. Indeed, had the actual knowledge of the existence of such questionable
11  accounting practices at HBOC been placed in the hands of an independent ERISA fiduciary at
12  this time, such matters would have been carefully considered and weighed in the context of
13  evaluating the McKesson Plan's investment policies.

14              f.    **The Retirement Savings of McKesson Plan Participants, so**
15  **Heavily Concentrated in McKesson Company Stock, Depended Upon the Success of the**
16  **Merger.** The retirement savings of the McKesson Plan participants were virtually entirely resting
17  on the performance of McKesson Company Stock held by the McKesson Plan. Having "all your
18  eggs in one basket" is necessarily and inherently risky, heightening the requirement and
19  responsibility that the fiduciaries closely monitor the propriety of such an investment policy and
20  singular course of action. This heightened scrutiny was particularly necessary and advisable in
21  the context of the major corporate acquisition and insofar as McKesson had frozen its defined
22  benefit plan in 1996 (a plan which provided participants with a monthly annuity retirement not
23  based on the performance of McKesson shares) and had substituted *additional Company*
24  *Contributions in McKesson Company Stock* to partially replace the benefits lost to employees by
25  virtue of freezing the defined benefit plan. This was the Retirement Share Plan Contributions,
26  given that name because these contributions were intended to replace the benefits lost under the
27  frozen defined benefit plan. (See McKesson Plan Document, Article 6)

28

1          g.    **Certain HBOC and McKesson Plan Fiduciaries Had**

2    **Irreconcilable Conflicts of Interest, Because They Had a Financial Incentive for the Merger**

3    **to be Completed**. The Joint Proxy (p. 51) disclosed that certain of the Defendants had a financial

4    interest in seeing to it that the merger was completed, in the form of stock options and restricted

5    stock that would vest. Thus, the interests of Defendants such as Pulido, McCall and Bergonzi

6    were characterized in the Joint Proxy as being "in addition to, or different from, the interests of

7    stockholders of HBOC and McKesson generally." In November 1998, the Atlanta Business

8    Chronicle reported that Defendant Pulido would personally get as much as $82.6 million by

9    cashing in stock and exercising options, and Defendant McCall would be eligible to receive

10   $11.7 million in stock options which would be accelerated due to the merger. Not coincidentally,

11   these conflicted Defendants were the individuals who primarily negotiated the merger. See Roni

12   Robbins, "McKesson/HBOC Merger Yields Rewards for Execs," Atlanta Business Chronicle,

13   November 1998 (the largest payouts would go to McKesson management according to

14   documents filed with the SEC). Such conflicts necessarily tainted the decision-making of

15   McKesson Plan Fiduciaries, since they would likely never either consider or sell McKesson

16   shares held by the McKesson Plan if such a course of action might in any way jeopardize the

17   financial rewards they expected if the merger were consummated, or those expected thereafter.

18          123.    Notwithstanding these extraordinary risk factors and enormous

19   uncertainties created by the proposed merger, and the conflicts of interest under which they were

20   laboring, the McKesson Plan Fiduciaries failed to conduct a fiduciary review of the McKesson

21   Plan investment policies at any time before or after the merger was announced on October 18,

22   1998, failed to take any action to change the McKesson Plan investment polices in anticipation of

23   or after the Corporate Merger; and failed to consider changing the contributions to the McKesson

24   Plan from McKesson Company Stock to cash.

25   **XI.    January 12, 1999: The Corporate Merger Is Effected**

26          124.    McKesson and HBOC executed the Merger Agreement and related

27   documents and, on October 18, 1998, they issued a joint press release announcing that they had

28   signed a definitive merger agreement for McKesson to acquire HBOC. In the press release,

1    which was carried over *Business Wire*, the companies represented that:

2    "This merger will create the world's first comprehensive healthcare supply
     management and information solutions company, uniting the top performing,
3    rapidly growing leaders in their respective industries:
     McKesson, the No. 1 healthcare supply management company, and HBOC,
4    the No. 1 healthcare information company."

5
     125.    McKesson and HBOC solicited proxies pursuant to the Joint Proxy. The
6
     Joint Proxy was filed with the SEC on November 27, 1998 as Amendment No. 1 to the
7
     McKesson Registration Statement dated November 13, 1998 that was used to register the new
8
     shares that McKesson issued to acquire the HBOC common stock. The Joint Proxy was
9
     distributed on or about November 30, 1998 by McKesson to its shareholders and by HBOC to its
10
     shareholders, including the fiduciaries of the McKesson and HBOC Plans.
11
     126.    Each company received the required shareholder votes and the Corporate
12
     Merger was accomplished and effective as of January 12, 1999. McKesson acquired HBOC and
13
     was renamed McKesson HBOC. In total, HBOC shareholders acquired approximately 177
14
     million shares of McKesson common stock in exchange for 478 million shares of HBOC
15
     common stock, which valued the Corporate Merger at approximately $14.2 billion.
16
     127.    Pursuant to the January 12, 1999 Corporate Merger of the companies and
17
     the subsequent April 1, 1999 merger of the two plans, upon information and belief, participants
18
     in the HBOC Plan received .37 shares of McKesson stock for each HBOC share held in their
19
     accounts.
20
     **XII.    April 1, 1999: The Merger of the HBOC Plan into the McKesson Plan**
21
     128.    After the Corporate Merger was consummated on January 12, 1999,
22
     McKesson began the process of combining the McKesson Plan and the HBOC Plan.
23
     129.    During this plan merger process, from January 12, 1999 through April 1,
24
     1999, the McKesson Plan Fiduciaries failed to consider whether the investment policies and
25
     guidelines for the McKesson Plan remained prudent, or whether Company Contributions should
26
     be made in cash in lieu of McKesson Company Stock.
27
     130.    On or about April 1, 1999, the HBOC Plan was merged into the McKesson
28

1  Plan, and the former participants in the HBOC Plan became participants in the McKesson Plan.

2  **XIII.  The Public Disclosures Show That HBOC's and McKesson's Financial Results Were**
        **Misstated**
3
            131.    **The Initial April 28, 1999 Press Release–McKesson Stock Drops 48%.**
4
5  On April 28, 1999, prior to the opening of the stock markets, McKesson issued the first of

6  several press releases which began to reveal the truth about the financial results and operations of

7  HBOC and McKesson. The release, which was published on the *Business Wire* and other news

8  services, announced, *inter alia*, the following:

9      "McKesson HBOC, Inc. (NYSE:MCK) . . . today announced that during
       the course of its year end financial audit process, the company has
10     determined that software sales transactions aggregating $26.2 million in the
       company's fourth quarter ended March 31, 1999, and $16.0 million in the
       prior quarters of the fiscal year, were improperly recorded because they
11     were subject to contingencies, and have been reversed. The audit process
       is ongoing and there is a possibility that additional contingent sales may be
12     identified."
       * * *
13
14     "We reaffirm our belief in the underlying strength and opportunities in our
       markets," said McCall and Pulido. "However, in light of the new
15     information, we believe it prudent to revise our earnings per diluted share
       goal for fiscal year 2000 to $2.50. Underlying this target is the assumption
16     that the Healthcare Information Technology Business software revenues
       will decrease from fiscal 1999."
       * * *
17     "After the reversals, the overall Health Care Information Technology
       revenue growth rate is three percent for the quarter and 18 percent for the
18     year, compared to ten percent for the quarter and 21 percent of the year
       before the reversals. The growth rate for software revenue after the
19     reversals is a decline of five percent for the quarter and a gain of 13 percent
       for the year, compared to increases of 21 percent for the quarter and 22
20     percent for the year prior to reversals. These reversals also decreased the
       growth rates for each of the year's prior three quarters."
21
22          132.    On April 28, 1998, Pulido, McCall and Hawkins held a conference call for

23  securities analysts and others. According to a tape recording of that call, Pulido stated:

24     "This morning we announced that McKesson HBOC has restated revenue and earnings
       for the most recent March fourth quarter and for the full fiscal year. During the course of
25     our year-end financial audit, the company determined that software sales transactions
       aggregating $26.2 million in the March-ended quarter and $16 million in the prior
26     quarters of fiscal 99 and that's about evenly across the June-September-December periods
       were improperly recorded because they were subject to certain contingencies that needed
27     to be removed. These sales have been reversed."

28

1        133.    These announcements caused the price of McKesson stock to plunge

2   nearly in half, from April 27, 1999's close of $65.75 to a close of $34.50 on April 28, 1999, a

3   loss of more than $9 billion in market capitalization.

4        134.    **The May 25, 1999 Press Release--Further Downward Revisions**

5   **Disclosed Causing Stock to Drop An Additional 12%.** On May 25, 1999, McKesson updated

6   the marketplace on the status of its internal investigation in a press release stating, *inter alia*, the

7   following:

8        "McKesson HBOC, Inc. . . . today announced that, as a result of information developed
         through its continuing year-end audit process and Audit Committee review of the
9        circumstances which earlier required the company to revise its preliminary announced
         March 31, 1999 fiscal year-end financial results, further downward revision will be
10       required of those fiscal year's results as well as of quarterly results during the fiscal year.
         The review, which is continuing, was initiated due to the company's discovery of certain
11       improper revenue recognition matters relating to software sales at its recently acquired
         Healthcare Information Technology Business unit (formerly HBO & Company).

12

13       Additional instances of improper revenue recognition have been found, which the
         company had previously indicated was a possibility, and certain other financial statement
14       items relating to the Healthcare Information Technology Business are under review. It is
         possible that prior years' results of this business unit also may require restatement. The
15       company is working diligently with its independent auditors, Deloitte & Touche LLP, and
         its legal and accounting advisors, Skadden, Arps, Slate, Meagher & Flom LLP and
16       Pricewaterhouse Coopers LLP, to resolve these matters on a timely basis. Upon
         conclusion of the company's year-end audit and the Audit Committee review, and action
17       thereon by the McKesson HBOC, Inc. Board of Directors, the company will promptly
         issue its results for the year ended March 31, 1999. The company also intends to consider
18       and implement such other actions as the Board determines may be necessary or
         appropriate."

19

20       135.    This announcement caused the price of McKesson stock to drop more than

21   12% from May 24, 1999's close of $38.1875 to a close of $33.50 on May 25, 1999.

22       136.    **The July 14, 1999 Release--McKesson Announces Restatement for the**

23   **Years 1997-1999.** On July 14, 1999, McKesson issued a press release announcing the conclusion

24   of its investigation and the resulting restatement of its previously issued financial statements. As

25   predicted in earlier announcements, McKesson restated its financial results not only for the fiscal

26   year ended March 31, 1999, but for its fiscal years ended March 31, 1998 and 1997 as well.

27   McKesson stated that:

28

1    "[I]t is revising downward its revenues by $245.8 million for the fiscal year
     ended March 31, 1999, by $48.8 million for the fiscal year ended March
2    31, 1998, and by $33.2 million for the fiscal year ended March 31, 1997.
     The Company is revising downward its income from continuing operations
3    by $152.2 million and its earnings per diluted share by 53 cents for the
     fiscal year ended March 31, 1999, by $25.8 million and nine cents for the
4    fiscal year ended March 31, 1998, and by $13.5 million and 5 cents for the
     fiscal year ended March 31, 1997."
5

6        137.    In the July 14, 1999 press release, McKesson acknowledged that of the

7    improperly recognized revenues, only about $90 million would become properly recognizable in

8    fiscal 2000, about $70 million would not become properly recognizable for several years,

9    and an estimated $50 million would likely never be recognized. As to the remaining $118 million

10   of improper revenue, McKesson stated that it "may ultimately be realized as revenues, but

11   requires further work to determine its status."

12       138.    On July 16, 1999, McKesson filed its Form 10-K and Form 10-K/A for the

13   year ended March 31, 1999 with the SEC. The consolidated financial statements included in the

14   Form 10-K and Form 10-K/A reflect amounts for HBOC for prior periods which were restated

15   from those previously reported.  The 1999 Form 10-K stated:

16       "The results of operations of HBOC have been restated for the quarters
         ended December 31, 1998, September 30, 1998 and June 30, 1998 and the
17       fiscal years ended March 31, 1998 and 1997 to reflect corrections of
         accounting errors in the Company's Health Care Information Technology
18       segment (formerly HBOC)."

19       139.    The restated financial statements indicated that HBOC's original financial

20   statements overstated HBO's net income for the quarter ending March 31, 1998 by 42.3%; for

21   the quarter ending June 30, 1998 by 221.7%; for the quarter ending September 30, 1998 by

22   407.3%; and for the quarter ending December 31, 1998 by 601.2%.

23       140.    From the time of the first announcement of HBOC accounting

24   irregularities on April 28, 1999, McKesson and the Post-Merger Individual McKesson Board

25   members failed to consider whether the investment policies and guidelines for the McKesson

26   Plan remained prudent, or whether Company Contributions should be made in cash in lieu of

27   McKesson Company Stock.

28

1  **XIV.    The Law under ERISA**

2          141.    ERISA § 502(a)(2) [29 U.S.C. §1132(a)(2)], provides, in pertinent part,

3  that a civil action may be brought by a participant for relief under ERISA § 409 [29 U.S.C.

4  §1109].

5          142.    ERISA § 409(a) [29 U.S.C. §1109(a)], "Liability for Breach of Fiduciary

6  Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who

7  breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title

8  shall be personally liable to make good to such plan any losses to the plan resulting from each

9  such breach, and to restore to such plan any profits of such fiduciary which have been made

10 through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or

11 remedial relief as the court may deem appropriate, including removal of such fiduciary.

12         143.    ERISA § 404(a)(1)(A) and (B) [29 U.S.C. § 1104(a)(1)(A) and (B)],

13 provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan *solely*

14 *in the interest of the participants* and beneficiaries, for the *exclusive purpose of providing*

15 *benefits to participants* and their beneficiaries, and *with the care, skill, prudence, and diligence*

16 under the circumstances then prevailing that a prudent man acting in a like capacity and familiar

17 with such matters would use in the conduct of an enterprise of a like character and with like

18 aims.

19         144.    These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to

20 as the *duties of loyalty, exclusive purpose and prudence.* They entail, among other things,

21         a. The duty to conduct an independent and thorough investigation into,

22 and continually to monitor, the merits of all the investment alternatives of a plan, including

23 employer securities, to ensure that each investment is a suitable option for the plan.

24         b. A duty to avoid conflicts of interest and to resolve them promptly when

25 they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the

26 participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan

27 sponsor.

28         c. A duty to disclose and inform, which encompasses (1) a negative duty

1   not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know

2   that silence might be harmful; and (3) a duty to convey complete and accurate information

3   material to the circumstances of participants and beneficiaries.

4              145.    Furthermore, ERISA fiduciary duties are the "highest known to the law,"

5   and the ERISA duty requiring the prudent investment of plan assets is judged against that of a

6   prudent expert, a standard markedly different from and higher than the "business judgment" rule.

7              146.    ERISA § 404(a)(1)(D) [29 U.S.C. § 1104(a)(1)(D)] provides in pertinent

8   part that at fiduciary shall discharge his duties with respect to a plan *in accordance with the*

9   *documents and instruments governing the plan.*

10             147.    ERISA § 405(a) [29 U.S.C. § 1105(a)] "Liability for breach by co-

11  fiduciary," provides, in pertinent part, that in addition to any liability which he may have under

12  any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of

13  fiduciary responsibility of another fiduciary with respect to the same plan in the following

14  circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or

15  omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure

16  to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific

17  responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to

18  commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes

19  reasonable efforts under the circumstances to remedy the breach.

20             148.    Plaintiffs therefore bring this action under the authority of ERISA

21  §502(a)(2) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the HBOC

22  Plan and the McKesson Plan arising out of the breaches of fiduciary duties by the Defendants for

23  violations under ERISA § 404(a)(1) and ERISA § 405(a).

24

25

26

27

28

1

**COUNT ONE: On Behalf of the Former HBOC Plan**

2

3

**Claim for Relief Against Defendant the HBOC Administrative Committee and Defendants the Individual HBOC Administrative Committee Members, Including Gilbertson and Bergonzi, for Violation of ERISA § 404**

4

5          149.    Plaintiffs incorporate by reference all allegations of this Complaint as set

6    forth in the paragraphs above.

7          150.    By virtue of all the facts and events alleged herein, Defendant the HBOC

8    Administrative Committee and Defendants designated as the Individual HBOC Administrative

9    Committee Members, including Gilbertson and Bergonzi, and all as fiduciaries of the HBOC

10   Plan, failed to discharge their duties with respect to the HBOC Plan solely in the interest of the

11   participants and their beneficiaries and for the exclusive purpose of providing benefits to

12   participants and their beneficiaries and defraying reasonable expenses of administering the

13   HBOC Plan and with the care, skill, prudence, and diligence under the circumstances then

14   prevailing that a prudent man acting in a like capacity and familiar with such matters would use

15   in the conduct of an enterprise of a like character and with like aims, in violation of ERISA

16   §§ 404(a)(1)(A) and (B) [29 U.S.C. §§ 1104(a)(1)(A) and (B)], by, among other things, between

17   March 31, 1996 and April 1, 1999:

18          a.    Failing to conduct an adequate fiduciary review to determine

19   whether HBOC Company Stock was a prudent investment when they knew or should have

20   known that new shares of HBOC Company Stock purchased after March 31, 1996 were inflated

21   in price because the financial statements did not report the true financial condition of HBOC;

22          b.    Causing the HBOC Plan to continue to offer the HBOC Stock

23   Fund as an investment alternative for the investment of assets of the HBOC Plan at a time when

24   they knew or should have known that new shares of HBOC Company Stock purchased after

25   March 31, 1996 were inflated in price and were not a prudent investment for the HBOC Plan

26   because the financial statements did not report the true financial condition of HBOC;

27          c.    Causing the HBOC Plan to continue to acquire new shares of

28

1    HBOC Company Stock after March 31, 1996 at per share prices that exceeded fair market value

2    and represented more than adequate consideration for such shares.

3            d.      Failing to provide adequate information to participants and

4    beneficiaries of the HBOC Plan with respect to the HBOC Stock Fund and HBOC Company

5    Stock and the true risk of such an investment alternative in light of the facts known to Gilbertson

6    and Bergonzi regarding the true financial condition of HBOC;

7            e.      Concealing from participants and beneficiaries of the HBOC Plan

8    material facts regarding the true financial condition of HBOC which prevented participants of

9    the HBOC Plan from exercising independent control over investments in the HBOC Stock Fund;

10            f.      Failing to disclose to participants and beneficiaries of the HBOC

11    Plan that new shares of HBOC Company Stock purchased after March 31, 1996 were inflated in

12    value because HBOC's financial statements did not report the true financial condition of HBOC

13    and the price of the HBOC Company Stock prevailing on the national exchanges did not

14    represent the fair market value of HBOC Company Stock; and

15            g.      Permitting the HBOC Plan and its participants to acquire,

16    accumulate and hold HBOC Company Stock after March 31, 1996 at such a time when

17    investment in HBOC Company Stock was no longer suitable or prudent as an investment

18    alternative under the HBOC Plan.

19         151.    As a result of the above enumerated breaches of duty of loyalty, exclusive

20    purpose and prudence in violation of ERISA § 404(a)(1), the HBOC Administrative Committee

21    and the Individual HBOC Administrative Committee Members caused losses to the HBOC Plan

22    and the accounts of the HBOC Plan participants which they are legally responsible to restore

23    pursuant to ERISA § 409(a).

24         152.    At such time as the accounting irregularities at HBOC began and for the

25    period that it continued (from March 31, 1996 through April 1, 1999), and during the period the

26    breaches complained of herein occurred, the HBOC Stock Fund and HBOC Company Stock

27    became and remained an imprudent and unsuitable retirement investment for the participants of

28    the HBOC Plan.

1    153.    During this time frame the HBOC Plan participants invested no less than
2  $41,340,485 of their HBOC Plan contributions in HBOC Company Stock (the amount from
3  March 31, 1996 through December 31, 1998).

4    154.    In lieu of investing in the HBOC Stock Fund and HBOC Company Stock
5  while the accounting irregularities at HBOC were occurring, HBOC Plan participants should
6  have been able to invest their 401(k) dollars (both salary-deferrals and employer matching
7  contributions) in other suitable investments rather than the HBOC Stock Fund and HBOC
8  Company Stock.

9    155.    Had HBOC Plan participants been able to invest their 401(k)
10  contributions (both salary-deferral and employer matching contributions) in investments other
11  than the HBOC Stock Fund and HBOC Company Stock, their overall account balances, as
12  subsequently merged into the McKesson Plan, would have been worth far more today than the
13  actual value of their accounts which included their improvident investment in HBOC Company
14  Stock.

15    156.    The HBOC Administrative Committee and the Individual HBOC
16  Administrative Committee Members are legally required pursuant to ERISA § 409(a) to restore
17  to the HBOC Plan participants the losses determined by comparing the actual value of the HBOC
18  Plan participant accounts invested in HBOC Company Stock to what such accounts would have
19  been worth today had such amounts been invested instead in suitable investment alternatives.
20  Such loss amount shall be proven at trial, applying ERISA loss analysis and standards in which
21  all ambiguities in loss calculation are resolved against the breaching fiduciaries and in favor of
22  the Plaintiffs.

23    157.    The HBOC Administrative Committee and the Individual HBOC
24  Administrative Committee Members may not avail themselves of any defense under ERISA
25  § 404(c) to relieve them of liability for their ERISA violations insofar as, (a) the participants
26  were never provided with an explanation that the HBOC Plan was intended to constitute a plan
27  described in ERISA § 404(c), as required by 29 C.F.R. § 2550.404c-1(b)(2)(B)(1)(i), nor did the
28  HBOC Plan satisfy the administrative requirements under Department of Labor ( the "DOL")

1    regulations for the application of ERISA § 404(c); (b) ERISA § 404(c) does not relieve

2    fiduciaries of the responsibility under ERISA § 404(a)(1)(A) and (B) to select prudent and

3    suitable investment options in the first instance, and to monitor those selections, and therefore

4    the fiduciaries of the HBOC Plan had ongoing fiduciary liability with respect to the selection of

5    investment options, including the choice of the HBOC Stock Fund, even if participants were

6    permitted to direct the investment of their accounts; (c) the HBOC Plan participants never

7    exercised "independent control," within the meaning of 29 C.F.R. § 2550.404(c)-1(c)(2), over

8    investment decisions regarding the HBOC Stock Fund, as required by ERISA § 404(c), because

9    participants were not provided with adequate and truthful information concerning the HBOC

10   Stock Fund as an investment option selected and offered by the HBOC Administrative

11   Committee and the Individual HBOC Administrative Committee Members; and (d) any HBOC

12   Plan provision which purports to relieve fiduciaries of the obligation to select and monitor

13   prudent investment options, and transfer such liability to participants, would be void as against

14   public policy and be in violation of ERISA § 410 [29 U.S.C. § 1110].

15        **WHEREFORE**, Plaintiffs pray for relief as set forth below.

16

17                         **COUNT TWO: On Behalf of the Former HBOC Plan**

18        **Claim for Relief against Defendant HBOC, Defendant the HBOC Administrative
          Committee and Defendants the Individual HBOC Administrative Committee Members,**
19        **including Gilbertson and Bergonzi, for Violations of ERISA §§ 406 and 407**

20

21        158.    Plaintiffs incorporate by reference all allegations of this Complaint as set

22   forth in the paragraphs above.

23        159.    By virtue of all the facts and events alleged herein, the HBOC

24   Administrative Committee and the Individual HBOC Administrative Committee Members,

25   including Gilbertson and Bergonzi, in connection with their actions and omissions in authorizing

26   the HBOC Plan to continue to offer the HBOC Stock Fund and HBOC Company Stock as an

27   investment alternative for the HBOC Plan and permitting participants to invest in HBOC

28   Company Stock at a time when they knew or should have known that HBOC's financial

1  statements did not record the true financial condition of HBOC and that, as a result, the prices
2  per share at which the HBOC Plan was acquiring HBOC Company Stock exceeded fair market
3  value and was more than adequate consideration for such shares, caused the HBOC Plan to
4  engage in transactions that they knew or should have known constituted a direct or indirect
5  acquisition of HBOC Company Stock on behalf of the HBOC Plan in violation of ERISA
6  §§ 406(a)(1)(E) and 407(a) [29 U.S.C. §§ 1106(a)(1)(E) and 1107(a)].

7        160.    Because the price these fiduciaries caused to be paid by the HBOC Plan
8  for such shares exceeded fair market value and was more than adequate consideration, the
9  prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1) [29 U.S.C. §
10  1108(e)(1)].

11        161.    Defendant HBOC is liable hereunder as a fiduciary and party in interest for
12  participating in the prohibited transactions.

13        162.    At such time as the accounting irregularities at HBOC began and for the
14  period that they continued (from March 31, 1996 through April 1, 1999), HBOC Stock remained
15  inflated in value and the fiduciaries of the HBOC Plan continued to engage in prohibited
16  transactions by paying more than adequate consideration for the HBOC Company Stock acquired
17  for the accounts of individual participants.

18        163.    During this time frame the HBOC Plan participants invested no less than
19  $41,340,485 of their HBOC Plan contributions in additional HBOC Company Stock (the amount
20  from March 31, 1996 through December 31, 1998).

21        164.    Because the acquisition of HBOC Company Stock by the HBOC Plan for
22  more than adequate consideration was a prohibited transaction which was a "per se" violation of
23  ERISA §§ 406(a)(1)(E) and 407(a) [29 U.S.C. §§ 1106(a)(1)(E) and 1107(a)], under ERISA §§
24  409(a) and 502(a)(2) and (3) [29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3)] the Court has the
25  equitable power to redress such violations by undoing the prohibited transaction. In the present
26  case, the appropriate remedy would be for the Court to restore to the participants of the HBOC
27  Plan the consideration which the participants paid to acquire in their individual accounts shares
28  of HBOC Company Stock at inflated prices through the HBOC Stock Fund.

1         165.    In addition, in order to fully restore the HBOC Plan and its participants to

2   the position they would have been in had the fiduciaries of the HBOC Plan not engaged in the

3   prohibited transactions alleged in this Complaint, the HBOC Plaintiffs are entitled to recover the

4   amount the improper contributions used to purchase HBOC Company Stock would have earned

5   had such amounts been instead invested in suitable investment alternatives.

6         **WHEREFORE,** Plaintiffs pray for relief as set forth below.

7

8               **COUNT THREE: On Behalf of the Former HBOC Plan**

9   **Claim for Relief Against Defendant HBOC, Defendant the HBOC Board and Defendants**
10  **the Individual HBOC Board Members, Including Defendant McCall, for Violation of**
            **ERISA § 404**

11

12        166.    Plaintiffs incorporate by reference all allegations of this Complaint as set

13  forth in the paragraphs above.

14        167.    The knowledge of the accounting irregularities committed by HBOC's

15  most senior officers benefitted HBOC and is imputed to HBOC as a matter of law during all

16  relevant time frames for the purposes of evaluating its conduct and determining its liability

17  hereunder.

18        168.    By virtue of the foregoing facts and events alleged herein, the Defendant

19  HBOC, Defendant the HBOC Board and Defendants the Individual HBOC Board Members,

20  including Defendant McCall, failed to discharge their duties with respect to the HBOC Plan

21  solely in the interest of the participants and their beneficiaries and for the exclusive purpose of

22  providing benefits to participants and their beneficiaries and defraying reasonable expenses of

23  administering the HBOC Plan and with the care, skill, prudence, and diligence under the

24  circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

25  matters would use in the conduct of an enterprise of a like character and with like aims, in

26  violation of ERISA §§ 404(a)(1)(A) and (B) [29 U.S.C. §§ 1104(a)(1)(A) and (B)], by, among

27  other things:

28           a.    Failing to adequately monitor the performance of the HBOC

1    Administrative Committee and the Trustee, when they knew or should have known that the

2    financial statements of HBOC did not report the true financial condition of HBOC, to ensure that

3    the performance of the HBOC Administrative Committee and the Trustee was in compliance

4    with the terms of the HBOC Plan Document and statutory standards, and satisfied the needs of

5    the HBOC Plan;

6              b.       Failing to prevent the HBOC Administrative Committee from

7    offering the HBOC Stock Fund as an investment alternative for the investment of new assets of

8    the HBOC Plan after March 31, 1996 when they knew or should have known that new shares of

9    HBOC Company Stock were inflated in price and were not a prudent investment for the HBOC

10   Plan because the financial statements did not report the true financial condition of HBOC;

11             c.       After March 31, 1996, failing to prevent the HBOC Plan from

12   acquiring new shares of HBOC Company Stock for HBOC Plan participants at inflated per share

13   prices which they knew or should have known were greater than fair market value and

14   represented more than adequate consideration for such shares;

15             d.       After March 31, 1996, failing to communicate such information to

16   the Trustee, the HBOC Administrative Committee, and the HBOC Investment Committee which

17   each needed for the proper performance of its duties; and

18             e.       After January 12, 1999, failing to monitor or communicate

19   information to the HBOC Administrative Committee, thereby permitting the HBOC Plan to

20   exchange shares of HBOC Company Stock for McKesson Company Stock, in contravention of

21   the terms of the HBOC Plan Document, all in violation of ERISA § 404(a)(1)(D).

22             169.     As a result of the above enumerated breaches of duty of loyalty, exclusive

23   purpose and prudence in violation of ERISA § 404(a)(1), the Defendant HBOC, Defendant the

24   HBOC Board and Defendants the Individual HBOC Board Members, including Defendant

25   McCall, caused losses to the HBOC Plan and the accounts of the HBOC Plan participants which

26   they are legally responsible to restore pursuant to ERISA § 409(a).

27             170.     At such time as the accounting irregularities at HBOC began and for the

28

1    period that it continued (from March 31, 1996 through April 1, 1999), and during the period the
2    breaches complained of herein occurred, the HBOC Stock Fund and HBOC Company Stock
3    became and remained an imprudent and unsuitable retirement investment for the participants of
4    the HBOC Plan.

5              171.    During this time frame the HBOC Plan participants invested no less than
6    $41,340,485 of their new HBOC Plan contributions in HBOC Company Stock (the amount from
7    March 31, 1996 through December 31, 1998).

8              172.    In lieu of investing in the HBOC Stock Fund and HBOC Company Stock
9    while the accounting irregularities at HBOC were occurring, HBOC Plan participants should
10   have been able to invest their 401(k) dollars (both salary-deferrals and employer matching
11   contributions) in prudent investments rather than the HBOC Stock Fund and HBOC Company
12   Stock.

13             173.    Had Defendant HBOC, Defendant the HBOC Board and the
14   Defendants the Individual HBOC Board Members, including Defendant McCall, diligently
15   performed their ERISA fiduciary duties by properly monitoring the HBOC Administrative
16   Committee and communicating such information to the Trustee and the HBOC Administrative
17   Committee needed for the proper performance of its duties, and not breached such duties as
18   outlined herein, the HBOC Plan and its participants would not have invested over $41,000,000 in
19   the HBOC Stock Fund and HBOC Company Stock after March 31, 1996, thereby avoiding the
20   losses they suffered by virtue of such improvident investments.

21             174.    Had HBOC Plan participants been able to invest their 401(k) contributions
22   (both salary-deferral and employer matching contributions) in investments other than the HBOC
23   Stock Fund and HBOC Company Stock, their overall account balances, as subsequently merged
24   into the McKesson Plan, would have been worth more than the actual value of their accounts
25   today which include their improvident investment in HBOC Company Stock.

26             175.    Defendant HBOC, Defendant the HBOC Board and Defendants the
27   Individual HBOC Board Members, including Defendant McCall, are legally required pursuant to
28   ERISA § 409(a) to restore to the HBOC Plan participants the losses determined by comparing the

1    actual value of the HBOC Plan and participant accounts which included the imprudent

2    investment in HBOC Company Stock to what such plan and participant accounts would have

3    been worth today had such amounts been instead invested in suitable investment alternatives.

4    The amount of such loss shall be proven at trial, applying ERISA loss analysis and standards in

5    which all ambiguities in loss calculation are resolved against the breaching fiduciaries and in

6    favor of the Plaintiffs.

7        **WHEREFORE**, Plaintiffs pray for relief as set forth below.

8

9        **COUNT FOUR: On Behalf of the Former HBOC Plan**

10   **Claim for Relief against All HBOC Plan Fiduciaries for Co-Fiduciary Liability in Violation**
     **of ERISA § 405, and Against HBOC under Agency Principles**
11

12       176.    Plaintiffs reallege and incorporate by reference all allegations of this

13   Complaint as set forth in the paragraphs above.

14       177.    By virtue of all the facts and events alleged herein, Defendants Gilbertson,

15   Bergonzi, McCall, HBOC, the HBOC Board, the HBOC Administrative Committee, the

16   Individual HBOC Administrative Committee Members and the Individual HBOC Board

17   Members, (the "HBOC Plan Fiduciaries"), by failing to comply with their specific fiduciary

18   responsibilities under ERISA § 404(a)(1) enabled their co-fiduciaries to commit violations of

19   ERISA and, with knowledge of such breaches, failed to make reasonable efforts to remedy the

20   breaches. Accordingly, the HBOC Plan Fiduciaries are each liable for the others' violations

21   pursuant to ERISA §§ 405(a)(2) and (3), [29 U.S.C. §§ 1105(a)(2) and (3)].

22       178.    Co-fiduciary liability arises hereunder, *inter alia*, by virtue of the

23   following:

24           a.    The accounting irregularities which occurred at HBOC were

25   directed by, or known to, many of the senior officers at HBOC and/or McKesson, including

26   Defendants Gilbertson, Bergonzi, and McCall, and were carried on for the benefit of HBOC's

27   business. As such, the knowledge of the existence of such accounting irregularities is imputed to

28

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
Case No. C00-20030 RMW

1    HBOC as a matter of law. HBOC as the Named Fiduciary of the HBOC Plan, and with
2    knowledge of the accounting irregularities, failed to properly monitor the performance of the
3    HBOC Administrative Committee and the Individual HBOC Administrative Committee
4    Members or to communicate to them and the Trustee such information as each needed for the
5    proper performance of its duties (including, without limitation, that HBOC's financial condition
6    as recorded was not accurate), as required of HBOC as a fiduciary under HBOC Plan Document
7    §11.1. As a result of HBOC's own breaches in violation of ERISA § 404(a)(1), HBOC enabled
8    the HBOC Administrative Committee and the Individual HBOC Administrative Committee
9    Members to commit breaches of duty, had knowledge of such Individual HBOC Administrative
10   Committee Members breaches and failed to make reasonable efforts under the circumstances to
11   remedy the breaches. HBOC is also liable for the breaches of Defendant McCall because HBOC
12   had knowledge of the breaches of McCall, and failed to remedy such breaches. Consequently,
13   HBOC is liable as a co-fiduciary under ERISA § 405(a)(2) and (3).

14                  b.      Defendant McCall was a member of the HBOC Board and was a
15   fiduciary by virtue of such membership. McCall had knowledge of the HBOC accounting
16   irregularities. Notwithstanding, he failed to properly monitor the performance of the Individual
17   HBOC Administrative Committee Members or to communicate to them and the Trustee such
18   information as each needed for the proper performance of its duties, as required of McCall as a
19   fiduciary under HBOC Plan Document § 11.1. As a result of McCall's own breaches committed
20   in violation of ERISA § 404(a)(1), McCall enabled the HBOC Administrative Committee and the
21   Individual HBOC Administrative Committee Members to commit breaches of duty, had
22   knowledge of such Individual HBOC Administrative Committee Members' breaches and failed
23   to make reasonable efforts under the circumstances to remedy the breaches.  As such, McCall is
24   liable as a co-fiduciary under ERISA § 405(a)(2) and (3).

25                  179.    HBOC is further liable for the breaches of duty by the HBOC Board, the
26   HBOC Administrative Committee, the Individual HBOC Administrative Committee Members
27   and the Individual HBOC Board Members under the law of agency, including the principles of
28   vicarious liability and *respondeat superior*; and HBOC is liable as an indemnitor of these

1    Defendants pursuant to applicable corporate law and under the terms of HBOC articles of

2    incorporation, by-laws and other HBOC documents of corporate governance, for the losses

3    caused by the breaches of these Defendants.

4         **WHEREFORE**, Plaintiffs pray for relief as set forth below.

5

6         <u>**COUNT FIVE**</u>**: On Behalf of the Former HBOC Plan**

7    **Claim for Relief Against Defendant the HBOC Administrative Committee, Defendants the**
     **Individual HBOC Administrative Committee Members, Including Defendants Rumsey and**
8    **Kappel, for Violation of ERISA § 404(a)(1)(D)**

9         180.    Plaintiffs incorporate by reference all allegations of this Complaint as set

10   forth in the paragraphs above.

11        181.    By virtue of all the facts and events alleged herein, Defendants the HBOC

12   Administrative Committee and Defendants the Individual HBOC Administrative Committee

13   Members, including Defendants Rumsey and Kappel, and as fiduciaries of the HBOC Plan, failed

14   to discharge their duties with respect to the HBOC Plan solely in the interest of the participants

15   and their beneficiaries and in accordance with the documents and instruments governing the

16   HBOC Plan, in violation of ERISA §§ 404(a)(1)(D) [29 U.S.C. §§ 1104(a)(1)(D)], by, among

17   other things, between January 12, 1999 and April 1, 1999:

18        a.    Failing to conduct an adequate fiduciary review to determine

19   whether the HBOC Plan Document permitted the HBOC Plan to hold shares of McKesson in the

20   HBOC Stock Fund;

21        b.    Causing the shares of HBOC Company Stock that were held by the

22   HBOC Stock Fund prior to the Corporate Merger to be exchanged for 1,132,608 shares of

23   McKesson Company Stock at the time of the Corporate Merger, notwithstanding the fact that the

24   HBOC Plan expressly provided that *only* shares of HBOC, and not shares of McKesson, could be

25   held by the HBOC Stock Fund;

26        c.    Failing to immediately liquidate the 1,132,608 shares of McKesson

27   Company Stock which was exchanged for shares of HBOC Company Stock at the time of the

28

1  Corporate Merger, which the HBOC Stock Fund was not permitted to hold under the HBOC Plan
2  Document;

3                    d.      Continuing to hold and to acquire an additional 51,372 shares of
4  McKesson Company Stock in the HBOC Stock Fund after January 12, 1999, notwithstanding the
5  fact that the HBOC Plan expressly provided that *only* shares of HBOC, and not shares of
6  McKesson, could be held by the HBOC Stock Fund; and

7                    e.      Continuing to hold and acquire shares of McKesson Company
8  Stock in the HBOC Stock Fund after January 12, 1999, without proper direction from the
9  participants of the HBOC Plan authorizing McKesson shares to be maintained in individual
10  participant accounts.

11       182.    As a result of the above enumerated failures to discharge their duties with
12  respect to the HBOC Plan in accordance with the documents and instruments governing the
13  HBOC Plan in violation of ERISA § 404(a)(1)(D), the HBOC Administrative Committee and the
14  Individual HBOC Administrative Committee Members, including Defendants Rumsey and
15  Kappel, caused losses to the HBOC Plan and the accounts of the HBOC Plan participants which
16  they are legally responsible to restore pursuant to ERISA § 409(a).

17       183.    At such time as the Corporate Merger took place and continuing until the
18  HBOC Plan was merged into the McKesson Plan, the HBOC Stock Fund was not permitted
19  under the HBOC Plan Document to hold any stock other than HBOC Company Stock. Therefore,
20  at the time of the Corporate Merger, by virtue of the exchange of HBOC Company Stock for
21  McKesson Company Stock, the HBOC Administrative Committee and the Individual HBOC
22  Administrative Committee Members, including Defendants Rumsey and Kappel, failed to
23  administer the HBOC Plan in accordance with the documents and instruments governing the
24  HBOC Plan, and should have liquidated all shares of McKesson Stock held by the HBOC Stock
25  Fund.

26       184.    After January 12, 1999, the HBOC Plan held no less than 1,132,608
27  shares of McKesson Company Stock in the HBOC Stock Fund.

28

1      185.    In lieu of liquidating the McKesson Company Stock held by the HBOC

2    Stock Fund and distributing the proceeds to participants' accounts for investment in another

3    investment option offered by the HBOC Plan, the HBOC Administrative Committee and the

4    Individual HBOC Administrative Committee Members, including Defendants Rumsey and

5    Kappel, continued to invest the assets of the HBOC Stock Fund in McKesson Company Stock.

6      186.    Had the HBOC Administrative Committee and the Individual HBOC

7    Administrative Committee Members, including Defendants Rumsey and Kappel, allowed the

8    HBOC Plan participants to invest the proceeds from the liquidation of the McKesson Company

9    Stock obtained by the HBOC Stock Fund as a result of the Corporate Merger, participant overall

10   account balances, as subsequently merged into the McKesson Plan, would have been worth far

11   more today than the actual value of their accounts.

12     187.    The HBOC Administrative Committee and the Individual HBOC

13   Administrative Committee Members, including Defendants Rumsey and Kappel, are legally

14   required pursuant to ERISA § 409(a) to restore to the HBOC Plan participants the losses

15   determined by comparing the actual value of the HBOC Plan participant accounts invested in

16   McKesson Company Stock to what such accounts would have been worth today had such stock

17   been liquidated after January 12, 1999, and the proceeds been invested instead in an appropriate

18   investment alternative. Such loss amount shall be proven at trial, applying ERISA loss analysis

19   and standards in which all ambiguities in loss calculation are resolved against the breaching

20   fiduciaries and in favor of the Plaintiffs.

21     188.    The HBOC Administrative Committee and the Individual HBOC

22   Administrative Committee Members, including Defendants Rumsey and Kappel, may not avail

23   themselves of any defense under ERISA § 404(c) to relieve them of liability for their ERISA

24   violations insofar as (a) the participants were never provided with an explanation that the HBOC

25   Plan was intended to constitute a plan described in ERISA § 404(c), as required by 29 C.F.R. §

26   2550.404c-1(b)(2)(B)(1)(i), nor did the HBOC Plan satisfy the administrative requirements under

27   DOL regulations for the application of ERISA § 404(c); (b) ERISA § 404(c) does not relieve

28   fiduciaries of the responsibility under ERISA § 404(a)(1)(D) to act in accordance with the

1    documents and instruments governing the HBOC Plan; (c) the HBOC Plan participants never

2    exercised "independent control," within the meaning of 29 C.F.R. § 2550.404(c)-1(c)(2), over

3    investment decisions regarding the McKesson Company Stock in the HBOC Stock Fund, as

4    required by ERISA § 404(c), because HBOC Plan Fiduciaries did not provide participants with

5    adequate and truthful information concerning the McKesson Company Stock as an investment

6    option selected and offered by the HBOC Plan Fiduciaries; and (d) any HBOC Plan provision

7    which purports to relieve fiduciaries of the obligation to select and monitor prudent investment

8    options, and transfer such liability to participants, would be void as against public policy and be

9    in violation of ERISA § 410 [29 U.S.C. § 1110].

10        **WHEREFORE**, Plaintiffs pray for relief as provided below.

11

12                    **COUNT SIX: On Behalf of the Former HBOC Plan**

13        **Claim for Relief Against Defendant Gilbertson for Violation of ERISA § 404 and for
          Remedial and Equitable Relief under ERISA § 409**

14

15             189.    Plaintiffs reallege and incorporate all paragraphs of the Complaint set forth

16    above as though fully set forth herein.

17             190.    This Count of the Complaint is brought against Defendant

18    Gilbertson for the losses caused to the HBOC Plan and its participants for HBOC Company

19    Stock *held* by the HBOC Plan on March 31, 1996. This Count differs from the Counts One

20    through Five above insofar as it seeks a recovery exclusively for losses for *holdings of HBOC on*

21    *March 31, 1996*, whereas Counts One through Five above seek a recovery of losses determined

22    under ERISA primarily for *purchases* of HBOC shares *after* the accounting irregularities at

23    HBOC commenced on or about April 1, 1996.

24             191.    Upon information and belief, as of March 31, 1996, the HBOC Plan

25    already held approximately 250,000 shares of HBOC Company Stock, valued then at

26    approximately $ 3,000,000. These shares should have been divested at the time the accounting

27    irregularities commenced at HBOC on or about April 1, 1996. The failure to divest these shares

28

1   and invest the proceeds in other suitable investments constituted a breach of fiduciary duty, and

2   resulted in losses to the HBOC Plan which must be restored.

3          192.    Defendant Gilbertson served as a fiduciary of the HBOC Plan by virtue of

4   his membership on the HBOC Administrative Committee.  The principal asset of the plan he

5   served was the publicly-traded stock of HBOC. Defendant Gilbertson had knowledge of, engaged

6   in and directed the improper accounting activities at HBOC. A fiduciary like Gilbertson who

7   engages in accounting irregularities at the very company that comprises the principal asset of an

8   ERISA plan he must faithfully serve necessarily violates his ERISA duty of loyalty by knowingly

9   engaging in such improper conduct, because his actions will inevitably and predictably result in

10  the diminution in the value of the assets of the plan he serves. As such, by virtue of his actions

11  and knowledge in engaging in and directing the improper accounting practices at HBOC at a time

12  when he served as a fiduciary of the HBOC Plan whose principal asset was HBOC Company

13  Stock, Defendant Gilbertson violated his ERISA § 404(a)(1) fiduciary duty of loyalty to the

14  March 31, 1996 holders of HBOC Company Stock.

15         193.    As a result of his breaches of loyalty outlined herein, Defendant Gilbertson

16  caused the losses to the HBOC Plan and the HBOC Company Stock *held* by the HBOC Plan at

17  the time the accounting irregularities commenced on or about April 1, 1996. Under ERISA

18  §409(a), Defendant Gilbertson must make good and restore those losses to the HBOC Plan. Such

19  amount shall be proven at trial.

20         194.    Furthermore, when the accounting irregularities began at HBOC on or

21  about April 1, 1996,  the information concerning the accounting irregularities at HBOC may have

22  been material non-public information, and the HBOC Plan Fiduciaries may have been precluded

23  from acting to divest the then existing HBOC Plan's holdings in HBOC Company Stock to the

24  extent that insider trading rules under the securities laws conflicted with their ERISA duties.

25  However, the losses caused to the HBOC Plan as a result of the inability to divest existing HBOC

26  Plan holdings in HBOC Company Stock should still nonetheless be borne by Defendant

27  Gilbertson because, among other things:

28

1               a.     It is Gilbertson's own illegal activities that gave rise to the

2 existence and knowledge of the material non-public information in the first instance. As such,

3 Defendant Gilbertson's posture in this litigation is far different than those HBOC Plan

4 Fiduciaries who may be found to have uncovered the irregularities and/or not participated in the

5 accounting irregularities, and were precluded from acting due to insider trading laws, as opposed

6 to those who actually perpetrated the irregularities, like Gilbertson.

7               b.     ERISA actions brought under ERISA §§ 502(a)(2) and 409 are

8 drawn from the law of trusts, and are essentially equitable in nature. *Kahnke v. Hertes*, 579 F.

9 Supp. 1523, 1527-28 (D. Minn. 1984) (remedy seeking payment of funds into the plan for

10 distribution to participants is clearly an equitable remedy for breach of fiduciary duty under

11 sections 409 and 502(a)(2) of ERISA); *Motor Carriers Labor Advisory Council v. Trucking

12 Management, Inc.*, 731 F. Supp. 701, 703 (E.D.Pa.1990). Among the principles of equity is that

13 one should not profit from one's own wrongdoing. If Defendant Gilbertson were to evade ERISA

14 liability hereunder by resort to an insider trading preclusion, *i.e.*, that he was precluded from

15 acting to divest the HBOC Plan of HBOC Company Stock because of knowledge of material

16 non-public information *that he caused and which arose by virtue of his own illegal misdeeds*, he

17 would necessarily be profiting. Defendant Gilbertson is also before this Court with unclean

18 hands, and the overall balancing of the equities require the Court to afford proper relief and

19 remedies to the HBOC Plan and its participants that does substantial justice.

20               c.     Furthermore, the interests of the HBOC Plan participants, and the

21 interests of preserving the retirement savings of American workers generally, *are public

22 interests*. When "public interests" are implicated, the role of equity and the need to fashion

23 proper remedies is further heightened. In *Castle v. Cohen*, 676 F. Supp. 620, 627-29 (E.D. Pa.

24 1987), an action for relief brought under ERISA, the need for courts to protect public interests

25 and fashion appropriate remedies was acknowledged, "[c]ourts of equity may, and frequently do,

26 go much farther to give and withhold relief in furtherance of the public interest than they are

27 accustomed to go when only private interests are involved." *Castle*, 676 F. Supp. at 628, citing

28 *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 179-80, 94 S.Ct. 414, 423, 38 L. Ed. 2d 388

1   (1973). Congress was greatly concerned about the pension rights due to workers for long years of

2   service with their employer." *Castle*, 676 F. Supp. at 628.

3                              d.        The Court is empowered under ERISA § 409(a) to fashion such

4   remedial relief as it deems appropriate in order to provide substantial justice. As between the

5   wholly innocent HBOC Plan participants and a fiduciary like Gilbertson *who engaged in the*

6   *improper and illegal conduct*, the losses to holders of HBOC Company Stock should fall on the

7   offending fiduciary Gilbertson. This emphasis on the particulars of each individual case is

8   consistent with the central feature of equity jurisdiction: "the ability to assess all relevant facts

9   and circumstances and tailor appropriate relief on a case by case basis." *Rosario-Torres v.*

10  *Hernandez-Colon*, 889 F.2d 314, 321 (1st Cir. 1989) (en banc); "The essence of equity

11  jurisdiction has been the power ... to do equity and to mould each decree to the necessities of the

12  particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591-592, 88 L.Ed. 754

13  (1944); and "the hallmarks of equity have long been flexibility and particularity," *Lussier v.*

14  *Runyon*, 50 F.3d 1103, 1110 (1st Cir. 1995), *cert. denied*, 133 L.Ed. 2d. 30 (1995).

15                             195.       By virtue of all the facts and events alleged herein, including without

16  limitation the fiduciary breaches committed by Defendant Gilbertson as an HBOC Plan

17  Fiduciary, and the fact that Defendant Gilbertson participated in, directed and had knowledge of

18  a wide-ranging accounting irregularities at the very company which comprised the principal asset

19  of the plans he served as a fiduciary, Defendant Gilbertson has breached his ERISA § 404(a)(1)

20  duty of loyalty and should be ordered to restore the losses he caused and which resulted to the

21  HBOC Plan and its participants for HBOC Company Stock *held* at the time the accounting

22  irregularities began. In addition, Defendant Gilbertson should be enjoined from forever serving

23  as a fiduciary of any ERISA plan.

24          **WHEREFORE,** Plaintiffs pray for relief as provided herein and below.

25

26

27

28

1                 **COUNT SEVEN: On Behalf of the McKesson Plan**

2   **Claim for Relief Against the Pre-Merger Individual McKesson Board Members for Breach**
3   **of Fiduciary Duty in Violation of ERISA § 404 for the Pre-Merger Period (before January**
                                                     **12, 1999)**
4

5           196.    Plaintiffs reallege and incorporate all paragraphs of this Complaint set
6   forth above as though fully set forth herein.

7           197.    This Count of the Complaint alleges breach of fiduciary duty against the
8   Pre-Merger Individual McKesson Board Members (named above in paragraph 20) for violations
9   of ERISA occurring before and up through the Corporate Merger on January 12, 1999.

10           198.    The duties of loyalty, exclusive purpose and prudence provided for in
11   ERISA § 404(a)(1) require, among other things, that fiduciaries of ERISA plans conduct
12   adequate and diligent fiduciary reviews of the investment policies of plans they serve, and
13   monitor those policies and investments so that the plan assets remain prudently invested, and that
14   fiduciaries not place themselves in a conflicted position such that they compromise their ability
15   to fulfill their ERISA duties to the plan and participants they are obligated to serve loyally and
16   exclusively, with an "eye single" devotion to the plan and participants.

17   **October 1998--The McKesson Plan is Overly Concentrated in McKesson Company Stock**

18           199.    At the time McKesson announced on October 18, 1998 that it would be
19   acquiring HBOC in a merger, the McKesson Plan was heavily concentrated and overly weighted
20   in McKesson Company Stock. In particular, the ESOP portion of the McKesson Plan
21   (attributable to all Company Contributions, including matching contributions) was 100%
22   invested in McKesson Company Stock, comprising approximately $1.2 billion in McKesson
23   Company Stock as of the March 31, 1999. On an overall plan-wide basis, the McKesson Plan
24   held 75% of its assets in McKesson Company Stock as of March 31, 1999.

25   **ESOP Fiduciaries Are Subject to ERISA §404(a)(1) Duties of Loyalty, Exclusive Purpose**
    **and Prudence, Requiring Diversification when Necessary to Fulfill Fiduciary Duties**
26

27           200.    ESOPs are not required to invest their assets *exclusively* in company
    stock/employer securities. Rather, under ERISA § 407(d)(6) and Internal Revenue Code
28

1   §4975(e)(7), ESOPs are only required to invest *primarily* in company stock/employer securities

2   to qualify as an ESOP. Specifically, ERISA § 407(d)(6) states:

3           "The term 'employee stock ownership plan' means an individual account plan (A) which
            is a stock bonus plan which is qualified, or a stock bonus plan and money purchase plan
4           both of which are qualified, under section 401 of the Internal Revenue Code of 1986 [26
            USC 401], and which is designed to invest *primarily* in qualifying employer securities,
5           and (B) which meets such other requirements as the Secretary of the Treasury may
            prescribe by regulation." (emphasis added)
6

7   This distinction is important, because the ESOP portion of the McKesson Plan could have

8   maintained it status as an ESOP without having *all* its assets invested in McKesson Company

9   Stock, and the McKesson Plan as a whole would still have fulfilled its express purpose of

10  promoting the retirement savings of participants *and* providing employees with a proprietary

11  interest in McKesson.

12          201.    To the extent that the terms of the ESOP portion of the McKesson Plan

13  could be interpreted as requiring that Company Contributions be held in McKesson Company

14  Stock, such a limiting plan provision may not be blindly followed by an ERISA fiduciary. That is

15  because ESOPs, under all case law and government (DOL) authority, remain subject to the

16  ERISA § 404(a)(1) duties of loyalty, prudence, and exclusive purpose, even though, as "eligible

17  individual account plans" under ERISA, they are exempt from the strict duty to diversify the

18  investment of plan assets. These ERISA fiduciary duties are the highest known to the law, and

19  the duty of prudent investment is judged against that of a prudent expert, a standard that is

20  different from and higher than a "business judgment" standard.

21          202.    Furthermore, under ERISA § 404(a)(1)(D), an ERISA fiduciary may

22  follow the terms of a plan document only *to the extent such provisions are consistent with*

23  *ERISA*. If the investment of *100% of the ESOP assets* in McKesson Company Stock were

24  imprudent, that would necessarily violate and not be consistent with ERISA, and, thus, a plan

25  provision requiring such an exclusive investment course of action could not be considered to be

26  *consistent with* ERISA, and would violate ERISA § 404(a)(1)(D).

27          203.    That a plan provision or term requiring investment of all ESOP assets in

28  employer securities/company stock cannot be read to prohibit diversification of the investment in

1    employer securities/company stock under appropriate circumstances is buttressed by case law,

2    specifically the decision in *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995). In that case, the

3    plan term in question *required* investment in employer securities and *prohibited* diversification.

4    The Court nonetheless held

5        *"that the purpose and nature of ERISA and ESOPs preclude a plan's per se prohibition*
         *against diversification or liquidation"* and that *"the purpose of ESOPs cannot override*
6        *ERISA's goal of ensuring the proper management and soundness of employee benefit*
         *plans... Therefore, a plan provision that completely prohibits diversification of ESOP*
7        *assets necessarily violates the purposes of ERISA."* (emphasis added)

8
                 204.     The Department of Labor (DOL), the government agency responsible for
9
     the enforcement of ERISA's fiduciary provisions, is in full accord on these rules relating to
10
     ESOPs. In *ERISA Op. Ltr.* 83-6A, the DOL interpreted the ERISA § 407(d)(6) "primarily"
11
     standard for ESOPs as being satisfied if only 50% of the assets are invested in employer
12
     securities over the life of the plan, but cautioned that "instances may arise where an investment
13
     of more than 50 percent of plan assets in qualifying employer securities would not satisfy the
14
     fiduciary responsibility requirements imposed by section 404 of ERISA." In *ERISA Op. Ltr. 90-*
15
     *05A*, the DOL likewise cautioned fiduciaries they cannot blindly follow a plan provision in an
16
     ESOP regarding the investment of company stock which mandates a particular investment
17
     percentage threshold. ("In this regard, we note that compliance with a plan provision would not
18
     insulate the fiduciaries from liability under section 404 of ERISA *should prudence or exclusive*
19
     *benefit requirements dictate an alternative investment course of action."* (emphasis added))

20
                 205.     The requirement under ERISA § 404(a)(1) to diversify ESOP assets when
21
     necessary would be consistent with the provisions of the McKesson Master Trust §7.5, which
22
     provided that the "Board of Directors and the Compensation Committee" bore "full
23
     responsibility for the diversification of Trust Fund assets." McKesson Master Trust § 2.14
24
     defined the "Trust Fund" to mean, "collectively, *all of the assets* held by the Master Trustee
25
     under this Master Trust." (emphasis added) McKesson Company Stock was part of "all of the
26
     assets" held by the Master Trustee and therefore part of the Trust Fund established by the
27
     McKesson Master Trust.

28

1    206.    In observing their fiduciary responsibilities to the McKesson Plan, the Pre-

2    Merger Individual McKesson Board Members knew or should have known the law pertaining to

3    ESOPs–that ERISA fiduciary duties of loyalty, prudence, and exclusive purpose continue to

4    apply to ESOPs at all times; that ERISA § 404(a)(1)(D) allows a fiduciary to follow plan

5    provisions only to the extent they are consistent with ERISA; that ESOPs are only required to

6    invest "primarily" in employer securities/company stock and not exclusively; that the "primarily"

7    standard can be satisfied if only 50% of the assets of the plan are invested in employer

8    securities/company stock; and that case law decided up through the time the breaches complained

9    of herein would prohibit fiduciaries from blindly following a plan term that would require a

10   single investment course of action and otherwise prohibit any diversification in appropriate

11   situations.

12   207.    The Pre-Merger Individual McKesson Board Members also knew that

13   their fiduciary responsibilities under the McKesson Plan encompassed the responsibility for

14   determining the investment policies and guidelines for the McKesson Plan and McKesson Master

15   Trust assets. Such duties necessarily included the duty to monitor the investment policy of the

16   McKesson Plan, once established. The word "policy" is defined to mean a "course of conduct,"

17   and thus the duty for determining the McKesson Plan's investment policies under McKesson

18   Plan and McKesson Master Trust provisions was indisputably ongoing, requiring confirmation

19   that the investment "course of conduct" for the McKesson Plan assets remained prudent.

20   **The Merger Presents Significant and Unique Risk Factors for the Continued Heavy
     Concentration in McKesson Company Stock, Requiring a Fiduciary Review by the
21   McKesson Plan Fiduciaries**

22   208.    The acquisition of HBOC was undoubtedly a seminal and major corporate

23   event for McKesson. An October 18, 1998 press release announcing the anticipated merger

24   valued the combined companies at $23 billion. McKesson issued shares of stock of the combined

25   company to existing HBOC shareholders totaling $14 billion, evidencing that HBOC's market

26   capitalization was actually *greater than* McKesson's at the time of the Corporate Merger. The

27   Joint Proxy indicated that after the Corporate Merger, HBOC shareholders would own 64% of

28   the combined company, and McKesson shareholders would own just the remaining 36%. These

1   figures demonstrate that McKesson, as the surviving company in the Corporate Merger, *was*
2   *essentially purchasing a company that was larger than itself*, and that the future success of the
3   combined companies could depend more on the performance of HBOC after the merger than on
4   the pre-merger McKesson businesses.

5          209.    A merger of this magnitude by McKesson required, among other things,
6   that the Pre-Merger McKesson Individual Board Member, as fiduciaries of the McKesson Plan
7   responsible for determining its investment policies and guidelines, conduct a thorough ERISA
8   fiduciary review for the purposes of determining the propriety of maintaining such a heavily
9   weighted concentration of McKesson Plan assets in McKesson Company Stock in the wake of
10  such a major and significant corporate event, the proposed acquisition of HBOC.

11         210.    The necessity of conducting such a fiduciary review of the overly weighted
12  concentration of McKesson Plan assets in McKesson Company Stock was magnified by the fact
13  that McKesson and/or the McKesson Board Members had knowledge, at a minimum, that HBOC
14  had employed questionable accounting practices by virtue of the Deloitte due diligence presented
15  to them in July 1998, even if it is assumed they did not know of the full extent of the HBOC
16  accounting irregularities at that time.

17         211.    Apart from the sheer size of the Corporate Merger in terms of combining
18  two companies with such large market capitalizations, and the fact that McKesson would be
19  acquiring a company with market capitalization *larger than itself*, there were a number of
20  additional reasons why the Pre-Merger Individual McKesson Board members should have
21  performed a fiduciary review beginning no later than the time the anticipated merger was
22  announced on October 18, 1998, and continuing through the time the Corporate Merger was
23  consummated on January 12, 1999. Among them are:

24         a.      **75% of Mergers Fail to Achieve Expected Results**. Reputable
25  and credible studies confirm that 70-75% of such mergers fail to achieve the financial results
26  contemplated by the parties before the merger, a finding that the McKesson Plan Fiduciaries
27  knew or should have known in their capacity as ERISA fiduciaries of the McKesson Plan in
28  evaluating its investment policies. See Walters, K. & Stensholt, J., "Management at Work

1   Exercise Making Mergers Work!" Business Review Weekly, 1117 April 2002 (Research

2   evidence suggests that mergers fail to add shareholder value in 75% of mergers and over half

3   actually decrease value.)

4                      b.      **McKesson and HBOC are Essentially in Different**

5   **Businesses**. The high probability of the failure of this merger to achieve anticipated results was

6   significantly increased in this instance by the fact that this merger involved two companies with

7   different businesses operating in different segments of the healthcare industry. McKesson was a

8   wholesale pharmaceutical distribution company. HBOC, on the other hand, was in the computer

9   software development, sales and service business. Though they had common customers in the

10  healthcare industry, there were serious questions and concerns about the synergies of such a

11  combination of large companies. In fact, the Joint Proxy issued by McKesson and HBOC on

12  November 27, 1998 raised these concerns as among the most significant risk factors arising out

13  of the proposed merger. The Joint Proxy stated:

14              "the integration of the two companies will involve special risks because
                McKesson and HBOC currently operate in different sectors of the
15              healthcare industry. There may also be challenges in retaining the
                customers of the combined businesses. Moreover, challenges will be
16              presented in assimilating and retaining personnel. In addition, the
                integration of the operations and systems of the two companies and the
17              realization of the potential operating synergies may prove difficult, and
                may cause management's attention to be diverted from other business
18              concerns."

19                     c.      **Integration Risks Magnified by Numerous Prior**

20  **McKesson and HBOC Acquisitions**. The potential difficulties in integrating the businesses of

21  the two companies was exacerbated by another factor–that both McKesson and HBOC had each

22  acquired numerous other businesses and companies in the years preceding the Corporate Merger.

23  Indeed, much of HBOC's growth throughout the 1990's had occurred as a result of an acquisition

24  growth strategy. In fact, HBOC acquired not less than seven companies from the period August

25  1996 through December 1998, typically using its inflated share price as a currency to make such

26  acquisitions. McKesson also acquired not less than three companies from the period November

27  1996 through November 1998. These acquisitions were all characterized as "significant" in SEC

28  public filings, and magnified the integration problems associated with combining McKesson and

1   HBOC. The Corporate Merger not only involved the problems of combining just two large
2   companies, but in reality the integration of over ten companies that had a separate existence only
3   two-three years prior to the January 1999 Corporate Merger.

4               d.      **Independent Analysts Publicly Question HBOC's**
5   **Operations and Accounting Practices**. Publicly available information by credible sources
6   raised questions about the operations of HBOC in light of its acquisition growth strategy,
7   including HBOC's accounting practices. For example, the report issued by the Center for
8   Financial Research and Analysis in August 1998, soon before the announcement of the merger,
9   documented the recent downward trend in several of HBOC's operating and financial metrics,
10  including, without limitation, the rapid increase in accounts receivable, which logically called
11  into question HBOC's revenue recognition policies, and the improper use of acquisition reserves
12  to offset operating expenses, all matters which turned out to be accounting irregularities. The
13  CFRA Report was developed from published HBOC financial statements. (See paragraphs 103-
14  107 above for a more complete overview of the CFRA Report.)

15              e.      **Pre-Merger–Deloitte Advises McKesson Plan Fiduciaries of**
16  **Questionable HBOC Accounting Practices.** As detailed in paragraphs 90-102 and 111-116,
17  prior to the Corporate Merger, McKesson's own advisors, Deloitte and Bear Stearns, uncovered
18  and reported the existence of questionable accounting practices at HBOC while performing due
19  diligence on the accounting practices at HBOC in the summer of 1998, matters which remained
20  unresolved when the merger was announced in October 1998. That due diligence uncovered prior
21  to the Corporate Merger several of the same accounting practices which not coincidentally
22  proved to be HBOC's undoing when the accounting irregularities were announced. According to
23  written memorandum prepared by Bear Stearns, McKesson's financial advisor for the merger,
24  these questionable accounting practices were brought to the attention of the Pre-Merger
25  Individual McKesson Board Members, who were told at this time that the risk that the SEC
26  would require a restatement of HBOC financial statements was "high." Furthermore, the Deloitte
27  information essentially mimicked the findings in the CFRA Report which had been developed
28  from HBOC's published financial statements.

1        At a minimum, Defendants McKesson and the Pre-Merger Individual McKesson

2   Board Members negligently dismissed these accounting matters as either irrelevant or

3   immaterial, or as something that could disregarded so the merger could proceed, but be "fixed"

4   after the merger, over an extended time period. Indeed, that is exactly what McKesson's Chief

5   Financial Officer proposed to do to address certain of the accounting problems which Deloitte

6   uncovered. However, such actions, and the absolute laxity with which Defendants treated this

7   information from Deloitte, whether or not they rise to the level and form the basis for an

8   allegation of securities fraud, is certainly evidence of and establishes ERISA imprudence on the

9   part of the Pre-Merger Individual McKesson Board Members *in their capacity as ERISA*

10  *fiduciaries*. ERISA imprudence does not require a showing of intent to defraud or scienter, but

11  rather imprudent and negligent behavior. Indeed, had  the actual knowledge of the existence of

12  such questionable accounting practices at HBOC been placed in the hands of an independent

13  ERISA fiduciary at this time, such matters would have been carefully considered and weighed in

14  the context of evaluating the McKesson Plan's investment policies.

15              f.      **Having "All Your Eggs in One Basket" is Always Risky**

16  **Anyway.** The retirement savings of the McKesson Plan participants were virtually entirely

17  resting on the performance of McKesson Company Stock held by the McKesson Plan, and, to a

18  large extent, on the success of the HBOC merger. Having "all your eggs in one basket" is

19  necessarily and inherently risky, heightening the requirement and responsibility that the

20  fiduciaries closely monitor the propriety of such an investment policy and singular course of

21  action. This heightened scrutiny was particularly necessary and advisable in the context of the

22  major HBOC corporate acquisition and insofar as McKesson had frozen its defined benefit plan

23  in 1996 (a plan which provided participants with a monthly annuity retirement not based on the

24  performance of McKesson shares) and had substituted additional Company Contributions in

25  McKesson Company Stock to partially replace the benefits lost to employees by virtue of

26  freezing the defined benefit plan. This was the Retirement Share Plan Contribution, given that

27  name because these contributions were intended to replace the benefits lost under the frozen

28  defined benefit plan. (See McKesson Plan Document, Article 6)

1                 g.      **Certain HBOC and McKesson Plan Fiduciaries Had**

2 **Irreconcilable Conflicts of Interest, Because They Had a Financial Incentive for the Merger**

3 **to Be Completed**. The Joint Proxy (p. 51) disclosed that certain of the Defendants had a

4 financial interest in seeing to it that the merger was completed, in the form of stock options and

5 restricted stock that would vest. Thus, the interests of Defendants such as Pulido, McCall and

6 Bergonzi were characterized in the Joint Proxy as being "in addition to, or different from, the

7 interests of stockholders of HBOC and McKesson generally." In November 1998, the Atlanta

8 Business Chronicle reported that Defendant Pulido would personally get as much as $82.6

9 million by cashing in stock and exercising options, and Defendant McCall would be eligible to

10 receive $11.7 million in stock options which would be accelerated due to the merger. Not

11 coincidentally, these conflicted Defendants were the individuals who primarily negotiated the

12 merger. See Roni Robbins, "McKesson/HBOC Merger Yields Rewards for Execs," Atlanta

13 Business Chronicle, November 1998 (the largest payouts would go to McKesson management

14 according to documents filed with the SEC.) Such conflicts of interest necessarily tainted the

15 decision-making of McKesson Plan Fiduciaries, since they would likely never either consider or

16 sell McKesson shares held by the McKesson Plan if such a course of action might in any way

17 jeopardize the financial rewards they expected if the merger were consummated, or rewards they

18 anticipated thereafter.

19           212.     The size of this anticipated merger, that McKesson was acquiring a

20 company that was bigger then itself, coupled with the unusual and extraordinary risk factors

21 outlined herein, including the conflicts of interest and other matters which will be developed

22 during the discovery phase of this case, were sufficient to require the Pre-Merger Individual

23 McKesson Board Members to conduct a thorough and diligent fiduciary review of the investment

24 policies of the McKesson Plan that were so heavily concentrated in McKesson Company Stock.

25 **Pre-Merger McKesson Plan Fiduciaries are in a Conflicted Position**

26           213.     That no fiduciary review of the McKesson Plan investment policies was

27 conducted arose, in whole or in part, from the conflict of interest under which the Pre-Merger

28

1   Individual McKesson Board Members were laboring. Though ERISA does not preclude an

2   individual from serving as both a plan fiduciary and as a corporate officer/board member, when

3   the fiduciary decision involves the investment of plan assets in publicly-traded company stock,

4   that decision is inherently tainted by a conflict of interest. In this instance, any proper

5   consideration of whether to diversify the McKesson Plan holdings in McKesson Company Stock

6   (a fiduciary determination) conflicted with McKesson's desire to consummate the Corporate

7   Merger (a business or corporate concern). According to the Joint Proxy (p.51), certain

8   Defendants, including Pulido (the director most responsible for negotiating the merger), stood to

9   benefit financially if the merger were completed through the acceleration of restricted stock

10  and/or stock options. Indeed, the interests of certain Defendants (including Pulido) were

11  characterized as being "different from, and in addition to, the interest of stockholders generally"

12  in the Joint Proxy. The prudent sale of a percentage of McKesson Company Stock designed to

13  protect the long-term retirement savings of McKesson Plan participants by the fiduciaries would

14  have been viewed as inconsistent with the goal of promoting and completing the Corporate

15  Merger. Furthermore, insiders and corporate directors are reluctant to sell company stock from a

16  plan, since the plan serves as a ready market for the stock and supports the price of the stock, and

17  sales of company stock might affect the price of shares in the marketplace. All these matters and

18  considerations placed the Pre-Merger Individual Board Members in a conflicted position and

19  tainted their decision-making as ERISA fiduciaries, resulting in their failure to evaluate their

20  options as ERISA fiduciaries with an "eye-single" to the interests of the McKesson Plan and its

21  participants.

22          214.    Placing oneself in conflicted position as officers or directors of the

23  company which prevents one from functioning with complete loyalty to participants demanded of

24  them as fiduciaries of the plan itself constitutes an independent breach of ERISA duties. See

25  *Donovan v. Bierwirth*, 680 F. 2d 263, 271-72 (2d Cir. 1982), *cert. denied*, 459 U.S. 1069 (1982).

26  Furthermore, when it is possible to question the fiduciaries' loyalty, they are obliged at a

27  minimum to engage in an intensive and scrupulous independent investigation of their options to

28  insure that they act in the best interests of the plan beneficiaries. *Howard v. Shay*, 100 F.3d 1484,

1    1488-89 (9th Cir. 1996). Fiduciaries who may be conflicted must also consider other options

2    available to them, such as resigning in favor of a truly independent fiduciary.

3    **An Independent Fiduciary Would Have *Objectively* Evaluated Investment Policies and**
     **Diversified the ESOP**

4

5    215.    The Pre-Merger Individual McKesson Board Members failed to conduct

6    any fiduciary review of the investment policies of the McKesson Plan, let alone an independent

7    and scrupulous review they should have conducted, notwithstanding their responsibilities under

8    ERISA, the pendency of a major corporate merger, their knowledge of the questionable

9    accounting practices at HBOC gleaned from the Deloitte due diligence, matters which had been

10   validated by the CFRA Report, and the other risk factors surrounding the Corporate Merger

11   outlined herein. Had a truly independent fiduciary review occurred, a prudent and loyal fiduciary

12   acting under these circumstances would have objectively evaluated the risks and made a different

13   investment decision, causing the McKesson Plan to diversify holdings in McKesson Company

14   Stock.

15   216.    The Pre-Merger Individual McKesson Board Members did not have to

16   diversify the *entire* McKesson Plan holdings in McKesson Company Stock to fulfill their

17   responsibilities under ERISA. An ERISA fiduciary may breach his duties by holding too much of

18   a plan's assets in a single investment. Instead of investing 100% of the ESOP portion of the

19   McKesson Plan in McKesson Company Stock, the Pre-Merger Individual McKesson Board

20   Members could have diversified up to 50% of the McKesson Plan holdings in McKesson

21   Company Stock and still complied with investment rules that ESOPs invest *primarily* in

22   employer securities. Such limited diversification would have still upheld the purposes of the

23   McKesson Plan to promote the retirement savings of participants and to provide employees with

24   a proprietary interest in McKesson. By failing to change the McKesson Plan's investment policy,

25   the Pre-Merger Individual McKesson Board Members failed to properly "hedge their bets" and

26   protect the participants from having "too many eggs in one basket," a prudent course of action in

27   the context of the scope, size and inherent riskiness surrounding the pending HBOC acquisition.

28

1  **The Pre-Merger Individual McKesson Board Members Breach Their Duties**

2      217.    Before January 12, 1999, by virtue of all the facts and events alleged

3  herein, the Pre-Merger Individual McKesson Board Members breached the fiduciary duties of

4  loyalty, exclusive purpose and prudence they owed to the McKesson Plan and its participants

5  under ERISA §§ 404(a)(1)(A) and 404(a)(1)(B) by, among other things:

6          a.    failing to adequately and diligently investigate the potential effect

7  of the HBOC merger on the investment policies under the McKesson Plan;

8          b.    failing to adequately determine whether the heavily concentrated

9  investment in McKesson Company Stock by the McKesson Plan satisfied ERISA § 404(a)(1)

10  standards in light of the pending acquisition of HBOC; and

11          c.    failing to diversify the McKesson Plan holdings in McKesson

12  Company Stock in anticipation of the merger with HBOC.

13      Furthermore, such actions also constituted a breach of fiduciary duty under ERISA

14  §404(a)(1)(D) insofar as the Pre-Merger Individual McKesson Board Members may have blindly

15  followed a provision of the McKesson Plan that it knew or should have known was not

16  consistent with ERISA's fiduciary duties or in the best interests of the McKesson Plan and its

17  participants.

18      218.    By placing themselves in conflicted position which prevented them from

19  functioning with complete loyalty to the McKesson Plan and its participants, the Pre-Merger

20  Individual McKesson Board Members committed independent breaches of ERISA duties in

21  violation of ERISA § 404(a)(1)(A) and (B).

22      219.    Alternatively, even if the Pre-Merger Individual McKesson Board

23  Members conducted any fiduciary review before the Corporate Merger, they failed to consider

24  those factors they new or should have known that would have led an unconflicted independent

25  fiduciary to reach a different investment decision and diversify the McKesson Plan holdings in

26  McKesson Company Stock, breaching their fiduciary duties of prudence, loyalty and exclusive

27  purpose in violation of ERISA § 404(a)(1).

28

1    **The Pre-Merger Fiduciary Breaches Cause the Losses to the McKesson Plan**

2           220.    As a direct and proximate result of the fiduciary breaches committed by

3    the Pre-Merger Individual McKesson Board Members, and each of them, the McKesson Plan has

4    sustained losses which such Defendants are legally obligated to restore to the McKesson Plan

5    pursuant to ERISA § 409(a). The losses will be proven at trial, and will be measured by

6    determining what the value of the McKesson Plan assets would have been had the Pre-Merger

7    Individual McKesson Board Members authorized the sale of up to 50% of the McKesson Plan's

8    holdings in McKesson Company Stock in anticipation of the merger with HBOC and invested

9    the proceeds in suitable investment alternatives, instead of keeping the McKesson Plan so

10   heavily concentrated in a single security.

11          **WHEREFORE**, Plaintiffs pray for relief as set forth below.

12                          **COUNT EIGHT: On Behalf of the McKesson Plan**

13   **Claim for Relief Against the Post-Merger Individual McKesson Board Members for**
14   **Breach of Fiduciary Duty in Violation of ERISA § 404 for the Post-Merger/Pre-**
     **Announcement Period (January 12, 1999 - April 20, 1999)**
15

16          221.    Plaintiffs reallege and incorporate all paragraphs of this Complaint set

17   forth above as though fully set forth herein.

18          222.    This Count of the Complaint alleges breach of fiduciary duty against the

19   **Post-Merger** Individual McKesson Board Members (as named in paragraph 21 above) for

20   violations of ERISA occurring *after* the Corporate Merger on January 12, 1999 and up to and

21   through about April 20, 1999, the approximate date at which McKesson alleges that its internal

22   audit process uncovered the extent and scope of the accounting irregularities which had been

23   occurring at HBOC both before and after the Corporate Merger.

24          223.    The necessity for this separate Count arises because after the Corporate

25   Merger on January 12, 1999, the composition of the McKesson Board changed. New individuals

26   became members of the McKesson Board, and therefore became fiduciaries of the McKesson

27   Plan at such time, including Defendant McCall.

28                                                                                           -

**January 12, 1999--The Post-Merger McKesson Plan Fiduciaries' Continuing Duty to Monitor the McKesson Plan's Investment Policies**

224.    The duty to consider the investment policies of the McKesson Plan continued after the Corporate Merger on January 12, 1999. These Post-Merger Individual McKesson Board Members were duty bound to consider the investment policies of the McKesson Plan from January 12, 1999 up to and through about April 20, 1999, when McKesson allegedly first uncovered that the scope and extent of the HBOC accounting irregularities, which may have otherwise precluded them from acting to divest McKesson Company Stock *after allegedly uncovering but before announcing* the accounting irregularities on April 28, 1999.

225.    In fulfilling their ERISA fiduciary duties hereunder during this time period, these Post-Merger Individual McKesson Board Members were cognizant of the same criteria and factors relating to ESOPs that the Pre-Merger Individual McKesson Board Members were as specified in Count Seven above, namely that (a) ESOPs are designed to invest primarily in employer securities rather than exclusively in such; (b) that this primarily standard can be satisfied by investing only 50% of the ESOP assets in employer securities rather than 100%; (c) investing 50% of the McKesson Plan assets would have still fulfilled the purposes of the McKesson Plan that it provide a mechanism for employees to save for retirement and provide a proprietary interest in McKesson; (d) ESOPs remain subject to the fiduciary duties of loyalty, prudence and exclusive purpose; (e) that such fiduciary duties, and the ERISA § 404(a)(1)(d) duty to follow plan provisions only applies if the provision is consistent with ERISA, and do not permit ESOP fiduciaries to blindly follow a plan provision that might otherwise prohibit diversification in certain circumstances, which position had been upheld in both case law and pronouncements from the DOL; (f) that there were numerous risk factors and evidence concerning the merger (see Paragraph 211 above), including the size of the merger and the associated integration issues, the number of companies both HBOC and McKesson had acquired exacerbating these integration and business issues, the knowledge that HBOC had certain questionable accounting practices, validated by the CFRA Report, for which there was a high probability a restatement of its financial statements would be required; and (g) that the current

1    heavily concentrated investment policy of the McKesson Plan resulted in the participants having

2    "too many eggs in one basket" in the context of the Corporate Merger, an inherently risky

3    situation considering the fact the McKesson had frozen its defined benefit plan several years

4    earlier and the McKesson Plan was the only qualified retirement plan available to participants.

5          226.    Furthermore, the Post-Merger Individual McKesson Board Members were

6    presented with a perfect opportunity during this time frame to reconsider the investment policy of

7    the McKesson Plan, insofar as planning began immediately on January 12, 1999 to merge the

8    HBOC Plan into the McKesson Plan. The plan merger was effectuated by April 1, 1999.

9          227.    The size of this Corporate Merger that had just been consummated,

10    coupled with the above enumerated risk factors, as well as other matters which will be developed

11    during the discovery phase of this case, were clearly sufficient to require the Post-Merger

12    Individual McKesson Board Members, after January 12, 1999 through about April 20, 1999, to

13    conduct a fiduciary review of the investment policies of the McKesson Plan that were so heavily

14    concentrated in McKesson Company Stock.

15    **The Post-Merger McKesson Plan Fiduciaries Remain Conflicted**

16          228.    That no fiduciary review of the McKesson Plan investment policies was

17    conducted arose, in whole or in part, from the conflict of interest under which the Post-Merger

18    Individual McKesson Board Members were laboring. Though ERISA does not preclude an

19    individual from serving as both a plan fiduciary and as a corporate officer/board member, when

20    the fiduciary decision involves the investment in publicly-traded company stock, that decision is

21    inherently tainted by a conflict of interest. In this instance, any proper consideration of whether to

22    diversify the McKesson Plan holdings in McKesson Company Stock (a fiduciary determination)

23    conflicted with McKesson's desire to demonstrate confidence in the recently completed

24    Corporate Merger (a business or corporate concern). The prudent sale of a percentage of

25    McKesson Company Stock designed to protect the long-term retirement savings of McKesson

26    Plan participants by the fiduciaries would have been viewed as inconsistent with the goal of

27    promoting the soundness of the Corporate Merger. Furthermore, insiders and corporate directors

28    are reluctant to sell company stock from a plan at any time, since the plan serves as a ready

1  market for the stock, supports the price of the stock; therefore, sales could undermine the price of

2  shares in the marketplace. All these matters and considerations placed the Post-Merger Individual

3  Board Members in a conflicted position and tainted their decision-making process as fiduciaries,

4  resulting in their failure to evaluate their options as ERISA fiduciaries with an "eye-single" to the

5  interests of the McKesson Plan and its participants.

6       229.   Placing oneself in conflicted position as officers or directors of the

7  company which prevents one from functioning with complete loyalty to participants demanded of

8  them as fiduciaries of a plan itself constitutes an independent breach of ERISA duties. (See

9  *Donovan v. Bierwirth*, 680 F. 2d at 271-72) Furthermore, when it is possible to question the

10  fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous

11  independent investigation of their options to insure that they act in the best interests of the plan

12  beneficiaries. *Howard v. Shay*, 100 F.3d 1484, 1488-89 (9th Cir. 1996). Fiduciaries who may be

13  conflicted must also consider other options available to them, such as resigning in favor of a truly

14  independent fiduciary.

15       230.   The Post-Merger Individual McKesson Board Members failed to conduct

16  any fiduciary review of the investment policies of the McKesson Plan after January 12, 1999

17  through April 20, 1999, let alone an independent and scrupulous review they should have

18  conducted, notwithstanding their responsibilities under ERISA, the recently consummated major

19  corporate merger and the various risk factors outlined in paragraph 211 herein. Had a truly

20  independent fiduciary review occurred, a prudent and loyal fiduciary acting under these

21  circumstances would have made a different investment decision, and diversified the McKesson

22  Plan holdings in McKesson Company Stock.

23       231.   Like the Pre-Merger Individual McKesson Board Members, the Post-

24  Merger Individual McKesson Board Members did not have to diversify the *entire* McKesson

25  Plan holdings in McKesson Company Stock in order to uphold their responsibilities under

26  ERISA. An ERISA fiduciary can breach his duties by holding too high a percentage of plan

27  assets in a single security. Instead of investing 100% of the ESOP portion of the McKesson Plan

28  in McKesson Company Stock, the Post-Merger Individual McKesson Board Members could

1   have diversified up to 50% of the McKesson Plan holdings in McKesson Company Stock and

2   still complied with investment rules that ESOPs invest *primarily* in employer securities. Such

3   limited diversification would still have upheld the purposes of the McKesson Plan that it promote

4   the retirement savings of participants and provide employees with a proprietary interest in

5   McKesson. In this way, the Post-Merger Individual McKesson Board Members would have

6   simply but properly "hedged its bets" and protected the participants from having "too many eggs

7   in one basket," a prudent course of action in the context of the scope, size and inherent riskiness

8   of the HBOC acquisition.

9   **The Post-Merger McKesson Plan Fiduciaries Breach Their Duties**

10      232.    From January 12, 1999 through April 20, 1999, by virtue of the foregoing

11  facts and events, the Post-Merger Individual McKesson Board Members breached the fiduciary

12  duties of loyalty, exclusive purpose and prudence they owed to the McKesson Plan and its

13  participants under ERISA §§ 404(a)(1)(A) and 404(a)(1)(B), by, among other things:

14          a.    failing to adequately and diligently investigate the potential effect

15  of the recently completed HBOC merger on the investment policies under the McKesson Plan;

16          b.    failing to conduct a fiduciary review and adequately determine

17  whether the heavily concentrated investment in McKesson Company Stock by the McKesson

18  Plan satisfied ERISA § 404 standards in light of the recently consummated acquisition of HBOC;

19  and

20          c.    failing to diversify the McKesson Plan holdings in McKesson

21  Company Stock in the wake of the recently consummated Corporate Merger with HBOC.

22  Furthermore, such actions also constituted a breach of fiduciary duty under ERISA §

23  404(a)(1)(D) insofar as the Post-Merger Individual McKesson Board Members may have blindly

24  followed a provision of the McKesson Plan that it knew or should have known was not

25  consistent with ERISA's fiduciary duties or the best interests of the McKesson Plan and its

26  participants.

27      233.    By placing themselves in conflicted position which prevented them one

28  from functioning with complete loyalty to the McKesson Plan and its participants demanded of

  
1  them as ERISA fiduciaries, the Post-Merger Individual McKesson Board Members committed

2  independent breaches of ERISA duties in violation of ERISA § 404(a)(1).

3          234.    Alternatively, even if the Post-Merger Individual McKesson Board

4  Members conducted any fiduciary review between January 12, 1999 and April 20, 1999, they

5  failed to consider those factors they knew or should have known that would have led an

6  unconflicted independent fiduciary to reach a different investment decision and diversify the

7  McKesson Plan holdings in McKesson Company Stock, breaching their fiduciary duties of

8  prudence, loyalty and exclusive purpose in violation of ERISA § 404(a)(1).

9  **The Post-Merger Fiduciary Breaches Cause the Losses to the McKesson Plan**

10         235.    As a direct and proximate result of the fiduciary breaches committed by

11 the Post-Merger Individual McKesson Board Members, and each of them, between January 12,

12 1999 and April 20, 1999, the McKesson Plan has sustained losses which such Defendants are

13 legally obligated to restore to the McKesson Plan pursuant to ERISA § 409(a). The losses will be

14 proven at trial, and will be measured by determining what the value of the McKesson Plan assets

15 would have been had the Post-Merger Individual McKesson Board Members authorized the sale

16 of up to 50% of the McKesson Plan's holdings in McKesson Company Stock after the

17 consummation of the Corporate Merger on January 12, 1999 (but before the alleged discovery of

18 the extent of the HBOC accounting irregularities in late April, 1999), instead of keeping the

19 McKesson Plan so heavily concentrated in a single security.

20         **WHEREFORE**, Plaintiffs pray for relief as set forth below.

21

22              **COUNT NINE: On Behalf of the McKesson Plan**

23  **Claim for Relief Against the Post-Merger Individual McKesson Board Members for
   Breach of Fiduciary Duty in Violation of ERISA § 404 for the Post Announcement Period
24              (the Period After April 28, 1999)**

25         236.    Plaintiffs reallege and incorporate all paragraphs of this Complaint set

26 forth above as though fully set forth herein.

27         237.    This Count of the Complaint alleges breach of fiduciary duty against the

28 **Post-Merger** Individual McKesson Board Members (as named in paragraph 21 above) for

1   violations of ERISA occurring *after* the initial announcement on April 28, 1999 that McKesson

2   had allegedly first uncovered the accounting irregularities which occurred at HBOC.

3   **The April 28, 1999 Initial Announcement of HBOC Accounting Irregularities Creates Even
    Greater Uncertainty for McKesson Company Stock as a McKesson Plan Investment**

4

5             238.    In a press release dated April 28, 1999, McKesson announced that "during

6   the course of its year end financial audit process, the company has determined that software sale

7   transactions aggregating $ 26.2 million in the company's fourth quarter ended March 31, 1999,

8   and $ 16.0 million in the prior quarters of the fiscal year, were improperly recorded because they

9   were subject to contingencies, and have been reversed."

10            239.    Significantly, McKesson also stated in that April 28, 1999 press release

11  that "the audit process is ongoing and there is a possibility that additional contingent sales may

12  be identified."

13            240.    Therefore, after April 28, 1999, accounting irregularities at HBOC had

14  been both discovered by the Post-Merger Individual McKesson Board Members and publicly

15  announced by McKesson. The public announcement on April 28, 1999 also publicly

16  acknowledged the possibility of *additional discoveries* of financial and accounting irregularities

17  at HBOC, undoubtedly creating even greater uncertainty in the marketplace regarding the future

18  performance of McKesson shares.

19            241.    Thus, at this point in time, the Post-Merger Individual McKesson Board

20  Members were confronted with the possibility and uncertainty that there would be additional

21  announcements of accounting improprieties. The April 1999 discoveries also validated the

22  Deloitte due diligence that had been reported to them in July 1998, which should have further

23  heightened the level of the vigilance and diligence of the Post Merger Individual McKesson

24  Board Members as ERISA fiduciaries. Furthermore, since the Corporate Merger had been

25  consummated less than 4 months earlier, all the same risk factors inherent in the merger still

26  existed. Finally, the Post-Merger Individual McKesson Board Members were fully cognizant of

27  the flexibility afforded them under the same ESOP investment rules that applied in the prior

28  periods, as specified in Counts Seven and Eight above, and that the McKesson Plan participants

1   still had all most of their eggs in the McKesson Company Stock basket. One last time, the Post-

2   Merger Individual McKesson Board Members had the opportunity to apply their ERISA

3   fiduciary responsibilities to consider and alter the investment policies of the McKesson Plan

4   during the period when the ongoing audit process was proceeding, with the tremendous

5   uncertainty that posed for McKesson Company Stock held by the McKesson Plan. One more

6   time, they failed in that role.

7   **The Post Merger McKesson Plan Fiduciaries Are Hopelessly Conflicted in the Post-**
    **Announcement Period**

8

9               242.    Furthermore, at this time, the Post-Merger Individual McKesson Board

10  Members were hopelessly conflicted. There was an ongoing internal audit process that the Post-

11  Merger Individual McKesson Board Members *themselves were either conducting* or which they

12  knew was occurring  They faced the specter that their position as Board Members, and any

13  advance knowledge of additional improprieties that were uncovered at HBOC during the course

14  of the investigation,  would necessarily taint any decisions they should have considered as

15  ERISA fiduciaries of the McKesson Plan during this time frame. Placing oneself in conflicted

16  position as officers or directors of the company which prevents one from functioning with

17  complete loyalty (an "eye-single) to participants demanded of them as fiduciaries of the plan

18  itself constitutes an independent breach of ERISA duties. See *Donovan v. Bierwirth*, 680 F. 2d at

19  271-72. Furthermore, when it is possible to question the fiduciaries' loyalty, they are obliged at a

20  minimum to engage in an intensive and scrupulous independent investigation of their options to

21  insure that they act in the best interests of the plan beneficiaries. *Howard v. Shay*, 100 F.3d 1484,

22  1488-89 (9th Cir. 1996). Fiduciaries who may be conflicted must also consider other options

23  available to them, such as resigning in favor of a truly independent fiduciary.  Nonetheless, the

24  Post-Merger Individual McKesson Board Members continued to occupy their role as McKesson

25  Plan Fiduciaries, instead of resigning their position in favor of a truly independent fiduciary who

26  could have considered the investment policies of the McKesson Plan at this time. The Post-

27  Merger Individual McKesson Board Members failed to consider this option, and even if they did,

28  they did not resign their position.

1   **McKesson Stock Price Continues Its Decline After the April 28, 1999 Announcement**

2          243.    After April 28, 1999, the price of McKesson shares continued to plummet.
3   On April 28, 1999, the date of the initial announcement, the price of McKesson shares fell 48%,
4   from $65.75 to $34.50 per share. But McKesson share prices continued their downward fall over
5   the next 12-14 months, amid the uncertainty of the Corporate Merger generally and the prospects
6   of uncovering further accounting irregularities. Indeed, on May 25, 1999, in a subsequent press
7   release, McKesson announced that its continued investigation would require that it revise 1999
8   results downward even further, and that it might have to revise HBOC's financial statements for
9   earlier years. The price of McKesson shares fell 12% on that date. On June 21, 1999, sweeping
10  management changes were announced, including the dismissal of Defendant McCall as
11  Chairman and an employee of McKesson, and the firing of Defendant Bergonzi (and others) for
12  cause. The resignation of Defendant Pulido was also announced. On July 14, 1999, McKesson
13  announced the restatement of HBOC's financial results, revising downward the revenues and
14  income for HBOC for 1997, 1998 and 1999. Recognized revenue was adjusted downward by
15  over $327 million for that period, and recognized income was adjusted downward by over $191
16  million, *over ten times* the amount of adjustments that had been announced in the April 28, 1999
17  initial press release.

18         244.    During the period April 28, 1999 and thereafter, the price of McKesson
19  shares closed each month at the following per share price, reaching a low price of $15.75 per
20  share on May 26, 2000, falling more than *50% lower* than even the $34.50 price McKesson
21  shares fell to on the day of the initial public announcement of the accounting irregularities on
22  April 28, 1999, when the share price declined 48% in a single day.

| Date | Month End Price | Date | Month End Price |
|------|-----------------|------|-----------------|
| May 1999 | $33.14 | January 2000 | $20.10 |
| June 1999 | $31.31 | February 2000 | $18.99 |
| July 1999 | $30.22 | March 2000 | $20.59 |
| August 1999 | $30.46 | April 2000 | $16.60 |
| September 1999 | $28.27 | May 2000 | $16.17 |
| October 1999 | $19.55 | June 2000 | $20.60 |
| November 1999 | $22.84 | | |
| December 1999 | $21.99 | | |

1    McKesson shares trade as of the filing of this Consolidated Complaint at about $27 per share,

2    *20% lower than* the price it fell to when the accounting irregularities were first announced on

3    April 28, 1999.

4                245.    The effect of the failure to diversify McKesson Plan holdings in

5    McKesson Company Stock on the retirement savings on McKesson Plan participants after April

6    28, 1999, and the losses to participants that resulted, is not theoretical. For example, in February,

7    2000, McKesson announced that it was selling a major subsidiary, the McKesson Water Products

8    Company, in a stock purchase agreement for $1.1 billion. Thus, many of these McKesson Water

9    Product Company employees who were participants in the McKesson Plan received distributions

10   of their McKesson Company Stock during 2000 (when McKesson shares traded below $20) and

11   thus saw their retirement savings diminished even further, as a result of the significant price

12   declines in their McKesson Company Stock occurring after April 28, 1999. All McKesson Plan

13   participants were also affected and suffered losses as a result of the further declines in the price

14   of McKesson shares after April 28, 1999, so these losses are not limited to the Water Products

15   employees.

16   **Post-Merger McKesson Plan Fiduciaries Breach Their Duties in the Post-Announcement**
     **Period**
17

18               246.    After April 28, 1999, the Post-Merger Individual McKesson Board

19   Members failed to conduct any fiduciary review of the investment policies of the McKesson

20   Plan, let alone an independent and scrupulous review they should have conducted as a conflicted

21   fiduciaries, notwithstanding their responsibilities under ERISA, the recently consummated major

22   corporate merger, the announcement that the investigation of additional accounting improprieties

23   at HBOC was ongoing and that they themselves would be conducting that investigation, and the

24   existence of the other risk factors outlined herein (see Paragraph 211 above). Had a truly

25   independent fiduciary review occurred, a prudent and loyal fiduciary acting under these

26   circumstances would have made a different investment decision after April 28, 1999, and

27   diversified the McKesson Plan holdings in McKesson Company Stock at such time.

28

1    247.    After April 28, 1999, the Post-Merger Individual McKesson Board
2    Members did not have to diversify the *entire* McKesson Plan holdings in McKesson Company
3    Stock in order to uphold their responsibilities under ERISA. Instead of investing 100% of the
4    ESOP portion of the McKesson Plan in McKesson Company Stock, the Post-Merger Individual
5    McKesson Board Members could have diversified up to 50% of the McKesson Plan holdings in
6    McKesson Company Stock and still complied with investment rules that ESOPs invest *primarily*
7    in employer securities. Such limited diversification would still have upheld the purposes of the
8    McKesson Plan that it promote the retirement savings of participants and provide employees with
9    a proprietary interest in McKesson. In this way, the Post-Merger Individual McKesson Board
10    Members would have simply but properly "hedged their bets" and protected the participants from
11    having "too many eggs in one basket," a prudent course of action in the context of the inherent
12    risks which existed as of April 28, 1999.

13    248.    After April 28, 1999, by virtue of the foregoing facts and events, the Post-
14    Merger Individual McKesson Board Members breached the fiduciary duties of loyalty, exclusive
15    purpose and prudence they owed to the McKesson Plan and its participants under ERISA §§
16    404(a)(1)(A) and 404(a)(1)(B) by, among other things,

17            a.    failing to adequately and diligently investigate the potential effect
18    of the recently completed HBOC merger on the investment policies under the McKesson Plan,
19    including the added uncertainties surrounding the future impact of the ongoing investigation of
20    accounting irregularities at HBOC;

21            b.    failing to adequately determine whether the heavily concentrated
22    investment in McKesson Company Stock by the McKesson Plan satisfied ERISA § 404
23    standards in light of the recently consummated acquisition of HBOC, including the uncertainties
24    surrounding the future impact of discovery of the accounting irregularities and the ongoing
25    investigation of the extent of accounting irregularities at HBOC; and

26            c.    failing to diversify the McKesson Plan holdings in McKesson
27
28

1   Company Stock in the wake of the recently consummated merger with HBOC and the

2   uncertainties surrounding the future impact of the ongoing investigation of accounting

3   irregularities at HBOC.

4        Furthermore, such actions also constituted a breach of fiduciary duty under ERISA

5   §404(a)(1)(D) insofar as the Post-Merger Individual McKesson Board Members may have

6   blindly followed a provision of the McKesson Plan that it knew or should have known was not

7   consistent with ERISA's fiduciary duties or in the best interests of the McKesson Plan and its

8   participants.

9        249.    After April 28, 1999, by placing themselves in conflicted position which

10  prevented them one from functioning with complete loyalty to the McKesson Plan and its

11  participants demanded of them as ERISA fiduciaries, the Post-Merger Individual McKesson

12  Board Members committed independent breaches of ERISA duties in violation of ERISA

13  §404(a)(1).

14       250.    Alternatively, even if the Post-Merger Individual McKesson Board

15  Members conducted any fiduciary review after April 28, 1999, they failed to consider those

16  factors they new or should have known that would have led an unconflicted independent

17  fiduciary to reach a different investment decision and diversify the McKesson Plan holdings in

18  McKesson Company Stock, breaching their fiduciary duties of prudence, loyalty and exclusive

19  purpose in violation of ERISA § 404(a)(1).

20  **The Breaches in the Post-Announcement Period Cause the Losses to the McKesson Plan**

21       251.    As a direct and proximate result of the fiduciary breaches committed by

22  the Post-Merger Individual McKesson Board Members after April 28, 1999, the McKesson Plan

23  has sustained losses which such Defendants are legally obligated to restore to the McKesson Plan

24  pursuant to ERISA § 409(a). The losses will be proven at trial, and will be measured by

25  determining what the value of the McKesson Plan assets would have been had the Post-Merger

26  Individual McKesson Board Members authorized the sale of up to 50% of the McKesson Plan's

27  holdings in McKesson Company Stock after April 28, 1999, instead of keeping the McKesson

28  Plan so heavily concentrated in a single security.

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
0090017/001/ 2639v2                99                Case No. C00-20030 RMW

1    **WHEREFORE,** Plaintiffs pray for relief as set forth below.

2

3    **COUNT TEN: On Behalf of the McKesson Plan**

4    **Claim for Relief Against Defendant McKesson for Breach of Fiduciary Duty in Violation of**
5    **ERISA § 404, and for Liability under Agency Principles**

6        252.    Plaintiffs reallege and incorporate all paragraphs of this Complaint set
7    forth above as though fully set forth herein.

8        253.    Under the McKesson Plan, McKesson had the fiduciary discretion to
9    determine whether Company Contributions would be made in cash or in McKesson Company
10   Stock. (McKesson Plan Document §§ 4.3(a) and 6.3(a))

11       254.    McKesson Company Stock was an imprudent investment beginning not
12   later than October 18, 1998, (a) as a result of all the risk factors that McKesson knew or should
13   have known that were associated with the merger generally (see Paragraphs 122 and 211 above);
14   (b) its knowledge gleaned from the 1998 Deloitte accounting due diligence that HBOC
15   employed, at a minimum, questionable accounting practices, which had been validated by the
16   CFRA Report; (c) the fact that, after April 28, 1999, there would be an investigation into the
17   extent of the HBOC accounting irregularities which created added uncertainty for continued
18   investment and contributions of McKesson Company Stock; and (d) the fact that the McKesson
19   Plan was already so overly concentrated in McKesson Company Stock, creating unnecessary and
20   imprudent risks for the McKesson Plan and its participants.

21       255.    By making Company Contributions after October 18, 1999 in McKesson
22   Company Stock, at a time when it was imprudent for the McKesson Plan to be holding additional
23   contributions in the form of McKesson Company Stock, McKesson breached its fiduciaries
24   duties of prudence, loyalty and exclusive purpose in violation of ERISA § 404(a)(1)(A)and (B).

25       256.    The breaches of McKesson outlined herein must take into account that the
26   accounting irregularities at HBOC were ongoing after the Corporate Merger on January 12, 1999
27   and was carried on by certain of McKesson's most senior officers, including McCall and
28   Bergonzi. However, the prudent decision of making Company Contributions in cash instead of

1  McKesson Company Stock would not have implicated any violation of the insider trading
2  securities laws.

3       257.    As a result of the fiduciary breaches committed by McKesson, the
4  McKesson Plan has sustained losses which McKesson is legally obligated to restore to the
5  McKesson Plan pursuant to ERISA § 409(a). The losses will be proven at trial, and will be
6  measured by determining what the value of the McKesson Plan assets would have been had
7  McKesson made contributions in cash in lieu of making such Company Contributions in
8  McKesson Company Stock, or had McKesson not converted such cash contributions to
9  McKesson Company Stock

10       258.    McKesson is further liable for the breaches of duty by the Pre-Merger
11  Individual McKesson Board Members and the Post-Merger Individual McKesson Board
12  Members (including Defendant McCall, who was an employee/board member of McKesson on
13  and after January 12, 1999) under the law of agency, including the principles of vicarious liability
14  and respondeat superior; and McKesson is liable as an indemnitor of the Pre-Merger Individual
15  McKesson Board Members and the Post-Merger Individual McKesson Board Members pursuant
16  to the terms of the McKesson Plan (McKesson Plan Document § 13.10), applicable corporate law
17  and under the terms of McKesson's articles of incorporation, by-laws and other McKesson
18  documents of corporate governance, for the losses caused by the breaches of these Defendants.

19      **WHEREFORE**, Plaintiffs pray for relief as set forth below.

20

21             **COUNT ELEVEN: On Behalf of the McKesson Plan**

22  **Claim for Breach of Fiduciary Duty Against the Pre-Merger Individual McKesson Board**
23  **Members and the Post-Merger Individual McKesson Board Members for Maintaining**
    **McKesson Company Stock as an Investment Option for Participant Salary-Deferral**
24  **Contributions, in Violation of ERISA § 404**

25
     259.    Plaintiffs reallege and incorporate all paragraphs of this Complaint set
26  forth above as though fully set forth herein.
27
     260.    The McKesson Plan permitted participants to make pre-tax salary-deferral
28

1  contributions to the McKesson Plan, and to direct their investment to any number of investment
2  and mutual fund options.

3       261.    One of the options available for the investment of the participant salary-
4  deferral contributions was the purchase of McKesson Company Stock. Among the pre-tax salary
5  deferrals which were invested in McKesson Company Stock were the "Quarterly Contributions,"
6  pre-tax salary deferral contributions made to the McKesson Plan pursuant to McKesson Plan
7  Document § 3.1(b).

8       262.    The McKesson Plan was overly concentrated in McKesson Company
9  Stock, due to the fact, among other reasons, that all Company Contributions were invested in
10  McKesson Company Stock over much of the life of the McKesson Plan. Indeed, as of March 31,
11  1999, publicly filed records indicate that the value of McKesson Company Stock held by the
12  McKesson Plan was $1.2 billion out of $1.6 billion in assets held by the McKesson Plan as a
13  whole.

14       263.    Notwithstanding such an overly-concentrated position in a single security,
15  the Pre-Merger Individual McKesson Board Members and Post-Merger Individual McKesson
16  Board Members, pursuant to their authority to establish the McKesson Plan and McKesson
17  Master Trust investment policies, permitted additional investment in McKesson Company Stock
18  by participants with their own salary-deferral contributions, further exacerbating the
19  concentration of the McKesson Plan in a single security.

20       264.    At the time the pending merger of HBOC was announced on October 18,
21  1998, continued investment in McKesson Company Stock by participants with their own salary-
22  deferrals was no longer prudent, (a) as a result of all the risk factors the Pre-Merger Individual
23  McKesson Board Members knew or should have known that were associated with the pending
24  merger generally (see Paragraphs 122 and 211 above); (b) due to their knowledge gleaned from
25  the 1998 Deloitte accounting due diligence that HBOC employed, at a minimum, questionable
26  accounting practices; and (c) the fact that the McKesson Plan already had an overly-concentrated
27  position in McKesson Company Stock, an inherently risky for the McKesson Plan and its
28  participants.

1       265.    Notwithstanding the foregoing, between October 18, 1998 and January 12,
2    1999, the Pre-Merger Individual McKesson Board Members failed to change the McKesson Plan
3    investment policies by freezing or suspending future investments by participants in McKesson
4    Company Stock with their own salary-deferral contribution after October 18, 1998. Instead, they
5    continued to allow McKesson Plan participants to accumulate additional shares of McKesson
6    Company Stock with their salary deferrals. This decision violated ERISA § 404(a)(1)(A) and (B)
7    duties of loyalty, exclusive purpose and prudence. Such breach by the Pre-Merger Individual
8    McKesson Board Members continued until January 12, 1999.

9       266.    After the January 12, 1999 Corporate Merger and through April 28, 1999,
10   continued investment in McKesson Company Stock by participants with their own salary-
11   deferrals was no longer prudent, among other things, (a) as a result of all the risk factors the Post-
12   Merger Individual McKesson Board Members knew or should have known were associated with
13   the merger generally (see Paragraph 211 above); (b) the knowledge of the Post-Merger Individual
14   McKesson Board Members gleaned from the 1998 Deloitte accounting due diligence that HBOC
15   employed, at a minimum, questionable accounting practices; (c) the fact that the McKesson Plan
16   already had an overly-concentrated position in McKesson Company Stock, an inherently risky for
17   the McKesson Plan and its participants; and (d) by virtue of the fact that, beginning January 12,
18   1999, Defendant McCall became a director of McKesson and therefore a fiduciary of the
19   McKesson Plan and that McCall knew, or should have known, that continued investment in
20   McKesson Company Stock by participants was imprudent because of the ongoing improper
21   accounting practices which occurred at HBOC both before and after the Corporate Merger.

22       267.    Notwithstanding the foregoing, McCall and the other the Post-Merger
23   Individual McKesson Board Members failed to change the McKesson Plan investment policies
24   by freezing or suspending future investments by participants in McKesson Company Stock with
25   their own salary-deferral contribution after January 12, 1999. Instead, they continued to allow
26   McKesson Plan participants to accumulate additional shares of McKesson Company Stock with
27   their salary deferrals. This decision violated ERISA § 404(a)(1)(a) and (B) duties of loyalty,
28   exclusive purpose and prudence. Such breach by the Post-Merger Individual McKesson Board

1    Members continued until January 12, 1999.

2    268.    After the initial April 28, 1999 announcement of the discovery of a limited

3    amount of accounting irregularities at HBOC, the price of McKesson Company Stock continued

4    to plummet and continued investment in McKesson Company Stock by participants with their

5    own salary deferrals remained imprudent, among other reasons, (a) as a result of all the risk

6    factors the Post-Merger Individual McKesson Board Members knew or should have known were

7    associated with the merger generally; (b) due to the fact that it was now known that HBOC had

8    engaged in accounting irregularities both before and after the merger, and the investigation into

9    the extent of the HBOC accounting irregularities would be ongoing, which created even greater

10   uncertainty for the participants continued investment in McKesson Company Stock; (c) due to

11   the fact that the McKesson Plan already had an overly-concentrated position in McKesson

12   Company Stock, an inherently risky for the McKesson Plan and its participants; and (d) by virtue

13   of the fact that Defendant McCall, as director of McKesson and therefore a fiduciary of the

14   McKesson Plan, knew, or should have known, that the extent of the accounting irregularities was

15   far greater than what was initially announced on April 28, 1999.

16   269.    Notwithstanding the foregoing, the Post-Merger Individual McKesson

17   Board Members failed to change the McKesson Plan investment policies by freezing or

18   suspending future investments by participants in McKesson Company Stock with their own

19   salary-deferral contribution after April 28, 1999. Instead, they continued to allow McKesson Plan

20   participants to accumulate additional shares of McKesson Company Stock with their salary

21   deferrals. This decision violated ERISA § 404(a)(1)(a) and (B) duties of loyalty, exclusive

22   purpose and prudence.

23   270.    The breaches alleged herein result from the failure to *freeze or suspend*

24   *future investment* by participants in McKesson Company Stock with their own salary-deferral

25   contributions. The proper fiduciary decision to freeze or suspend such purchases would not

26   implicate any potential violation of the insider trading securities laws, despite the actual

27   knowledge of the accounting irregularities by McCall or others. Thus, the decision to freeze or

28

1  suspend future investment could, and should, have been made by the Pre-Merger Individual

2  McKesson Board Members and Post-Merger Individual McKesson Board Members.

3      271.    As a result of the breaches outlined herein, the McKesson Plan and its

4  participants have suffered losses which the Pre-Merger Individual McKesson Board Members

5  and Post- Merger Individual McKesson Board Members are obligated to restore pursuant to

6  ERISA § 409(a). The loss is measured by the difference in what their accounts were actually

7  worth with the improvident investment in McKesson Company Stock and what such accounts

8  would have been worth had they invested their salary-deferral contributions in the most

9  profitable alternative investment option under the McKesson Plan. Such amount shall be proven

10 at trial. In determining the measure of such losses, all ambiguities shall be resolved against the

11 breaching fiduciaries and in favor of the participants.

12      **WHEREFORE**, Plaintiffs pray for relief as set forth below.

13

14              **COUNT TWELVE: On Behalf of the McKesson Plan**

15  **Claim for Relief Against the McKesson Plan Fiduciaries for Co-Fiduciary Liability under**
                              **ERISA § 405(a)**
16

17      272.    Plaintiffs reallege and incorporate all paragraphs of the Complaint set forth

18 above as though fully set forth herein.

19      273.    ERISA § 405(a) generally provides that in addition to any liability a

20 fiduciary may have under any other part of Title I of ERISA, a fiduciary with respect to a plan

21 also shall be liable if:

22          a.    he participates knowingly in, or knowingly undertakes to conceal,

23 an act or omission of another fiduciary, knowing the other fiduciary's act or omission is a breach;

24          b.    by failing to comply with ERISA Section 404(a)(1) in the

25 administration of his specific responsibilities that give rise to his fiduciary status, he enables

26 another fiduciary to commit a breach; or

27          c.    he has knowledge of a breach by another fiduciary, and fails to

28 make reasonable efforts under the circumstances to remedy the breach.

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA

1    274.    By virtue of all the facts and events alleged herein, the McKesson Plan

2    Fiduciaries enabled their co-fiduciaries to commit violations of ERISA and, with knowledge of

3    such breaches, failed to make reasonable efforts to remedy the breach. Accordingly, the

4    McKesson Plan Fiduciaries are each liable for the others' violations pursuant to ERISA §§

5    405(a)(2) and (3), 29 U.S.C. §§ 1105(a)(2) and (3).

6    275.    Co-fiduciary liability arises hereunder by virtue of, among other things, the

7    following:

8    a.    Defendant McCall, as a McKesson Plan Fiduciary, and with

9    knowledge of the accounting irregularities, enabled McKesson to breach its duties by continuing

10    to make contributions of McKesson Company Stock to the McKesson Plan when such course of

11    action was no longer prudent. Defendant McCall also continued to permit the other Post-Merger

12    Individual McKesson Board Members to offer McKesson Company Stock for salary-deferral

13    investments. As a result of McCall's own breaches committed in violation of ERISA § 404(a)(1),

14    McCall enabled the other McKesson Plan Fiduciaries to commit breaches of duty, had

15    knowledge of such breaches, and failed to make reasonable efforts under the circumstances to

16    remedy the breaches. As such, McCall is liable as a co-fiduciary under ERISA § 405(a)(2) and

17    (3).

18    b.    McKesson, in its capacity as McKesson Plan Fiduciary, was aware

19    that continuing to hold such a heavily weighted concentration of McKesson Plan assets in

20    McKesson Company Stock was not prudent in the wake of the anticipated and consummated

21    merger with HBOC, due to all the various risk factors surrounding the merger. Knowing that the

22    Pre-Merger and Post-Merger Board Members were breaching their duties by failing to evaluate

23    and change the McKesson Plan's investment policies and guidelines, McKesson failed to make

24    reasonable efforts under the circumstances to remedy the breaches of the Pre and Post Merger

25    Board members. As such, McKesson is liable as a co-fiduciary.

26    c.    Each of the Pre-Merger Individual McKesson Board Members

27    failed to take any action, in his individual capacity and as a fiduciary of the McKesson Plan, to

28    see to it that a fiduciary review of the McKesson Plan investment policies was conducted in the

1   wake the anticipated merger with HBOC, and the significant risk factors that proposed merger

2   posed for the continued heavily weighted investment by the McKesson Plan in McKesson

3   Company Stock. As a result of each individual breach by each Pre-Merger Individual McKesson

4   Board member committed in violation of ERISA § 404(a)(1), each Pre-Merger Board Member

5   enabled the other Pre-Merger Board Members to commit breaches of duty, had knowledge of

6   such breaches, and failed to make reasonable efforts under the circumstances to remedy the

7   breaches. As such, each Pre-Merger Individual McKesson Board Member is liable as a co-

8   fiduciary under ERISA § 405(a)(2) and (3).

9                          d.      Each of the Post-Merger Individual McKesson Board Members

10  failed to take any action, in his individual capacity and as a fiduciary of the McKesson Plan, to

11  see to it that a fiduciary review of the McKesson Plan investment policies was conducted in the

12  wake the merger with HBOC, and the significant risk factors that proposed merger posed for the

13  continued heavily weighted investment by the McKesson Plan in McKesson Company Stock. As

14  a result of each individual breach by each Post-Merger Individual McKesson Board member

15  committed in violation of ERISA § 404(a)(1), each Post-Merger Board Member enabled the

16  other Post-Merger Board Members to commit breaches of duty, had knowledge of such breaches,

17  and failed to make reasonable efforts under the circumstances to remedy the breaches. As such,

18  each Post-Merger Individual McKesson Board Member is liable as a co-fiduciary under ERISA

19  § 405(a)(2) and (3).

20                 276.     As a result of their acts and omissions that violate ERISA § 405(a), the

21  McKesson Plan Fiduciaries caused the McKesson Plan to sustain losses in the hundreds of

22  millions of dollars, which Defendants are legally obligated to restore to the McKesson Plan.

23          **WHEREFORE,** Plaintiffs pray for relief as set forth below.

24

25

26

27

28
                                                                                                    -

1          <u>COUNT THIRTEEN</u>: On Behalf of the McKesson Plan

2   **Claim for Relief Against Defendant Charles McCall for Violation of ERISA § 404 and for**
3                **Remedial and Equitable Relief under ERISA § 409**

4          277.    Plaintiffs reallege and incorporate all paragraphs of the Complaint set forth

5   above as though fully set forth herein.

6          278.    Defendant McCall served as a fiduciary of the HBOC Plan and, starting

7   January 12, 1999, as a fiduciary of the McKesson Plan. The principal assets of each plan he

8   served was the publicly-traded stock of the sponsors--HBOC and McKesson. Defendant McCall

9   had knowledge of and engaged in and directed the accounting irregularities at both companies,

10  both before *and after* the Corporate Merger. A fiduciary who engages in such conduct, or has

11  knowledge thereof, at the very company that comprises the principal asset of an ERISA plan he

12  must faithfully serve necessarily violates his ERISA duty of loyalty by knowingly engaging in

13  such improper conduct, because his actions will inevitably and predictably result in the

14  diminution in the value of the assets of the plan he serves. As such, by virtue of his actions and

15  knowledge in engaging in and directing the accounting irregularities at HBOC and McKesson

16  when he served as a fiduciary of the HBOC and McKesson Plans whose principal asset was

17  HBOC and McKesson Company Stock, Defendant McCall has violated his ERISA § 404(a)(1)

18  fiduciary duty of loyalty.

19         279.    As a result of his breaches of loyalty outlined herein, Defendant McCall

20  caused the losses to the McKesson Plan and the McKesson Company Stock which arose when

21  the irregularities were revealed. Under ERISA § 409(a), McCall must make good and restore

22  those losses to the McKesson Plan. Such amount shall be proven at trial.

23         280.    When the full extent of the fraud was allegedly uncovered at McKesson in

24  late April 1999, but not yet announced to the public (which occurred on April 28, 1999), the

25  insider trading rules under the securities laws may have precluded the McKesson Plan

26  Fiduciaries from acting to divest the McKesson Plan's holdings in McKesson Company Stock

27  until the April 28, 1999 public announcement, since the information concerning the accounting

28  irregularities may have been material non-public information. However, the losses caused to the

1  McKesson Plan as a result of the inability to divest, a breach of fiduciary duty, should still

2  nonetheless be borne by Defendant McCall, because, among other things:

3          a.      It is McCall's own illegal and improper activities that gave

4  rise to the existence and knowledge of the material non-public information in the first instance.

5  As such, Defendant McCall's posture in this litigation is far different than those fiduciaries who

6  are found to have uncovered the irregularities, and were precluded from acting, as opposed to

7  those who actually perpetrated the irregularities, like McCall.

8          b.      ERISA actions brought under ERISA §§ 502(a)(2) and 409

9  are drawn from the law of trusts, and are essentially equitable in nature. *Kahnke v. Hertes*, 579 F.

10  Supp. 1523, 1527-28 (D. Minn. 1984) (remedy seeking payment of funds into the plan for

11  distribution to participants is clearly an equitable remedy for breach of fiduciary duty under

12  sections 409 and 502(a)(2) of ERISA); *Motor Carriers Labor Advisory Council v. Trucking*

13  *Management, Inc.*, 731 F. Supp. 701, 703 (E.D.Pa. 1990). Among the principles of equity is that

14  one should not profit from one's own wrongdoing. If Defendant McCall were to evade ERISA

15  liability hereunder by resort to an insider trading preclusion, *i.e.*, that he was precluded from

16  acting to divest the McKesson Plan of McKesson Company Stock because of knowledge of

17  material non-public information *that he caused and which arose by virtue of his own illegal*

18  *misdeeds*, he would necessarily be profiting. Defendant McCall is also before this Court with

19  unclean hands, and the overall balancing of the equities require the Court to afford proper relief

20  and remedies to the McKesson Plan and its participants that does substantial justice.

21          c.      Furthermore, the interests of the McKesson Plan participants, and

22  the interests of preserving the retirement savings of American workers generally, *are public*

23  *interests*. When "public interests" are implicated, the role of equity and the need to fashion

24  proper remedies is further heightened. In *Castle v. Cohen*, 676 F. Supp. 620, 627-29 (E.D. Pa.

25  1987) an action brought for relief under ERISA, the need for courts to protect public interests and

26  fashion appropriate remedies was acknowledged, "[c]ourts of equity may, and frequently do, go

27  much farther to give and withhold relief in furtherance of the public interest than they are

28  accustomed to go when only private interests are involved." *Castle*, 676 F. Supp. at 628, citing

1  *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 179-80, 94 S.Ct. 414, 423, 38 L. Ed. 2d 388

2  (1973). Congress was greatly concerned about the pension rights due to workers for long years of

3  service with their employer. *Castle*, 676 F. Supp. at 628.

4              d.      The Court is empowered under ERISA § 409(a) to fashion such

5  remedial relief as it deems appropriate in order to provide substantial justice. As between the

6  wholly innocent McKesson Plan participants and the fiduciaries like McCall *who engaged in the*

7  *illegal conduct*, the losses should fall on the offending fiduciaries, in this case McCall. This

8  emphasis on the particulars of each individual case is consistent with the central feature of equity

9  jurisdiction: "the ability to assess all relevant facts and circumstances and tailor appropriate relief

10  on a case by case basis." *Rosario-Torres v. Hernandez-Colon*, 889 F.2d 314, 321 (1st Cir. 1989)

11  (*en banc*). "The essence of equity jurisdiction has been the power ... to do equity and to mould

12  each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64

13  S.Ct. 587, 591-592, 88 L.Ed. 754 (1944). And, "the hallmarks of equity have long been

14  flexibility and particularity." *Lussier v. Runyon*, 50 F.3d 1103, 1110 (1st Cir.1995), *cert. denied*,

15  133 L.Ed. 2d. 30 (1995).

16              281.    By virtue of all the facts and events alleged herein, including without

17  limitation the fiduciary breaches committed by Defendant McCall as both an HBOC Plan

18  Fiduciary and a McKesson Plan Fiduciary, and the fact that Defendant McCall participated in and

19  directed and had knowledge of a wide-ranging accounting irregularities at the very company

20  which comprised the principal asset of the plans he served as a fiduciary, Defendant McCall

21  caused the losses to the McKesson Plan and should be ordered to restore the losses he caused and

22  which resulted to the McKesson Plan and its participants. In addition, Defendant McCall should

23  be enjoined from forever serving as a fiduciary of the McKesson Plan or any ERISA plan.

24              **WHEREFORE**, Plaintiffs pray for relief as provided herein and below.

25

26

27

28

1

## CLASS ACTION ALLEGATIONS

2      282.    This action is brought to recover losses to the McKesson Plan (and the

3  HBOC Plan which was merged into the McKesson Plan) and the participants in those plans

4  arising from breaches of fiduciary duty by the respective Plan fiduciaries on behalf of two sub-

5  classes of plan participants.

6      283.    The HBOC Sub-Class is defined as:  All participants in the former HBOC

7  Plan and their beneficiaries in the period from March 31, 1996 to April 1, 1999 (the date of the

8  merger of the HBOC Plan into the McKesson Plan), for whose benefit the HBOC Plan held and

9  acquired HBOC Company Stock (and, after January 12, 1999, McKesson Company Stock).

10      284.    Representative Plaintiffs Dolliver and Adams seek certification of the

11  HBOC Sub-Class, and such subclass separately satisfies the requirements for class certification

12  as set forth below:

13              a.    **Numerosity:** The HBOC Sub-Class separately satisfies the

14  numerosity requirements of Fed.R.Civ.P. 23(a) because it is composed of, at a minimum,

15  thousands of persons in numerous and various locations throughout the United States and the

16  number of class members is so large that joinder of all its members is impracticable.

17              b.    **Commonality:** There are common questions of fact and law

18  common to the HBOC Sub-Class.  These questions include:

19                   i.    Whether as a result of accounting irregularities engaged in

20  by HBOC's management, the price of HBOC Company Stock, beginning March 31, 1996 and

21  continuing until at least until April 1, 1999, was artificially inflated and was an imprudent

22  investment;

23                   ii.    Whether the shares of stock acquired by the HBOC Plan

24  between March 31, 1996 and April 1, 1999 were acquired for greater than adequate consideration

25  because the price of such stock was artificially inflated;

26                   iii.    Whether Defendants Gilbertson, Bergonzi and the

27  Individual HBOC Administrative Committee Members breached their fiduciary obligations to

28  the HBOC Plan by causing the HBOC Plan to continue to offer the HBOC Stock Fund as an

1    investment alternative for the investment of new assets of the HBOC Plan at a time when

2    Bergonzi and Gilbertson knew or should have known that shares of HBOC stock were inflated

3    and were not a prudent investment for the HBOC Plan;

4                            iv.        Whether Defendants Gilbertson and Bergonzi breached

5    their fiduciary obligations to the HBOC Plan by failing to disclose to the participants of the

6    HBOC Plan that the price of HBOC stock was inflated;

7                            v.        Whether Defendants McCall, HBOC, the HBOC Board,

8    and the Individual HBOC Board Members breached their fiduciary obligations to the HBOC Plan

9    by failing to monitor the actions of the HBOC Administrative Committee and the Trustee;

10                            vi.        Whether Defendants McCall, HBOC, the HBOC Board,

11    and the Individual HBOC Board Members breached their fiduciary obligations to the HBOC Plan

12    by failing to prevent the HBOC Administrative Committee from offering the HBOC Stock Fund

13    as an investment option at a time when new shares of stock of the HBOC Plan sponsor were

14    inflated in price and were not a prudent investment for the HBOC Plan;

15                            vii.        Whether Defendants McCall, HBOC, the HBOC Board,

16    and the Individual HBOC Board Members breached their fiduciary obligations to the HBOC

17    Plan by failing to communicate such information to the Trustee and the Administrative

18    Committee as needed for the proper performance of their respective duties; and

19                            viii.        Whether as a result of fiduciary breaches engaged in by the

20    HBOC Plan Fiduciaries, the HBOC Plan and its participants suffered losses.

21                    c.        **Typicality:** The claims of Representative Plaintiffs Dolliver and

22    Adams are typical of the claims of the members of the HBOC Sub-Class.

23                    d.        **Adequacy:** Plaintiffs Dolliver and Adams are adequate

24    representatives and will protect the members of the HBOC Sub-Class. Dolliver is represented by

25    the law firms of Liner Yankelevitz Sunshine & Regenstreif, L.L.P and Law Offices of Steven J.

26    Ross, who also represent the McKesson Sub-Class. Adams is represented by the McTigue Law

27    Firm and Malakoff Doyle & Finberg, P.C. All of the counsel are experienced in class and

28    ERISA litigation. Neither Dolliver nor Adams have interests which are antagonistic or in

1  conflict with the interests of the HBOC Sub-Class which they seek to represent. They both
2  intend to vigorously pursue this action.

3              e.    **Other matters**: A class action is superior to the other available
4  methods for the fair and efficient adjudication of this controversy related to the HBOC Sub-Class
5  because, among other things, joinder of all members of the HBOC Sub-Class is impracticable.
6  As the losses suffered by some of the individual members of the HBOC Sub-Class may be
7  relatively small, the expense and burden of individual litigation makes it impracticable for
8  individual members of the Sub-Class to enforce their rights. Moreover, the HBOC defendants
9  were required to treat all Sub-Class members similarly as each class member was a plan
10 participant under written plan documents and ERISA which imposes uniform standards of
11 conduct on defendants each of whom was a fiduciary of the HBOC Plan. Dolliver and Adams
12 are unaware of any difficulty that could be encountered in the management of this litigation that
13 would preclude its maintenance as a class action.

14           285.    The McKesson Plan Sub-Class is defined as: All participants in the
15 McKesson Plan (excluding employees of HBOC who became participants in the McKesson Plan
16 by virtue of the merger of the HBOC Plan into the McKesson Plan on or about April 1, 1999)
17 whose accounts were invested in McKesson Company Stock at any time, who maintained an
18 account balance under the McKesson Plan as of April 27, 1999 which included McKesson
19 Company Stock, and who had not received a distribution from the McKesson Plan as of April 27,
20 1999.

21           286.    Representative Plaintiffs Chang and Huffman seek certification of the
22 McKesson Sub-Class, and such subclass separately satisfies the requirements for class
23 certification as set forth below:

24           a.    **Numerosity:** The McKesson Sub-Class separately satisfies the
25 numerosity requirements of Fed.R.Civ.P. 23(a) because it is composed of, at a minimum,
26 thousands of persons in numerous and various locations throughout the United States and the
27 number of class members is so large that joinder of all its members is impracticable.

28           b.    **Commonality:** There are common questions of fact and law

CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
0090017/001/ 2639v2                    113                    Case No. C00-20030 RMW

1    common to the McKesson Sub-Class.  These questions include:

2                                   i.      Whether the McKesson Plan Fiduciaries conducted at any

3    time a fiduciary review concerning the investment policies and guidelines for the McKesson

4    Plan;

5                                   ii.     Whether the McKesson Plan Fiduciaries were aware of the

6    numerous risk factors concerning the HBOC acquisition;

7                                   iii.    Whether the McKesson Plan Fiduciaries failed to

8    adequately and diligently investigate the merits of the HBOC acquisition as it may have affected

9    the investment policies of the McKesson Plan;

10                                  iv.     Whether the McKesson Plan Fiduciaries breached their

11   fiduciary duties under ERISA to invest McKesson Plan assets in a prudent and loyal manner; and

12                                  v.      What losses were suffered by the McKesson Plan for the

13   breaches of fiduciary duty, and how should said losses be calculated.

14                          c.      **Typicality:** The claims of Representative Plaintiffs Chang and

15   Huffman are typical of the claims of the members of the McKesson Sub-Class.

16                          d.      **Adequacy:** Plaintiffs Chang and Huffman are adequate

17   representatives and will protect the members of the McKesson Sub-Class.  Chang and Huffman

18   are represented by the law firms of Liner Yankelevitz Sunshine & Regenstreif, L.L.P and Law

19   Offices of Steven J. Ross.  Counsel are experienced in class and ERISA litigation.  Neither Chang

20   nor Huffman have interests which are antagonistic or in conflict with the interests of the

21   McKesson Sub-Class which they seek to represent.  They both intend to vigorously pursue this

22   action.

23                          e.      **Other matters**: A class action is superior to the other available

24   methods for the fair and efficient adjudication of this controversy related to the McKesson Sub-

25   Class because, among other things, joinder of all members of the McKesson Sub-Class is

26   impracticable.  As the losses suffered by some of the individual members of the McKesson Sub-

27   Class may be relatively small, the expense and burden of individual litigation makes it

28   impracticable for individual members of the McKesson Sub-Class to enforce their rights.

1    Moreover, the McKesson defendants were required to treat all McKesson Sub-Class members
2    similarly as each class member was a plan participant under written plan documents and ERISA
3    which imposes uniform standards of conduct on defendants each of whom was a fiduciary of the
4    McKesson Plan. Chang and Huffman are unaware of any difficulty that could be encountered in
5    the management of this litigation that would preclude its maintenance as a class action

6                287.    **Each Sub-Class May be Certified under Rule 23(b).**

7                        a.      **23(b)(1)**.  As an ERISA breach of fiduciary duty action, this is a
8    classic Rule 23(b)(1) class action, insofar as the prosecution of separate actions by individual
9    members of the HBOC Sub-Class and the McKesson Plan Sub-Class would create a risk of (A)
10   inconsistent or varying adjudications with respect to individual members of each Sub-Class
11   which would establish incompatible standards of conduct for the defendants opposing the sub-
12   class, or (B) adjudications with respect to individual members of the sub-classes which would as
13   a practical matter be dispositive of the interests of the other members not parties to the
14   adjudication or substantially impair or impede their ability to protect their interests.

15                       b.      **23(b)(2) and/or (3)**.  This action is also maintainable as a class
16   action for the HBOC Sub-Class and the McKesson Sub-Class under the subsections Rule
17   23(b)(2) and/or (3), insofar as the HBOC Plan defendants and the McKesson Plan defendants
18   have acted or refused to act on grounds generally applicable to the HBOC Sub-Class and
19   McKesson Sub-Class respectively, thereby making appropriate final injunctive, declaratory or
20   other appropriate equitable relief with respect to the HBOC Sub-Class and the McKesson Sub-
21   Class, and questions of law common to the members of the HBOC Sub-Class and McKesson
22   Sub-Class predominate over any questions affecting only individual plan participants, and the
23   class action is superior to other available methods for the fair and efficient adjudication of the
24   controversy.

25
26
27
28

1

**PRAYER FOR RELIEF**

2   **WHEREFORE,** Plaintiffs Dolliver and Adams, on behalf of the former HBOC Plan and

3   its participants and beneficiaries, and Plaintiffs Chang and Huffman, on behalf of the McKesson

4   Plan and its participants and beneficiaries, pray for relief as follows:

5   A.    That judgment be entered for the Plaintiffs Adams and Dolliver and the HBOC

6   Sub-Class on behalf of the former HBOC Plan, determining that the HBOC Plan Fiduciaries, and

7   each of them jointly and severally, breached their fiduciary duties owed to the HBOC Plan and its

8   participants and beneficiaries and engaged in prohibited transactions under Counts One through

9   Count Six;

10   B.    That Defendants the HBOC Plan Fiduciaries, and each of them jointly and

11   severally, restore to the HBOC Plan and its participants and beneficiaries (as merged into the

12   McKesson Plan) the losses sustained by the HBOC Plan and its participants and beneficiaries due

13   to the breaches of fiduciary duties under Counts One through Six, in an amount to be proven at

14   trial;

15   C.    That Defendants HBOC, the HBOC Administrative Committee and the Individual

16   HBOC Administrative Committee Members, including Gilbertson and Bergonzi, and each of

17   them jointly and severally, be directed to correct and undo the prohibited transactions alleged in

18   Count Two, which were "per se" prohibited under ERISA, and restore to the participants of the

19   HBOC Plan the consideration which the participants paid to acquire in their individual accounts

20   common shares of the HBOC Plan sponsor for more than adequate consideration in violation of

21   ERISA §§ 406(a) and 407(a) [29 U.S.C. §§ 1106(a)(1)(E) and 1107(a)].

22   D.    That judgment be entered for the Plaintiffs Chang and Huffman and the

23   McKesson Sub-Class on behalf of the McKesson Plan, determining that Defendants the

24   McKesson Plan Fiduciaries, and each of them jointly and severally, breached their fiduciary

25   duties owed to the McKesson Plan and its participants and beneficiaries under Counts Seven

26   through Thirteen;

27   E.    That Defendants the McKesson Plan Fiduciaries, and each of them jointly and

28   severally, restore to the McKesson Plan and its participants and beneficiaries the losses sustained

1   by the McKesson Plan due to the breaches of fiduciary duties under Counts Seven through

2   Thirteen, in an amount to be proven at trial;

3       F.      That as to Defendants McCall and Gilbertson, they be forever enjoined from

4   serving as a fiduciary of the McKesson Plan, or of any ERISA plan;

5       G.      That an appropriate class of participants, including proper sub-classes, be certified

6   and designated by the Court to receive the amounts restored to the HBOC Plan and the

7   McKesson Plan by the Defendant fiduciaries, and a constructive trust be established for

8   distribution to the extent required by law;

9       H.      That the court award reasonable attorney fees, costs and expenses to class counsel

10  for each of the Sub-Classes, in accordance with the laws and rules governing class actions and

11  common funds, under Rule 23 of the Federal Rules of Civil Procedure; and

12      I.      For such further legal, equitable and remedial relief that this Court deems just and

13  proper to protect the legitimate rights of the Plaintiffs, the McKesson Plan and class and the sub-

14  class members.

15

16
    Dated: December _31_, 2002.           By: [signature]
17                                              Steven J. Ross

18                          **LINER YANKELEVITZ SUNSHINE &**
                                     **REGENSTREIF, L.L.P.**
19                          Ronald S. Kravitz
                            601 Montgomery Street Suite 900
20                          San Francisco, CA 94111
                            Tel: 415.438.4321
21                          Fax: 415.434.4689

22                          **LAW OFFICES OF STEVEN J. ROSS**
                            Steven J. Ross
23                          1886 Beach Avenue, Suite 1
                            Atlantic Beach, FL 32233
24                          Tel: 904.249.8799
                            Fax: 904.247.2322
25
                            *Attorneys for Plaintiff JOSEPH DOLLIVER as class*
26                          *plaintiff for the HBOC SUB-CLASS and*
                            *Attorneys for Plaintiffs Christine Chang and James*
27                          *Huffman as class plaintiffs for the MCKESSON SUB-*
                            *CLASS*
28

                    CONSOLIDATED AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA
                                              117                    Case No. C00-20030 RMW

1

2

3    _Ellen M. Doyle_

4

5    J. Brian McTigue
Bruce F. Rinaldi
6    **THE MCTIGUE LAW FIRM**
5513 Connecticut Avenue
Suite 220
7    Washington, DC 20015
Tel: 202-364-6900
8    Fax: 202-364-9960

9    Ellen M. Doyle
**MALAKOFF DOYLE & FINBERG, P.C.**
10    437 Grant Street, Suite 200
Pittsburg, PA 15219
11    Tel: 412-281-8400
Fax: 412-281-3262
12

13    *Attorneys for Plaintiff ALBERT ADAMS as class plaintiff for the HBOC SUB-CLASS*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **PROOF OF SERVICE**

2          I am employed in the County of San Francisco, State of California, over the age
     of eighteen years, and not a party to this action. My business address is Liner Yankelevitz
3    Sunshine & Regenstreif LLP, 601 Montgomery Street, Suite 900, San Francisco, California
     94111. On December 3l, 2002, I served the within document: **CONSOLIDATED**
4    **AMENDED COMPLAINT FOR BREACH OF FIDUCIARY DUTY UNDER ERISA**
     in this action, by placing a true copy thereof enclosed in a sealed envelope as follows:

5

6    ☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set
          forth below on this date between the hours of 8:00 a.m. and 6:00 p.m. The facsimile
7          transmission was reported as complete and without error by the transmitting facsimile
          machine.

8    ☒    by Mail; I am readily familiar with the firm's practice of collection and processing
          correspondence for mailing with the U.S. Postal Service. Under that practice it would
9          be deposited with the U.S. Postal Service on that same day with postage thereon fully
          prepaid in the ordinary course of business. I am aware that on motion of the party
10         served, service by mail is presumed invalid if the postal cancellation date or postage
          meter date on the envelope is more than one day after date of deposit for mailing
11         contained in this affidavit.

12   ☐    by Federal Express, or other express service carrier providing for overnight delivery,
          by depositing the document in a box or other facility regularly maintained by the
13         express service carrier, in an envelope or package designated by the express service
          carrier with delivery fees paid or provided for, addressed to the person on whom it is
14         to be served, at the address(es) set forth below.

15   ☐    by causing the document(s) listed above to be personally delivered to the address(es)
          set forth below.

16
                            **SEE ATTACHED SERVICE LIST**
17

18
              I declare under penalty of perjury under the laws of the United States and the
19   State of California that the above is true and correct. I declare that I am employed in the office
     of a member of the bar of this court at whose direction the service was made.

20
              Executed on December 3l, 2002, at San Francisco, California.
21

22

23                                     _____
                                              Annie Hsla
24

25

26

27

28

0090017/001/ 2625v1

## **SERVICE LIST**

Counsel for Defendants HBO & Company, McKesson, Inc., and McKesson Information Solutions, Inc.

James E. Lyons, Esq.
Timothy A. Miller, Esq.
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Embarcadero Center
San Francisco, CA 94111
Telephone: 415-984-6400
Facsimile: 415-984-2698

Counsel for Defendants Tully M. Friedman, John M. Pietruski, Carl S. Reichardt, and Alan Seelenfreund

Dorothy Fernandez, Esq.
Melvin R. Goldman, Esq.
Paul Friedman, Esq.
Paul Flum
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: 415-268-7000
Facsimile: 415-268-7522

Counsel for Defendants Alfred C. Eckert, Philip A. Incarnati, Alton F. Irby, M. Christine Jacobs, Michael L. Kappel, Gerald E. Mayo, James V. Napier, E. Christine Rumsey, Charles E. Thoele, and Donald Wegmiller

Samuel R. Miller, Esq.
James Goldberg, Esq.
Raquel L. Sefton, Esq.
FOLGER, LEVIN & KAHN
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
Telephone: 415-986-2800
Facsimile: 415-986-2827

Counsel for Defendant Jay P. Gilbertson

John A. Reding, Esq.
Grace A. Carter, Esq.
PAUL, HASTINGS, JANOFSKY & WALKER LLP
55 Second Street, 24th Floor
San Francisco, CA 94105-3441
Telephone: 415-856-7000
Facsimile: 415-856-7100

Counsel for Defendant Albert J. Bergonzi

Dorothy Yates Kirkley, Esq.
KIRKLEY & PAYNE, LLP
999 Peachtree Street, N.E., Suite 1640
Atlanta, GA 30309
Telephone: 404-892-8781
Facsimile: 404-892-3662

Paul A. Renne, Esq.
Charles M. Schaible, Esq.
COOLEY GODWARD LLP
1 Maritime Place, 20th Floor
San Francisco, CA 94111-3580
Telephone: 415-693-2000
Facsimile: 415-951-3699

Counsel for Defendant Charles W. McCall

Michael J. Shepard, Esq.
Laurel T. Paul, Esq.
HELLER, EHRMAN WHITE & McAULIFFE LLP
333 Bush Street
San Francisco, CA 94104-2878
Telephone: 415-772-6000
Facsimile: 415-772-6268

Howard S. Caro
HELLER, EHRMAN, WHITE & McAULIFFE
275 Middlefield Road
Menlo Park CA 94025
Telephone: 650-324-0638
Facsimile: 650-324-0638

Michael L. Charlson, Esq.
HELLER, EHRMAN WHITE & McAULIFFE LLP
120 West 45th Street
New York, NY 10036-4041
Telephone: 212-832-8300
Facsimile: 212-763-7600

Moses Silverman, Esq.
Karen S. Kennedy, Esq.
PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212-383-3000
Facsimile: 212-757-3990


Counsel for the Defendant Holcombe T. Green, Jr.

Robert R. Ambler, Esq.
SUTHERLAND ASBILL & BRENNAN LLP
999 Peachtree Street, N.E.
Atlanta, GA 30309-3915
Telephone: 404-853-8000
Facsimile: 404-853-8806

Jeffrey L. Bleich, Esq.
Hojoon Hwang, Esq.
MUNGER, TOLLES & OLSON LLP
33 New Montgomery Street, 19th Floor
San Francisco, CA 94105-9781
Telephone: 415-512-4000
Facsimile: 415-512-4077

Counsel for Defendant Mark A. Pulido

Mark J. Stein, Esq.
David B. Hennes, Esq.
FRIED, FRANK, HARRIS, SHRIVER & JACOBSEN
One New York Plaza
New York, NY 10004
Telephone: 212-859-8000
Facsimile: 212-859-4000

James T. Fousekis, Esq.
David J. Romanski, Esq.
Rachel E. Matteo-Boehm, Esq.
STEINHART & FALCONER, LLP
333 Market Street, 32nd Floor
San Francisco, CA 94105-2150
Telephone: 415-777-3999
Facsimile: 415-442-0839

Defendant McKesson HBOC, Inc. Profit Sharing Investment Plan

Kristina Veaco, Corporate Secretary
c/o Richard Ardoin, Associate General Counsel
MCKESSON CORPORATION
One Post Street, 34th Floor
San Francisco, CA 94104
Telephone: 415 983-9154
Facsimile: 415 983-9042

**Exhibit C**

FILED

SEP - 1 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

|  |  |
|---|---|
| IN RE MCKESSON HBOC, INC. ERISA LITIGATION | ) Master File No. C-00-20030 RMW<br>)<br>)<br>)<br>)<br>)<br>) CLASS ACTION<br>) |

**FINAL ORDER AND JUDGMENT**

# FINAL ORDER AND JUDGMENT

2      AND NOW, this 1st day of September, 2006,

3      (a)      upon consideration of (i) the motion of Plaintiffs for approval of a settlement (the

4 "Settlement") of this action pursuant to the terms of a Stipulation and Agreement to Settle Claims

5 of McKesson Settlement Class (the "Agreement") dated as of March 22, 2006, and amended as of

6 May 9, 2006, among the Named Plaintiffs[1] and Defendants McKesson Corporation f/k/a McKesson

7 HBOC, Inc. ("McKesson"), McKesson Information Solutions, LLC, f/k/a HBO & Company

8 ("HBOC"), the McKesson Profit Sharing and Investment Plan (the "McKesson Plan"),  E.

9 Christine Rumsey, Michael L. Kappel, Charles W. McCall, Alfred C. Eckert III, Alton F. Irby III,

10 Gerald E. Mayo, James V. Napier, Philip A. Incarnati, Donald C. Wegmiller, Charles E. Theole, M.

11 Christine Jacobs, Tully M. Friedman, John M. Pietruski, Carl S. Reichardt, Alan Seelenfreund, and

12 Mark A. Pulido (the "Defendants"), (ii) the applications of Class Counsel for awards of counsel

13 fees and reimbursement of expenses; and (iii) the applications of Christine Chang and James

14 Huffman for the award of an incentive fee (collectively, the "Motions");

15      (b)      the Court having entered an Order on May 19, 2006 preliminarily approving the

16 Settlement, certifying the Settlement Class as a mandatory non opt out class pursuant to Fed. R.

17 Civ. P. 23(b)(1)(A) and (b)(2) for purposes of proceedings to consider final approval of the

18 Settlement, approving the form of Class Notice and directing the manner of delivery and

19 publication thereof, and scheduling a hearing to consider the fairness of the Settlement, pursuant to

20 Federal Rule of Civil Procedure 23(e), among other matters (the "Preliminary Approval of

21 Settlement and Procedural Order");

22      (c)      the Court, having received a declaration attesting to the delivery and publication of

23 the Class Notice in accordance with the Preliminary Approval of Settlement and Procedural Order;

24 and

25      (d)      a hearing having been held before this Court on September 1, 2006 (the "Final

26 Approval and Fairness Hearing") (i) to determine finally whether this action satisfies the applicable

27
---
[1] Capitalized terms not otherwise defined in this Order shall have the meanings set forth or utilized
28 in the Agreement.

1

1 | prerequisites for class action treatment under Fed. R. Civ. P. 23(b)(1)(A) and (b)(2); (ii) to consider

2 | the fairness of the Settlement, pursuant to Fed. R. Civ. P. 23, and to determine whether to enter this

3 | Order approving the Settlement; (iii) to determine whether the proposed Plan of Allocation of the

4 | Settlement Amount is fair and reasonable and should be approved; (iv) to consider the applications

5 | of counsel to Plaintiffs for awards of counsel fees and reimbursement of expenses; (v) to consider

6 | the applications of Christine Chang and James Huffman for incentive awards; and (vi) to rule upon

7 | such other matters as the Court might deem appropriate,

8 |        IT IS HEREBY ORDERED:

9 |            1.       The Court has jurisdiction over the subject matter of the Action, the

10 | McKesson Settlement Class, and the Defendants pursuant to 29 U.S.C. § 1132(e).

11 |            2.       The Court finds that the prerequisites for a class action under Rule 23 of the

12 | Federal Rules of Civil Procedure have been satisfied in that:

13 |            (a)       The class, consisting of thousands of members, is so numerous that joinder

14 | of all members thereof is impracticable;

15 |            (b)       There are questions of law and fact common to the McKesson Settlement

16 | Class;

17 |            (c)       The Named Plaintiffs, Christine Chang and James Huffman, are members of

18 | the class and their claims are typical of the claims of the McKesson Settlement Class;

19 |            (d)       The Named Plaintiffs have and will fairly and adequately represent the

20 | interests of the McKesson Settlement Class, have no interests antagonistic to the McKesson

21 | Settlement Class and have retained qualified, experienced and able counsel;

22 |            (e)       Prosecutions of separate actions by individual members of the class could

23 | create a risk of inconsistent or varying adjudications with respect to individual members of the

24 | class which would establish incompatible standards of conduct for the Defendants;

25 |            (f)       The Named Plaintiffs contend that Defendants have allegedly acted or

26 | refused to act on grounds generally applicable to the class, thereby justifying equitable and/or

27 | declaratory relief for the class as a whole if the Named Plaintiffs prevail as to their claims;

28 |

1        (g)     The class definition is sufficiently precise and proper notice was provided to
2  the class; and

3        (h)     Class Counsel is appropriately qualified and suitable for appointment to
4  represent the class.

5        (i)     Accordingly, this Court hereby finally certifies the McKesson Settlement
6  Class as a mandatory non-opt-out class pursuant to Fed. R. Civ. P. 23(b)(1)(A) and 23(b)(2)
7  consisting of: all participants in the McKesson Plan (excluding employees of HBOC who became
8  Participants in the McKesson Plan by virtue of the merger of the HBOC Plan into the McKesson
9  Plan effective April 1, 1999) whose accounts were invested in McKesson Company Stock at any
10  time, who maintained an account balance under the McKesson Plan as of April 27, 1999 that
11  included McKesson Company Stock, and who had not received a complete distribution from the
12  McKesson Plan as of April 27, 1999, except for Defendants. No class member shall have the right
13  to opt out of the McKesson Settlement Class.

14       3.     In accordance with the Court's Preliminary Approval of Settlement and
15  Procedural Order, Class Notice was timely given to all members of the McKesson Settlement Class
16  who could be identified with reasonable effort by June 16, 2006, and was published on the Website
17  maintained by McKesson from June 16, 2006 through the date of this Order. The form and
18  methods of notifying the McKesson Settlement Class of the terms and conditions of the proposed
19  Agreement met the requirements of Rule 23 of the Federal Rules of Civil Procedure, due process,
20  and any other applicable law, constituted the best notice practicable under the circumstances, and
21  constituted due and sufficient notice to all persons and entities entitled thereto.

22       4.     The motion for approval of the Settlement is hereby GRANTED, and the
23  Settlement is APPROVED as fair, reasonable and adequate, and the terms of the Settlement are
24  hereby determined to be prudent, for the exclusive benefit of participants and beneficiaries of the
25  McKesson Plan and in compliance with all applicable provisions of the Employee Retirement
26  Income Security Act of 1974, as amended ("ERISA"). The Parties are directed to consummate the
27  Settlement in accordance with the terms of the Agreement.

28

1         5.     Counts Seven through Thirteen of the Consolidated Amended Complaint for

2 Breach of Fiduciary Duties under ERISA in the Action, asserted on behalf of the McKesson

3 Settlement Class against the Defendants, are hereby dismissed with prejudice.

4         6.     Upon this Order becoming final, the Named Plaintiffs, the McKesson

5 Settlement Class, all members of the McKesson Settlement Class, the McKesson Plan and the

6 HBOC Plan shall be deemed to have, and by operation of the Final Order and Judgment shall have,

7 fully, finally, and forever released and are forever barred from the prosecution of, any and all

8 Released Claims against any and all of the Released Persons.

9         7.     "Released Claims" shall encompass all claims, causes of action, demands,

10 rights or liabilities, (including but not limited to claims for violation of the federal securities laws,

11 ERISA, negligence, gross negligence, professional negligence, breach of duty of care, breach of

12 duty of loyalty, breach of the duty of candor, breach of the duty to monitor, fraud, breach of

13 fiduciary duty, mismanagement, corporate waste, malpractice, breach of contract, negligent

14 misrepresentation, violations of any federal or state statutes, or for violating any law of any nation,

15 province, state, county, city or subdivision or agency thereof, and any "Unknown Claims" (as

16 defined below)) that have been or that could have been asserted in this or any other forum by or on

17 behalf of the Named Plaintiffs, the McKesson Settlement Class, any member of the McKesson

18 Settlement Class, the HBOC Plan, or the McKesson Plan (by or on behalf of the McKesson

19 Settlement Class or as successor to the HBOC Plan), based on, arising out of, in connection with,

20 or related in any way to any of the conduct, events, actions, failures to act, or statements referenced

21 in the Complaint, or in any way to the holding, voting, purchase or other acquisition, sale or other

22 disposition of McKesson's or HBOC's securities. Released Claims may include claims, causes of

23 action, demands, rights, or liabilities based on, arising out of, in connection with, or relating in any

24 way to:

25         a.     any of the facts, circumstances, allegations, representations, statements,

26 reports, disclosures, transactions, events, occurrences, acts, omissions or failures to act, of whatever

27 kind or character, irrespective of the state of mind of the actor performing or omitting to perform

28 the same, that have been or could have been alleged in any pleading, amended pleading, argument,

1  complaint, amended complaint, brief, motion, report, or filing in the Action including, without
2  limitation, the Complaint or the [Proposed] Second Consolidated Amended Complaint; or

3          b.      any matter, cause or thing whatsoever, including, but not limited to, any
4  action, omission or failure to act of whatever kind or character, irrespective of the state of mind of
5  the actor performing or omitting to perform the same, arising out of or relating to the adequacy,
6  accuracy, preparation, dissemination, or completeness of any disclosure or statement made in any
7  filings, proxy statements, prospectus, reports, press releases, statements, documents required to be
8  filed by any ERISA plan, representations, analyst reports or announcements concerning
9  McKesson's or HBOC's operations, subsidiaries, services, sales, revenues, income, costs, financial
10 condition or prospects or in any filing with the Securities and Exchange Commission or any other
11 federal or state governmental agency or regulatory board (collectively referred to as "Public
12 Statements"), or in the preparation or dissemination of, or failure to disseminate, any such Public
13 Statements, at any time during the Class Period; or

14          c.      any of the facts, circumstances, representations, statements, reports,
15 disclosures, transactions, events, occurrences, acts or omissions of whatever kind or character,
16 regardless of the state of mind of the actor performing or omitting to perform the same,
17 encompassed by subparagraph 7(a) and 7(b) above, that has been or that could have been alleged,
18 or made the subject of any claim or action in state court or otherwise under the law of any state, at
19 common law or in equity, in any pleading, amended pleading, demand, complaint, amended
20 complaint, motion, discovery response or filing.

21      Notwithstanding the foregoing, Released Claims shall not include (i) any claims or rights
22 that the McKesson Plan may have in *In re McKesson HBOC, Inc. Securities Litigation*, (N.D. Cal.
23 No. CV-99-20743 RMW), or any other litigation asserting claims under the federal or state
24 securities laws arising out of the purchase, holding, or other acquisition of McKesson Company
25 Stock by the McKesson Plan during the time period between October 1998 through April 27, 1999
26 or (ii) any claims that relate solely to purchases of McKesson or HBOC securities by members of
27 the Settlement Class if those purchases were not (x) made by or through the McKesson Plan or the

28

1 HBOC Plan, or (y) related in any way to the participation of such members in the McKesson Plan
2 or the HBOC Plan.

3         8.     "Unknown Claims" means any Released Claims which any Releasing Person
4 does not know or suspect to exist in his, her or its favor at the time of the release which, if known
5 by him, her or it might, should or would have affected his, her or its settlement with and releases of
6 the Released Persons, or might, should or would have affected his, her or its decision to enter into
7 or not to object to this Agreement. With respect to any and all Released Claims, the parties hereto
8 agree that, upon the Effective Date, the Releasing Persons shall expressly be deemed to have, and
9 by operation hereof shall have, expressly waived the provisions, rights and benefits of California
10 Civil Code § 1542, which provides:

11
12         A general release does not extend to claims which the creditor does not know or
        suspect to exist in his or her favor at the time of executing the release, which if
        known by him or her must have materially affected his or her settlement with the
13         debtor.

14 The Releasing Persons shall expressly waive and shall be deemed to have, and by operation of the
15 Final Order and Judgment shall have, expressly waived any and all provisions, rights and benefits
16 conferred by any law of any state or territory of the United States, or principle of common law,
17 which is similar, comparable or equivalent to California Civil Code § 1542. The Releasing Persons
18 may hereafter discover facts in addition to or different from those which he, she or it now knows or
19 believes to be true with respect to the subject matter of the Released Claims. Notwithstanding any
20 such discovery, upon the Effective Date, the Releasing Persons shall be deemed to have, and by
21 operation of the Final Order and Judgment shall have, fully, finally, and forever settled and
22 released any and all Released Claims as against the Released Persons, whether known or unknown,
23 suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which
24 now exist, or which previously existed upon any theory of law or equity now existing or coming
25 into existence in the future, including, but not limited to, conduct which is negligent, intentional,
26 with or without malice, or a breach of any duty, law or rule, without regard to the subsequent
27 discovery or existence of such different or additional facts.

28

1        9.      "Released Persons" shall mean and include all persons or entities named as

2   defendants or nominal defendants in the Complaint, including, McKesson, HBOC, any members at

3   any time of the HBOC Administrative Committee, the HBOC Administrative Committee, Jay

4   Gilbertson, Albert Bergonzi, E. Christine Rumsey, Michael Kappel, the HBOC Board of Directors,

5   Charles McCall, Alfred Eckert, Alton Irby III, Gerald Mayo, James V. Napier, Holcombe Green,

6   Jr., Philip A. Incarnati, Donald Wegmiller, Charles Thoele, M. Christine Jacobs, any persons or

7   entities referred to or intended to be referred to in paragraph 18 of the Complaint under the

8   reference to "HBOC Plan Fiduciaries DOES 1-20", any persons referred to or intended to be

9   referred to in paragraph 20 of the Complaint under the reference to "The 'Pre-Merger Individual

10  McKesson Board Members'", including Tully Friedman, John Pietruski, Carl Reichardt, Alan

11  Seelenfreund, Mark Pulido, Mary Bitterman, David Pottruck, Jane Shaw, and Robert Waterman,

12  any persons referred to or intended to be referred to in paragraph 21 of the Complaint under the

13  reference to "The 'Post-Merger Individual McKesson Board Members'", any persons or entities

14  referred to or intended to be referred to in paragraph 23 of the Complaint under the reference to

15  "Defendants McKesson Plan Fiduciaries ROES 1-20", the McKesson Plan, the HBOC Plan, and

16  any other person or entity that could have been named as a defendant in any capacity in this action.

17  Released Persons shall also include, with respect to any of the above listed persons or entities, to

18  the extent applicable, their parent entities, affiliates, subsidiaries, predecessors, successors or

19  assigns, their past, present or future officers, directors, associates, stockholders, controlling

20  persons, representatives, employees, attorneys, accountants, underwriters, insurers, agents,

21  financial or investment advisors, heirs, executors, trustees (including, but not limited to, Fidelity

22  Management Trust Company), general or limited partners or partnerships, personal representatives,

23  estates or administrators.

24        10.     Notwithstanding any other provision of this Final Order and Judgment or the

25  Agreement, McKesson and HBOC shall retain all rights, nor shall this Final Order and Judgment

26  and/or the Agreement be deemed a waiver of, and shall not preclude, the right of McKesson or

27  HBOC to assert any claims permitted by any applicable federal or state statute or common law

28  against any person or entity (other than the Named Plaintiffs or their representatives), including

7

1 claims against any other Defendant, either in the form of a cross-claim or third party complaint
2 filed in this Action or by a separately filed action.

3         11.    The settlement shall have no effect on any claims of McKesson Settlement
4 Class Members with respect to purchases of McKesson or HBOC securities that were not (i) made
5 by or through the McKesson Plan or the HBOC Plan, or (ii) related in any way to the participation
6 of such members in the McKesson Plan or the HBOC Plan.

7         12.    The Release of Claims set forth herein and in the Agreement shall have no
8 impact whatsoever on the obligations set forth in and required by the Agreement, nor any party's
9 ability to enforce the provisions of the Agreement.

10         13.    Neither this Final Order and Judgment, the Agreement, nor any of its terms
11 and provisions, nor any of the negotiations or proceedings connected with it, nor any of the
12 documents or statements referred to therein shall be:

13         (a)    offered or received against any of the Released Persons or against the Named
14 Plaintiffs or the McKesson Settlement Class members as evidence of or construed as or deemed to
15 be evidence of any presumption, concession, or admission by any of the Released Persons or the
16 Named Plaintiffs or the McKesson Settlement Class members with respect to the truth of any fact
17 alleged by the Named Plaintiffs or the validity of any claim that had been or could have been
18 asserted in the Action or in any litigation, or the deficiency of any defense that has been or could
19 have been asserted in the Action or in any litigation, or of any liability, negligence, fault, or
20 wrongdoing of the Released Persons or the Named Plaintiffs or the McKesson Settlement Class
21 members;

22         (b)    offered or received against the Released Persons or the Named Plaintiffs or
23 the McKesson Settlement Class members as evidence of a presumption, concession or admission of
24 any fault, misrepresentation or omission with respect to any statement or written document
25 approved or made by the Released Persons, or against the Named Plaintiffs and/or the McKesson
26 Settlement Class members as evidence of any infirmity in the claims of the Named Plaintiffs and/or
27 the McKesson Settlement Class members;

28

1         (c)     offered or received against the Released Persons or against the Named

2 Plaintiffs or the McKesson Settlement Class members as evidence of a presumption, concession or

3 admission with respect to any liability, negligence, fault or wrongdoing, or in any way referred to

4 for any other reasons as against any of the Parties to the Agreement, in any other civil, criminal or

5 administrative action or proceeding, other than such proceedings as may be necessary to effectuate

6 the provisions of the Agreement;

7         (d)     construed against the Released Persons or the Named Plaintiffs and/or the

8 McKesson Settlement Class members as an admission or concession that the consideration to be

9 given hereunder represents the amount which could be or would have been recovered after trial; or

10         (e)     construed as or received in evidence as an admission, concession or

11 presumption against the Named Plaintiffs or the McKesson Settlement Class members or any of

12 them that any of their claims are without merit or that losses or damages recoverable in the Action

13 would not have exceeded the Settlement Fund.

14         14.     The Plan of Allocation is APPROVED as fair and reasonable, and Class

15 Counsel and the Plan Administrator or its designee are directed to administer the Distribution

16 Amount in accordance therewith.

17         15.     The Named Plaintiffs, Christine Chang and James Huffman are hereby

18 awarded, as incentive awards for their roles in prosecuting the Action on behalf of the Settlement

19 Class, \$10,000, payable from the Settlement Fund within fifteen (15) days after the Effective Date.

20         16.     Class Counsel are hereby awarded, as and for attorney fees of 25 percent of

21 the net Settlement Fund as determined under paragraph C.6 of the Settlement Agreemnet, which

22 the Court finds to be fair and reasonable, and for reimbursement of costs and expenses, the sum of

23 \$103,369.87 as reimbursement of costs and expenses, to be paid out of the Settlement Fund to

24 Class Counsel fifteen (15) days after the Effective Date. The award of attorney fees and expenses

25 shall be allocated among Class Counsel as such counsel mutually agree for their respective

26 contributions in the prosecution of the Action.

27         17.     Jurisdiction is hereby retained over this Action and the Parties, the

28 McKesson Plan, and the McKesson Settlement Class members for all matters relating to the

1  Action, including (without limitation) the administration, interpretation, effectuation or

2  enforcement of the Agreement and this Final Order and Judgment, and including any application

3  for fees and expenses incurred in connection with administering and distributing the settlement

4  proceeds to the members of the Settlement Class.

5          18.     Without further order of the Court, the Parties may agree to reasonable

6  extensions of time to carry out any of the provisions of the Agreement.

7          19.     There is no just reason for delay in the entry of this Final Order and

8  Judgment and immediate entry by the Clerk of the Court is expressly directly pursuant to

9  Rule 54(b) of the Federal Rules of Civil Procedure.

10         IT IS SO ORDERED, ADJUDGED AND DECREED.

11

12  Dated: _____9/1/06_____.          _____Ronald M. Whyte_____
                                              RONALD M. WHYTE
13                                          United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit D**

1  Ronald S. Kravitz (SBN 129704)
   Kim Zeldin (SBN 135780)
2  LINER YANKELEVITZ
   SUNSHINE & REGENSTREIF LLP
3  199 Fremont Street, Suite 2000
   San Francisco, CA 94105
4  Tel:    415-489-7700
5  Fax:    415-489-7701
   e-mail: rkravitz@linerlaw.com
6          kzeldin@linerlaw.com

7  Steven J. Ross (*Pro Hac Vice*)
8  LAW OFFICES OF STEVEN ROSS, P.A.
   1015 Atlantic Boulevard, Suite 306
9  Atlantic Beach, FL 32233
   Tel:    904-249-8799
10 Fax:    801-812-8512
   e-mail: stevenjross@msn.com
11

12 Attorneys for Plaintiffs CHRISTINE CHANG
   and JAMES HUFFMAN as class plaintiffs for
13 the McKESSON SUBCLASS

14                 UNITED STATES DISTRICT COURT

15               NORTHERN DISTRICT OF CALIFORNIA

16                     SAN JOSE DIVISION

17                                    )  MASTER FILE NO. C-00-20030 RMW
                                      )
18                                    )  **CLASS ACTION**
                                      )
19                                    )  **DECLARATION OF CHRISTINE**
                                      )  **CHANG IN SUPPORT OF MOTION**
20                                    )  **FOR AWARD OF CASE**
   IN RE MCKESSON HBOC, INC. ERISA   )  **CONTRIBUTION FEE:**
21 LITIGATION                         )
                                      )  **Date:** September 1, 2006
22                                    )  **Time:** 9:00 a.m.
                                      )  **Courtroom:** 6
23                                    )  **Judge:** The Honorable Ronald M. Whyte
                                      )
24                                    )
                                      )
25                                    )
                                      )
26                                    )
27

28
                                                Case No.  C-00-20030 RMW
   DECLARATION OF CHRISTINE CHANG IN SUPPORT OF MOTION FOR AWARD OF CASE CONTRIBUTION FEE

1  I, Christine Chang, declare as follows:

2      1.    I am a Named Plaintiff in Chang et al v. McKesson HBOC, Inc. et al, Case No. C-

3  00-20030 and a participant in the Profit Sharing Investment Plan ("PSIP"). The facts stated herein

4  are of my own personal knowledge and if called as a witness, I could and would testify

5  competently thereto. I make this declaration in support of the Motion for Award of Case

6  Contribution Fee.

7      2.    In connection with my role as Named Plaintiff, I performed the following tasks:

8  (a) I provided plan documents and other documents relating to my employment and benefits to

9  counsel and information about other participants in the plan; (b) I consulted with counsel regarding

10  strategic decisions throughout the course of this litigation; (c) I read the complaint (among other

11  things), court orders, motions to dismiss and responses drafted by my counsel, letters exchanged

12  with opposing counsel, and the mediation statements; (d) I consulted with counsel regarding

13  settlement discussions with opposing counsel; (e) I reviewed discovery requests; (f) I reviewed

14  documents produced by defendants; (g) I participated in the preparation of discovery responses

15  (document requests and interrogatories); and (h) I was consulted by counsel regarding the

16  settlement and the settlement documents.

17      3.    I understood, as a Named Plaintiff in this action, that, if necessary, I would also

18  have to have my deposition taken and testify at trial. Furthermore, I understood that any settlement

19  would have to be in the best interests of the class as a whole, and that I would be representing the

20  entire class and not just my own interests.

21      4.    I spent approximately 126 hours on this litigation. While I did not keep

22  contemporaneous records of the time I spent on the case, I was able to provide a reasonable

23  estimate of the time spent from correspondence to counsel in my files, discovery, pleadings and the

24  time records of counsels' fees motion which helped me to estimate the time I spent. A chart

25  summarizing my time spent on this case in chronological order is attached as Exhibit A.

26      //

27      //

28

1    I declare under penalty of perjury that the foregoing is true and correct, except as to those

2   matters set forth on information and belief, and as to those matters I am informed and believe them

3   to be true and correct.

4       Executed on July 27, 2006 at San Francisco, California.

5

6

7                                          _____
                                                    Christine Chang

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          2                          Case No.  C-00-20030 RMW
        DECLARATION OF CHRISTINE CHANG IN SUPPORT OF MOTION FOR AWARD OF CASE CONTRIBUTION FEE

00900017/001/ 78487v01

**EXHIBIT A**

**TIME SPENT BY CHRISTINE CHANG ON CHANG V. McKESSON**

**1999 to 2006**

| Description | Time (hrs) |
|---|---|
| Prepared for meetings with counsel | 5 |
| Attended 10 meetings with counsel; travel to and from San Francisco offices | 59 |
| Received and reviewed correspondence from counsel; telephone conferences with counsel re: same | 11 |
| Drafted correspondence to counsel | 6 |
| Telephone conferences with counsel | 11 |
| Reviewed pleadings in motion to dismiss proceedings; telephone conferences with counsel re: same | 30 |
| Prepared responses to Bergonzi's Request for Production of Documents | 1 |
| Prepared responses to Bergonzi's Interrogatories | 3 |
| **TOTAL** | **126** |

**<u>Exhibit E</u>**

# M꜀KESSON

*Empowering Healthcare*

May 3, 2007

To the Participants of the McKesson Corporation Profit-Sharing Investment Plan:

The proceeds from the settlement of the McKesson Corporation ERISA litigation have been allocated to the Profit-Sharing Investment Plan (PSIP) accounts of eligible current and former plan participants. To view the settlement from your PSIP shares, please log on to www.401k.com and click onto the McKesson Corporation PSIP link. Under the "View" section, go to "History" and click on "Transaction History". Select transaction history for the past 90 days, to see "Adjustments" posted to your account on April 24, 2007.

If you have questions regarding your individual settlement, please call the PSIP Service Center at 888-MCK-PSIP (888-625-7747) or send an email to corp.benefits@mckesson.com with the last four digits of your Social Security Number and a daytime phone number. You can expect to receive a response within a week.

These funds will remain in your PSIP account until you are eligible to take a distribution from the plan upon your separation of service or retirement. If you are a former McKesson employee and would like to take a distribution at this time, please contact the PSIP Service Center at 888-MCK-PSIP (888-625-7747) and speak to a representative.

The settlement of the McKesson Corporation Securities litigation is pending with the claims administrator and is not expected to be finalized any sooner than the end of this calendar year. The allocations of these proceeds will be posted to the PSIP accounts of eligible plan participants as soon as administratively possible after they are released to the Plan trustee.

McKesson Corporation

3.MC-C-758K.100

**Exhibit F**

## ATTACHMENT A

## McKESSON HBOC, INC. CORPORATE HEADQUARTERS

## McKESSON HBOC, INC. SEVERANCE PLAN SPD

Employee's Name:  **Christine Chang**

**Severance Payment**

Based on an expected termination date of  **March 31, 1999**, your severance benefit

is **$4,466.54** which represents **four (4)** weeks' pay.

In addition, you will receive the following:

1. TAP credits up to a maximum of $500 to help with your transition

2. COBRA premium payments for 3 months

3. Membership with Alumnae Resources

4. Outplacement assistance with Interim Career Solutions
   - A 3 day "Job Preparation Workshop"

**Exhibit G**

# WAIVER AND GENERAL RELEASE OF CLAIMS

### McKesson HBOC, Inc.
### Corporate Headquarters
### Information Technologies Division
### 1999 Reduction in Force Program

**Dear Christine Chang:**

As you know, your employment with McKesson HBOC, Inc. will end on March 31, 1999. In order to receive benefits under the 1999 ITD Reduction in Force Program (the "Program"), including benefits under the McKesson HBOC, Inc. Severance Pay Plan (the "Severance Pay Plan"), you must sign this Waiver and General Release of Claims ("Waiver") in the exact form provided, without altering, deleting from, or adding to it, and return it to your Human Resources Director no later than 5:00 p.m. on May 17, 1999.

This Waiver is an important document which you should examine carefully before signing. You may take up to forty-five (45) days to think about it before signing it. This period is intended to allow you time to think about whether you want to sign the Waiver, and to seek the advice of anyone you need to consult in order to make an informed decision. You should consult with your attorney about this document.

This Waiver will not become effective or enforceable until seven (7) days after you sign it. You may revoke the Waiver at any time during this seven-day period. If you do revoke the Waiver, you will not be entitled to the benefits under the Program.

Under federal law, we are required to inform you of the job titles and ages of all employees eligible for the Program, and the ages of all employees in the same job classification or organizational unit who are not eligible for the Program. This information is included in the attached schedule.

--------------------------------------------------------------------------------

1.    I have been offered benefits under the Program in exchange for signing this Waiver. These benefits include:

    (a)    Severance benefits under the McKesson HBOC, Inc. Severance Pay Plan.

    (b)    $500.00 in TAP credits.

    (c)    Three months' COBRA premiums, if I elect COBRA continuation coverage.

1D 0036

(d)    A three-day outplacement workshop.

2.    I understand that, in order to receive benefits under the Program, I must sign, date and return this Waiver on or before May 17, 1999. I acknowledge that I have been offered a period of at least forty-five (45) calendar days to consider this Waiver.

3.    I understand that, if I elect to sign this Waiver, I have seven (7) days thereafter to change my mind and revoke my agreement to the terms of this Waiver. I understand that if I decide to revoke during this seven-day period, I may do so by delivering a written notice to my Human Resources Director not later than 5:00 p.m. on the seventh calendar day after I have signed the Waiver.

4.    This Waiver covers both claims that I know about and those that I may not know about that exist as of the date of signing this form. I am aware of the provisions of California Civil Code Section 1542, which provides that:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

I am aware of this provision and its effect upon my rights, and I expressly waive any rights I may have under section 1542 or under any statutes or common law principles of similar effect.

5.    I agree not to disclose any information relating to the existence and terms of this Waiver and shall take every precaution to prevent disclosure of such information to third parties other than members of my immediate family and my personal financial and legal advisors, unless such disclosure is required by law.

6.    I acknowledge that, in the course of my work as an employee of the Company, I have had access to Proprietary Information (as defined below) concerning the Company, its products, customers and methods of doing business. I acknowledge that the Company has developed, compiled and otherwise obtained, often at great expense, this information, which has great value to the Company's business. I agree to hold in strict confidence and not disclose any Proprietary Information, directly or indirectly, to anyone outside of the Company, or use, copy, publish, summarize, or remove from Company premises such information. I agree to deliver promptly to Company all tangible Proprietary Information which is in my possession or under my control. For purposes of this Waiver, the reference to "Proprietary Information" means all information and any idea in whatever form, tangible or intangible, whether disclosed to or learned or developed by me, pertaining to

or affecting the business of the Company or other affiliated companies or their clients, consultants, or business associates unless:

(a)    the information is or becomes publicly known through lawful means not requiring the permission or license of the Company;

(b)    the information was rightfully in my possession or part of my general knowledge prior to my employment by the Company or by virtue of my activities not related to my employment by the Company; or

(c)    the information was disclosed to me without confidential or proprietary restriction by a third party who rightfully possesses the information (without confidential or proprietary restriction for the benefit of the Company) and did not learn it, directly or indirectly, from the Company on a confidential basis.

I further agree that the following information is included, without limitation, in the definition of Proprietary Information if the same is encompassed by the preceding sentence:

(i) processes, trade secrets, electronic codes, computer software, source codes, proprietary techniques, inventions, improvements and research projects;

(ii) information about costs, budgets, profits, markets, employees, sales and lists of customers or vendors;

(iii) plans for future development and new product concepts and marketing; and

(iv) all documents, books, papers, drawings, models, sketches, studies, consultant's reports and other data of any kind and description, including electronic data recorded or retrieved by any means, that have been given to me by the Company or other affiliated companies, as well as written or oral instructions or comments.

7.    I agree that I will not solicit or assist in the solicitation of any employees or customers of Company for the twelve (12) month period following my last day of employment with the Company.

8.    By signing this Waiver, I knowingly and voluntarily agree to release the Company (which includes its subsidiaries, affiliates, directors, officers, employees, agents, representatives and related entities) from all claims or demands I may have against the Company, including, but not limited to, claims based on my employment with the Company or the termination of that employment (other than claims for vested benefits in

accordance with the terms of the Company's written benefit plans). This includes, but is not limited to, a release of any rights or claims I may have under the Civil Rights Acts of 1964 and 1991, as amended, the Age Discrimination in Employment Act of 1967, as amended, ERISA, or any other federal state or local laws. This Waiver also includes a release by me of any claims for wrongful discharge or claims that the Company has dealt with me unfairly or in bad faith.

9.    I understand that this Waiver and all transactions hereunder shall be governed by, interpreted and enforced in accordance with the laws of the State of California without reference to principles of conflict of laws.

10.   I understand that if any provision of this Waiver or the application thereof is held invalid in a court of law, the invalidity shall not affect other provisions or applications of this Waiver which can be given effect without the invalid provisions or applications. To this end, the provisions of this Waiver are declared to be severable.

11.   The provisions of this Waiver set forth the entire agreement between me and the Company concerning my termination of employment. Any other promises, written or oral, are replaced by the provisions of this Waiver, and are no longer effective unless they are contained in this document.

12.   I acknowledge that I have been advised to consult with an attorney prior to signing this Waiver. I understand that whether or not to consult with an attorney is my own decision.

**I ACKNOWLEDGE THAT I HAVE READ THIS WAIVER AND GENERAL RELEASE OF CLAIMS, UNDERSTAND IT AND THAT I AM VOLUNTARILY SIGNING IT.**

_____          _____
Christine Chang                        Date

**Exhibit H**

**McKesson HBOC, Inc.**
One Post Street, 20th Floor
San Francisco, CA 94104-5296
tel 415-983-8570
fax 415-983-8549
chris.maher@mckhboc.com
www.mckhboc.com



**Christopher R. Maher**
Vice President
Compensation and Benefits

March 1, 2001

*Via Facsimile and U.S. Mail*

Peter S. Meyers, Esq.
The Meyers Law Firm
260 California Street, Suite 801
San Francisco, CA 94111

                    Re:  Christine Chang's Benefit Claim Appeal

Dear Mr. Meyers:

        This letter serves as the response of the Plan Administrator of the McKesson HBOC, Inc. Severance Pay Plan (the "Plan") to Christine Chang's appeal of the denial of her claim for benefits under the Plan.  As discussed with Kevin Urbatsch of your office by telephone, we are sorry for the delay in the response to you.  However, for the reasons set forth below, the Plan Administrator upholds its earlier determination that Ms. Chang is not entitled to benefits under the Plan.

        In her benefit appeal correspondence, Ms. Chang asserts two additional arguments as to her right to benefits under the Plan, both of which relate to the nature of the release that McKesson HBOC (the "Company") requested Ms. Chang execute as a condition for participating in the Plan.  First, your July 21, 2000 letter asserts that Ms. Chang "was required to sign a general release as to the circumstances of her termination.  She was instead presented with a release which required her to waive all claims, including claims she has as a participant in the Employee Stock Participation Plan."  The gist of this argument appears to be that Ms. Chang was promised Plan participation for agreeing to waive any termination-related claims, but was then requested to agree to a broader release.  The appeal correspondence provides no support for this proposition, and both the Plan and the information provided to the employees in connection with the 1999 ITD Reduction in Force Program (the "Program") illustrate that the waiver at issue was appropriate under the Plan.

        The release required for participation in the Plan in conjunction with the Program was provided to employees in the materials announcing the Program.  See Waiver and General Release of Claims (the Program offer).  As a result, the Company did not make representations about the Program that omitted any terms of the release upon which Plan

participation was conditioned. In addition, the Plan document states that the Company may request an employee to agree to a release in order to receive benefits under the Plan and notes that, at a minimum, such a release will require the employee to waive all claims "arising out of his or her employment," in addition to those relating to "the termination of his or her employment." See Plan at p. 5, § 3.4. Thus, the Plan discloses that if a release is required, it will be broader than simply waiving claims relating to the termination of employment with the Company. In any event, as discussed below, the Plan permits the Company to request a release as it sees fit, including a release of claims relating to other benefit plans.

The second argument asserted in support of Ms. Chang's appeal is that the Plan document "does not permit or require" the Company to request that an employee release claims he or she may have under ERISA, and that requesting such a release is unlawful. No support is offered for this argument.

The Plan provides that the Company may, in its sole discretion, require an employee to execute a waiver and general release as a requisite for Plan participation, and sets no restraint on requesting a release of claims arising under ERISA. Specifically, the Plan provides, in relevant part:

> The Company,[1] in its sole discretion, may require that each Eligible Employee execute a 'Waiver and General Release' as a condition of participation in the Plan. If the Company so requires, ... an Eligible Employee shall not become a Participant and shall not be eligible for Severance Pay unless he or she properly completes and executes the Waiver and General Release in exactly the form provided to the Eligible Employee by the Company, without altering or adding to the Waiver and General Release in any way. The Waiver and General Release shall ... provide that execution of such Waiver and General Release by the Eligible Employee will constitute a waiver and release of every claim the Eligible Employee might otherwise have arising out of his or her employment or the termination of his or her employment....

Plan at p. 5, § 3.4.

While the Plan does specify some of the items that must be released—*e.g.*, all claims arising out of the employee's employment and the termination of that employment—it does not purport to enumerate all terms of the release. In addition, the Plan does not, in any way, limit the authority or discretion of the Company to require the release of any matter not specified in the Plan. Thus, even assuming, *arguendo*, that ERISA claims are not inherently encompassed in the Plan's requirement that a waiver include the release of all claims relating to the employee's employment (an assumption which Ms. Chang appears to be making in her appeal correspondence), the Plan neither purports to provide an exhaustive list of the items which must be included in any requested waiver, nor places any constraints on the Company's discretion to include

---

[1] Initial capitalization indicates that the Plan defines the term so capitalized.

matters within such waivers. Instead, the Plan focuses its waiver qualifications on the employee's conduct, requiring that if the Company makes a release a precondition for participating in the Plan, the employee must execute the release in order to receive benefits from the Plan. Plan at p. 5, § 3.4. <u>The Plan Administrator is not aware of anything in ERISA that prohibits this provision and, in fact, believes that it is lawful.</u>

For these reasons, the arguments set forth in the correspondence constituting Ms. Chang's appeal do not alter the Plan Administrator's conclusions as to Ms. Chang's benefit entitlement. In addition, the Plan Administrator also confirms its denial of Ms. Chang's benefit claim for all the reasons set forth in its initial letter discussing her claim, a copy of which is attached and which is incorporated into this letter by this reference.

For the reasons stated above, the Plan Administrator confirms its earlier denial of Christine Chang's claim for benefits under the McKesson HBOC, Inc. Severance Pay Plan.

Very truly yours,

McKesson HBOC, Inc. Employee
Benefits Committee,
Plan Administrator of the McKesson
HBOC, Inc. Severance Pay Plan

By

Christopher R. Maher
Vice President, Compensation &
Benefits

cc:    Mr. Kevin Urbatsch

#33261

**<u>Exhibit I</u>**

# MCKESSON HBOC, INC. SEVERANCE PAY PLAN

**Amended as of January 27, 1999**

ID 0016

## TABLE OF CONTENTS

Page

SECTION 1. ESTABLISHMENT AND PURPOSE.................................................................... 1

SECTION 2. DEFINITIONS.................................................................................................... 1
2.1      "Affiliated Group"...................................................................................... 1
2.2      "Code"........................................................................................................ 1
2.3      "Company".................................................................................................. 1
2.4      "Curtailment Date"..................................................................................... 1
2.5      "Eligible Employee" ................................................................................... 1
2.6      "ERISA"..................................................................................................... 2
2.7      "Participant"............................................................................................... 2
2.8      "Participating Company" ............................................................................ 2
2.9      "Plan".......................................................................................................... 2
2.10     "Plan Year" ................................................................................................ 2
2.11     "Severance Pay" ......................................................................................... 2
2.12     "Severance Pay Allowance".......................................................................... 2
2.13     "Waiver and General Release" .................................................................... 2

SECTION 3. PARTICIPATION .............................................................................................. 2
3.1      Voluntary Participation............................................................................... 2
3.2      Mandatory Participation.............................................................................. 3
3.3      Persons Who Shall Not Participate ............................................................ 3
3.4      Waiver and General Release ....................................................................... 5

SECTION 4. SEVERANCE BENEFITS .................................................................................. 6
4.1      Severance Pay Allowance ........................................................................... 6
4.2      Normal Form of Payment of Severance Pay Allowance ..................... 6
4.3      Optional Methods........................................................................................ 6
4.4      Interest......................................................................................................... 7
4.5      Repayment or Forfeiture of Severance Pay Allowance ........................ 7

SECTION 5. WELFARE BENEFITS ...................................................................................... 7
5.1      Continuation of Coverage ........................................................................... 7

SECTION 6. SOURCE OF PAYMENTS AND EXPENSES...................................................... 8
6.1      Source of Payments..................................................................................... 8
6.2      Expenses ..................................................................................................... 8

SECTION 7. ADMINISTRATION AND PLAN FIDUCIARIES ............................................. 8
7.1      Plan Sponsor ............................................................................................... 8
7.2      Plan Administrator ...................................................................................... 8
7.3      Administrative Responsibility .................................................................... 8
7.4      Review of Denied Claims ............................................................................ 8

i

7.5    Named Fiduciaries ..................................................................................... 9
7.6    Allocation and Delegation of Responsibilities ................................... 9
7.7    No Individual Liability ............................................................................. 9

SECTION 8.  CLAIMS AND APPEALS.................................................................... 9
8.1    Claims for Benefits ................................................................................... 9
       (a)    Time Limits for Submission of Initial Claim................................... 9
       (b)    Time Limits for Decision on Initial Claim ................................. 10
       (c)    Deemed Denial............................................................................... 10
8.2    Review of Denied Claims ....................................................................... 10
       (a)    Time Limits for Submission of Request for Review .............. 11
       (b)    Time Limits for Decision on Review....................................... 11
8.3    Exhaustion of Remedies ......................................................................... 12

SECTION 9.  GENERAL PROVISIONS ................................................................ 12
9.1    Legal Construction of the Plan ........................................................... 12
9.2    No Rights Created or Accrued ............................................................. 12
9.3    Benefits Not Contingent Upon Retirement........................................ 12
9.4    Relation of the Plan to Descriptive Matter ...................................... 13
9.5    Nonalienation of Benefits ..................................................................... 13

SECTION 10.  AMENDMENT AND TERMINATION ........................................ 13
10.1    Amendment and Termination ............................................................. 13
10.2    Effect of Amendment or Termination................................................ 13

SECTION 11.  EXECUTION........................................................................................ 14

ID 0018

## MCKESSON SEVERANCE PAY PLAN
### (Amended as of January 27, 1999)

SECTION 1.  ESTABLISHMENT AND PURPOSE.

The McKesson HBOC, Inc. Severance Pay Plan (the "Plan") was established to provide severance benefits to Eligible Employees who become Participants in the Plan. The Plan is intended to be, and shall be maintained and operated as, an employee welfare benefit plan under ERISA.

The Plan is effective as of April 1, 1988. The Plan supersedes any plan, program or practice previously in effect by which the Participating Companies may have provided severance benefits prior to April 1, 1988, other than any written employment contract that expressly provides such benefits.

SECTION 2.  DEFINITIONS.

2.1    "Affiliated Group" means the Company, each Participating Company and any other direct or indirect subsidiary or affiliate of the Company.

2.2    "Code" means the Internal Revenue Code of 1986, as amended, and includes regulations promulgated thereunder by the Secretary of Treasury.

2.3    "Company" means McKesson HBOC, Inc., a Delaware corporation.

2.4    "Curtailment Date" means the date selected by a Participating Company on which an Eligible Employee's active duties cease.

2.5    "Eligible Employee" means a regular full-time or part-time employee of a Participating Company whose job performance has been satisfactory, as reflected in the most

recent performance evaluation of the employee.

2.6     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and includes regulations promulgated thereunder by the Secretary of Labor.

2.7     "Participant" means an Eligible Employee who participates in the Plan pursuant to Section 3.

2.8     "Participating Company" means the Company and each subsidiary of the Company which has been designated by the Company as a Participating Company.

2.9     "Plan" means the McKesson HBOC, Inc. Severance Pay Plan, as set forth herein and as amended from time to time hereafter.

2.10    "Plan Year" means the twelve month period commencing on April 1 and ending on the following March 31.

2.11    "Severance Pay" means amounts payable under the Plan to a Participant on account of termination of his or her employment under the conditions described in Section 3.

2.12    "Severance Pay Allowance" means the total amount of Severance Pay that a Participant may receive under the Plan.

2.13    "Waiver and General Release" means the written waiver and release form described in Section 3.4.

## SECTION 3. PARTICIPATION.

3.1     Voluntary Participation. An Eligible Employee shall become a Participant in the Plan if:

        (a)     A Participating Company sends a written notice to the Eligible

Employee offering him or her the opportunity to voluntarily terminate

employment with the Affiliated Group and participate in the Plan;

(b)    The Eligible Employee voluntarily elects in writing on such form
as prescribed by the Company to terminate employment with the Affiliated Group
and participate in the Plan, and delivers such form to the person designated in the
notice described in Section 3.1(a);

(c)    The Participating Company selects the Eligible Employee as a
Participant from the group of volunteers, on the basis of criteria to be determined
by the Company in its sole discretion, and notifies the Eligible Employee of his or
her selection; and

(d)    The Eligible Employee continues as a satisfactory employee until
his or her Curtailment Date (or such earlier date approved in advance by the head
of the Eligible Employee's department).

3.2    Mandatory Participation.  An Eligible Employee shall become a Participant in the
Plan if:

(a)    A Participating Company sends a written notice to the Eligible
Employee notifying him or her that his or her employment with the Affiliated
Group is to be terminated as a result of a permanent or extended period of
reduction in positions due to business conditions, plant closure, sale of a facility,
departmental reorganization, job consolidation or other similar circumstances; and

(b)    The Eligible Employee continues as a satisfactory employee until
his or her Curtailment Date (or such earlier date approved in advance by the head
of the Eligible Employee's department).

3.3    Persons Who Shall Not Participate.  Notwithstanding Sections 3.1 and 3.2, an

Eligible Employee shall not become a Participant and shall not be eligible for Severance Pay if he or she:

    (a)    Is terminated due to poor performance, dishonesty or other misconduct, such as excessive absenteeism, excessive tardiness or failure to comply with the law or with Company policies;

    (b)    Is receiving short-term or long-term disability benefits, or has applied for such disability benefits, immediately prior to his or her Curtailment Date under a plan provided by the Company;

    (c)    Is offered continued employment with the Affiliated Group in a position that is similar to the position the Eligible Employee holds immediately prior to his or her Curtailment Date;

    (d)    Is terminated as a result of the sale of a subsidiary or facility and continues in employment with the purchaser or accepts an offer of employment with the purchaser within 90 days of the sale. If an Eligible Employee initially became a Participant and received Severance Pay during such 90-day period (either because the purchaser did not offer employment or the Eligible Employee did not accept such employment) and later the Eligible Employee becomes so employed within such 90-day period, the forfeiture and repayment provisions of Section 4.5 shall apply.

    (e)    Is terminated as a result of the sale of a subsidiary or facility and receives an offer of employment with the purchaser within 90 days of the sale for a position that is similar to and for substantially the same pay as the position the Eligible Employee holds immediately prior his or her Curtailment Date but rejects

such offer of employment. If an Eligible Employee initially became a Participant and received Severance Pay during such 90-day period (because the purchaser did not offer employment at substantially the same pay) and later the Eligible Employee receives such an offer of employment within such 90-day period but rejects such offer, the forfeiture and repayment provisions of Section 4.5 shall apply whether a position is similar to an Eligible Employee's position immediately prior to his or her Curtailment Date, or provides substantially the same pay shall be determined by the Company in its sole discretion.

3.4     Waiver and General Release. The Company, in its sole discretion, may require that each Eligible Employee execute a "Waiver and General Release" as a condition of participation in the Plan. If the Company so requires, notwithstanding Sections 3.1 and 3.2, an Eligible Employee shall not become a Participant and shall not be eligible for Severance Pay unless he or she properly completes and executes the Waiver and General Release in exactly the form provided to the Eligible Employee by the Company, without altering or adding to the Waiver and General Release in any way. The Waiver and General Release shall set forth the nature and amount of the Eligible Employee's benefits under the Plan and shall provide that execution of such Waiver and General Release by the Eligible Employee will constitute a waiver and release of every claim the Eligible Employee might otherwise have arising out of his or her employment or the termination of his or her employment. If an Eligible Employee fails to make an election within the time period specified in procedures established by the Company, such Eligible Employee shall fail to qualify as a Participant under the Plan.

## SECTION 4. SEVERANCE BENEFITS.

4.1     Severance Pay Allowance. Upon termination of employment with the Company, a Participant shall be eligible to receive a Severance Pay Allowance, the amount of which shall be determined by the Company in its sole discretion. Such amount may vary in accordance with a Participant's wage rate or salary, length of service, division, facility, plant or job classification, or other similar factors, and need not be the same for all similarly situated Participants. The Company shall communicate the applicable amount to Eligible Employees in accordance with Section 3.1(a) or 3.2(a). The Company reserves the right to alter, reduce or eliminate any formula, in whole or in part, without notice.

4.2     Normal Form of Payment of Severance Pay Allowance. The normal form of payment of a Participant's Severance Pay Allowance shall be a single payment paid on, or as soon as reasonably practicable after, the Participant's Curtailment Date.

4.3     Optional Methods. In accordance with this Section 4.3, the Company reserves the right to allow certain Participants to elect a form or time of payment (an "Optional Method of Payment") that differs from the normal form of payment described in Section 4.2. Such Optional Methods of Payment will be determined by the Company and communicated to eligible Participants. A Participant's election of an Optional Method of Payment must be made on the prescribed form and filed with the Participant's local Personnel office or the person designated in the notice described in Section 3.1(a) or 3.2(a) prior to the Participant's Curtailment Date. The Participant's election shall be effective only with the Company's consent. If a Participant elects an Optional Method of Payment but dies before he or she receives the entire balance of his or her Severance Pay Allowance, any unpaid balance of such Severance Pay Allowance shall be paid to the Participant's spouse if then living or, if not, to the Participant's then living children in equal

shares or, if none, to the Participant's estate. If a Participant fails to make an election, his or her Severance Pay Allowance shall be paid in accordance with Section 4.2(a).

4.4    Interest. Without regard to the form in which a Participant's Severance Pay Allowance is paid, no interest shall accrue or be paid with respect to any portion of the Participant's Severance Pay Allowance.

4.5    Repayment or Forfeiture of Severance Pay Allowance . If a Participant is reemployed with a member of the Affiliated Group, accepts an employment offer with the purchaser as described in Section 3.3(c), or rejects an employment offer with the purchaser as described in Section 3.3(d), such Participant shall be required to repay to the appropriate Participating Company an amount to be determined under procedures to be established by the Company in its sole discretion. If the Participant's entire Severance Pay Allowance has not been paid (because he or she elected an Optional Method of Payment), the unpaid balance of his or her . Severance Pay Allowance shall be forfeited in a like amount.


SECTION 5. WELFARE BENEFITS.

5.1    Continuation of Coverage. If a Participant is covered by medical, dental or vision insurance on his or her Curtailment Date, the Company, in its sole discretion, may elect to continue employer contributions toward such coverage for a period to be determined by the Company. Any such coverage shall be counted as part of the period of the continuation coverage required by section 4980B(f) of the Code and section 602 of ERISA. If the Company does not elect to continue employer contributions, or discontinues employer contributions, the Participant may purchase such coverage, at his or her own expense, during the period for which continuation coverage is required to be offered under section 4980B(f) of the Code or section 602 of ERISA.

## SECTION 6.  SOURCE OF PAYMENTS AND EXPENSES.

6.1    Source of Payments.  Any benefits payable under the Plan shall be unfunded and shall be payable only from the general assets of the Participating Companies.

6.2    Expenses.  The expenses of operating and administering the Plan shall be borne entirely by the Participating Companies.

## SECTION 7.  ADMINISTRATION AND PLAN FIDUCIARIES.

7.1    Plan Sponsor.  The Company is the "plan sponsor" within the meaning of ERISA.

7.2    Plan Administrator.  The Employee Benefits Committee of the Company is the "administrator" of the Plan (the "Plan Administrator") within the meaning of ERISA.

7.3    Administrative Responsibility.  The Plan Administrator shall be the named fiduciary with the power and sole discretion to determine who is eligible for benefits under the Plan, to interpret the Plan and to prescribe such forms, make such rules, regulations, interpretations and computations and prescribe such guidelines as it may determine are necessary or appropriate for the operation and administration of the Plan, to change the terms of such rules, regulations or guidelines, and to rescind such rules, regulations or guidelines.  Such determinations of eligibility, rules, regulations, interpretations, computations and guidelines shall be conclusive and binding upon all persons.

7.4    Review of Denied Claims.  The Plan Administrator shall have the discretionary authority to review an appeal from a denial of benefits under the Plan in accordance with Section 8.2. The Plan Administrator shall determine conclusively for all parties all questions arising with respect to an appeal from a denial of benefits under the Plan, and any decision of the Plan

Administrator shall not be subject to further review.

7.5 Named Fiduciaries. The Plan Administrator is the "named fiduciary" of the Plan within the meaning of ERISA.

7.6 Allocation and Delegation of Responsibilities. The Plan Administrator may allocate any of its responsibilities for the operation and administration of the Plan among the officers, employees and agents of the Participating Companies. It may also delegate any of its responsibilities under the Plan by designating, in writing, another person to carry out such responsibilities. Any such written delegation shall become effective when executed by the Plan Administrator, and the designated person shall then be responsible for carrying out the responsibilities described in such writing.

7.7 No Individual Liability. It is declared to be the express purpose and intent of the Participating Companies that no individual liability whatsoever shall attach to or be incurred by any member of the Board of Directors of any Participating Company, by any officer of any Participating Company, by the Plan Administrator, or by any employee, representative or agent of any Participating Company, under or by reason of the operation of the Plan.

## SECTION 8. CLAIMS AND APPEALS.

8.1 Claims for Benefits. Any claimant who believes himself or herself to be entitled to receive benefits under the Plan, or benefits that are different from the benefits that he or she has received, may submit a claim for such different benefits by writing to the claimant's local Personnel office or the person designated in the notice described in Section 3.1(a) or 3.2(a) (the "Claims Reviewer").

(a) Time Limits for Submission of Initial Claim. No claim shall be valid unless it is

submitted within 90 days following the receipt of the disputed benefit.

(b)    Time Limits for Decision on Initial Claim. If any claim is denied, in whole or in part, written notice of such denial shall be given to the claimant within 90 days, except that, if special circumstances require that the time for consideration of the claim be extended, notice of the extension shall be given in writing within 90 days, and notice of such denial shall thereafter be given within 180 days. Each period of 90 or 180 days referred to in the preceding sentence shall begin to run on the day the claim is received by the Claims Reviewer. A written notice of denial shall set forth, in a manner calculated to be understood by the claimant, specific reasons for the denial, specific references to the Plan provisions on which it is based, a description of any information or material necessary to perfect the claim, an explanation of why such material is necessary and an explanation of the Plan's review procedure. A notice that additional time is necessary for consideration of a claim shall indicate the special circumstances requiring the extension of time and the date by which the Claims Reviewer expects to render his or her decision on the claim.

(c)    Deemed Denial. If written notice of a denial of a claim for benefits or of the fact that an extension of time is necessary for processing the claim is not furnished within the time period specified in Section 8.1(b), the claim shall be deemed to have been denied, and the claimant shall be permitted to appeal such denial in accordance with the review procedure set forth in Section 8.2.

8.2    Review of Denied Claims. Whenever a claim for benefits has been denied (or is deemed denied), in whole or in part, pursuant to Section 8.1, the claimant shall have the right to request a review of the denial by submitting a written request for review to the Plan Administrator, at the following address: "Plan Administrator, McKesson HBOC, Inc. Severance

Pay Plan, c/o Vice President, Human Resources and Administration, McKesson HBOC, Inc.,

One Post Street, San Francisco, California 94104." A request for review shall set forth all of the

grounds on which it is based, all facts in support of the request and any other matters that the

person requesting review deems pertinent. The Plan Administrator shall give the person who

wishes to request review of a denied claim an opportunity to review pertinent documents that are

not privileged when such person is preparing a request for review. The Plan Administrator may

require the person requesting review to submit such additional facts, documents or other material

as the Plan Administrator may deem necessary or appropriate in making its review.

    (a)   Time Limits for Submission of Request for Review. The Plan Administrator shall

have no obligation to provide a review of any claim that has been denied under Section 8.1,

unless a written request for review is submitted within 90 days following the initial denial or

deemed denial of the claim.

    (b)   Time Limits for Decision on Review. If the Plan Administrator affirms the denial

of a claim, in whole or in part, it shall give written notice of its decision to the person who

requested review within 60 days, except that, if special circumstances require that the time for

consideration of the request for review be extended, notice of the extension shall be given in

writing within 60 days, and notice of such decision shall be given within 120 days. Each period

of 60 or 120 days referred to in the preceding sentence shall begin to run on the day the claim is

received by the Plan Administrator. A written notice affirming the denial of a claim shall set

forth, in a manner calculated to be understood by the person requesting review, the specific

reasons for such decision and specific references to the Plan provisions on which it is based. If

no decision is reported within the period of time provided by this Section 8.2(b), the claim shall

be deemed to be denied upon the expiration of such period.

8.3     Exhaustion of Remedies. No legal action for benefits under the Plan shall be
brought unless and until the claimant (i) has submitted a written claim in accordance with this
Section 8.1(a), (ii) has been notified that the claim is denied or the claim is deemed to be denied
under Section 8.1(b) or 8.1(c), (iii) has filed a written request for review of the claim in
accordance with Section 8.2, and (iv) has been notified in writing that the Plan Administrator has
affirmed the denial of the claim; provided that legal action may be brought if the Plan
Administrator has failed to take any action on the claim within the time prescribed by Section
8.2(b).

SECTION 9.  GENERAL PROVISIONS.

9.1     Legal Construction of the Plan. The Plan shall be governed and construed in
accordance with ERISA.

9.2     No Rights Created or Accrued. Nothing in the Plan shall be construed as giving
to an employee of any Participating Company a right to receive any benefit other than the bene-
fits specifically provided under the terms of the Plan. Nothing in the Plan shall be construed to
limit in any manner the right of any Participating Company to discharge, demote, downgrade,
transfer, relocate, or in any other manner treat or deal with any person in its employ, without
regard to the effect such treatment or dealing may have upon such person as someone who might
otherwise have become (or remained) a Participant in the Plan, which right is hereby reserved.
No benefits shall be deemed to accrue under the Plan at any time except the time at which they
become payable under the Plan, and no right to a benefit under the Plan shall be deemed to vest
prior to the Participant's Curtailment Date.

9.3     Benefits Not Contingent Upon Retirement. No right to a benefit under the Plan

shall depend (or shall be deemed to depend) upon whether a Participant retires or elects to receive retirement benefits under the terms of any employee pension benefit plan.

  9.4  Relation of the Plan to Descriptive Matter. The Plan shall contain no terms or provisions except those set forth herein, or as hereafter amended in accordance with the provisions of Section 10. If any description made in any other document is deemed to be in conflict with any provision of the Plan, the provisions of the Plan shall control.

  9.5  Nonalienation of Benefits. No benefits payable under the Plan shall be subject to anticipation, alienation, sale, transfer, assignment, pledge or other encumbrance, and any attempt to do so shall be void.

## SECTION 10. AMENDMENT AND TERMINATION.

  10.1  Amendment and Termination . Although the Company intends to continue the Plan indefinitely, the Company reserves the right to amend or terminate the Plan, in whole or in part and without notice, at any time and for any reason by a written instrument executed by the Plan Administrator.

  10.2  Effect of Amendment or Termination . If a Participant's Curtailment Date has occurred and the Participant is entitled to receive benefits under the Plan, no amendment to the Plan, and no termination of the Plan, shall thereafter operate to diminish or eliminate such Participant's entitlement to such benefits.

## SECTION 11.  EXECUTION.

The Senior Vice President, Human Resources and Administration of the Company has

executed this document effective as of January 27, 1999.

MCKESSON HBOC, INC.

By: _William A. Armstrong_

Its:    Senior Vice President, Human Resources
        and Administration