FILED

CC APR -1 PM 3:32

1

2

3  CHRISTINE H. CHANG PRO SE
341 Tideway Drive #214
4  Alameda, CA 94501
Telephone : (510) 769-8232
5

6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  CHRISTINE H. CHANG, | ) Case No. C07-3981 MJJ |
| | ) |
| 11      Plaintiff, | ) RECONSIDERATION |
| | ) OF ORDER GRANTING |
| 12      v. | ) MOTION TO DISMISS |
| | ) PLAINTIFF'S AMENDED |
| 13  MCKESSON HBOC, INC; MCKESSON | ) COMPLAINT |
| HBOC CEO JOHN HAMMERGREN; | ) |
| 14  MCKESSON HBOC EXECUTIVE VICE | ) 1. BREACH OF IMPLIED |
| PRESIDENT PAUL KIRINCIC; MCKESSON | )    CONTRACT |
| 15  HBOC SENIOR VICE PRESIDENT JERRY | ) 2. WRONGFUL |
| WARREN; MCKESSON HBOC VICE | )    TERMINATION |
| 16  PRESIDENT CHRISTOPHER MAHER; | ) 3. FRAUD |
| MCKESSON HBOC VICE PRESIDENT | ) 4. INTENTIONAL |
| 17  TOM VON; MCKESSON HBOC VICE | )    INFLICTION OF |
| PRESIDENT TOM CAPIZZI; MCKESSON | )    EMOTIONAL |
| 18  HBOC DIVISION MANAGER DONNA | )    DISTRESS |
| DRAHER; MCKESSON HBOC DIVISION | ) 5. FOR SEVERANCE, |
| 19  MANAGER TOM PUTHUFF; MCKESSON | )    DISABILITY, |
| HBOC DIVISION MANAGER KEVIN | )    BACK, VACATION, |
| 20  MYRICK; MCKESSON HBOC HUMAN | )    PAYS; INTEREST |
| RESOURCE RICH SOUBLET; and DOES | )    AND PUNITIVE |
| 21  1 through 100, inclusive, | ) |
| | ) District Court Judge: Honorable |
| 22      Defendants. | ) Martin J. Jenkins |
| | ) Courtroom: 11, 19th Floor |
| 23  _____ | 1 |

1   **LEGAL ARGUMENT**

2   9. In *Fleming v. Carpenters/Contractors Cooperation Committee*, 834 F. Supp. 323

3   (1993), the employees worked more than 40 hours during certain workweeks for which

4   they were not paid overtime compensation. The employers argued "administrative

5   exemption". The court held that the employees did not meet the exemption's **salary test**

6   because (1) their pay was based on an hourly rate, (2) absences of less than a day were

7   accrued against vacation time, (3) the employees suffered disciplinary suspensions without

8   pay for other than major safety violations, (4) their pay was reduced for absences due to

9   jury duty or sick leave or vacation time.

10   10. The employers in *Fleming* failed the **duty and salary tests** because they carried out

11   the employer's day-to-day business of enforcing **labor laws**. The employers must prove that

12   the employees for whom it claims the administrative exemption: (1) primarily perform

13   office or non-manual work directly related to management policies or general business

14   operations, of the employer; (2) customarily and regularly exercise discretion and

15   independent judgment; (3) were compensated on a salary or fee basis.

16   11. Plaintiff Chang was paid based on an hourly rate and never performed related to

17   management policies or general business operations. Therefore, on March 30, 1999,

18   all overtime accrued but unable to take leave, was due for one and one half overtime pay.

19   12. In *Goldberg v. Bailey*, 1961 U.S. Dist. LEXIS 5201, under the Fair Labor Standards

20   Act of 1938, amended as 29 U.S.C. 201 et seq., that the scheduled workweeks of 48 or 45

21   hours which the parties entered agreement providing for an hourly rate, however, was paid

22   on a salary basis, without one and one-half for overtime hours. The Court held for Plaintiffs.

23   13. In *Funkhouser v. Wells Fargo Bank*, 289 F. 3d 1137 (2002), the (ERISA) Employee

24   Retirement Income Security Act of 1974, defines an "employee benefit plan" for the purpose

25   of providing medical benefits, or sickness, or vacation benefits, 29 U.S.C.S. Section 1002(1).

26   The ERISA preempts all state laws relate to any covered employee benefit plan

27   29 U.S.C.S. Section 1144.

28   3

1            **LEGAL STANDARD**

2      27. **Unjust Enrichment** – Obligations arise by operation of law and do not depend

3  upon the parties' intentions. Plaintiff Chang conferred a benefit upon McKesson

4  Defendants, that the Defendants knew of the benefit, and that Defendants has retained

5  the benefit under circumstances where such retention, without compensation, is unjust.

6      In November 1996 Plaintiff received "SATISFACTORY" rating and payroll increase,

7  but the payroll department failed to incorporate the increase into Plaintiff's base salary.

8  The Vice President Tom Von mistakened the payroll increase incurred in November

9  1997, therefore, denied the increase approved in November 1996 (**EXHIBT A**).

10      In Tom Von's memorandum dated November 18, 1998, it stated that Plaintiff was

11  not entitled to an increase because Plaintiff's performance was rated as "needing

12  improvement. The Vice President, Tom, Donna, and Rich (Senior Management Staffs),

13  **PURPOSELY** denied Plaintiff's 1996 payroll increase by framing Plaintiff's rating as

14  "needing improvement" which was 1997 rating.

15      The November 1997 rating was given immediately after Plaintiff came back from

16  surgery and sick leave, whereas the senior management staff, without foretold any

17  performance warning throughout the year in 1997.

18      Plaintiff worked double shifts singlehandedly established the Quality Ensurance

19  Department's testing environment which raised the performance rating to

20  "SATISFACTORY' in March 1998 (**EXHIBIT C**).

21      Even as of this present complaint, Defendants McKesson have not stopped framing

22  Plaintiff's performance rating (**EXHIBIT D** – Defendants's joint case management

23  statement dated November 27, 2007, page 3, line 4-5, (3) whether Plaintiff adequately

24  performed her job duties).

25      28. On March 30, 1999, Defendant McKesson laid off Plaintiff and coerced the

26  "Waiver and General Release of Claims" be signed to exchange for the severance pay

27  (**EXHIBIT E**). In page 3, last paragraph, it stated "I …agree to release the Company

28                                6

1   from all claims or demands I may have…claims based on my employment with the

2   Company or the termination of that employment (**other than claims for vested benefits**

3   **in accordance with the terms of the Company's written benefit plans**).

4      In the Vice President Christopher Maher's letter dated March 1, 2001, it stated that

5   the waiver and release required to waive all claims **including** the Employee Stock

6   Participation Plan, and the Plan permits the Company to request a release as it **sees fit**,

7   including a release of claims relating to **other benefit plans (EXHIBIT B)**. These two

8   "Waiver and Release" (**EXHIBIT B and E** are clearly conflict against each other).

9      Defendants McKesson made conflict statements regarding its Waiver and Release

10   from not including the vested benefits of "employee retirement stock plan" to including

11   the "employee stock participation plan".  It also denied Plaintiff's entitlement of pay

12   increase in 1996 by blaming Plaintiff's performance rating in a year later in 1997.

13   Plaintiff worked for Defendant McKesson on salary basis without being paid overtime

14   but worked nearly every weekends for two straight years.

15      On March 30, 1999, Defendants McKesson laid off Plaintiff stating that it was strictly

16   REDUCTION IN FORCE which had nothing to do with Plaintiff filing the grievance

17   and appeal, or job performance, or disabilities with migraine and tension headaches

18   (**EXHIBIT F** – letter to perspective employer and four weeks pay as severance for

19   $4466,54).

20      On March 30, 1999, Defendants McKesson handed Plaintiff the Waiver and Release

21   to be signed to exchange for four weeks pay of $4466.54, expecting Plaintiff to get out

22   of McKesson building instantly with four weeks pay without the back/vacation/disability/

23   overtime; and their continuous framing Plaintiff in its joint case management statement –

24   whether Plaintiff adequately performed her job duties. While its letter to perspective

25   employer stating Plaintiff was laid off due to REDUCTION IN FORCE.

26      Plaintiff Chang conferred a benefit upon Defendants McKesson, that the Defendants

27   knew and retained the benefit, without compensation to Plaintiff, which is unjust.

28                                    7

1    29. **Quantum Meruit** – An equitable remedy if one has received a benefit which one

2    may not justly retain, one should restore the aggrieved party to his or her former position

3    by return of the thing or its equivalent in money.

4    Plaintiff Chang had rendered services to Defendants McKesson that benefitted the

5    Defendants. And the Defendants McKesson would be unjustly enriched if Plaintiff was

6    not compensated. Plaintiff Chang is entitled to recover the reasonable value of the

7    services provided.

8    Plaintiff Chang received SATISFACTORY rating and merit increase in November

9    1996, but the increase was never adjusted in Plaintiff's payroll. Plaintiff received

10   needing improvement rating immediately after a surgery and sick leave in November

11   1997, but was able to deliver SATISFACTORY performance by working double shifts

12   establishing test environments for Quality Ensurance Department.

13   Plaintiff Chang worked overtime from home or during vacation but was never

14   compensated. The Defendants McKesson offered compensatory time but Plaintiff was

15   unable to utilize it because continuous weekend installations.

16   Defendants McKesson have received the benefits which may not justly retain, the

17   Defendants should restore the aggrieved Plaintiff to her former position by return of

18   the thing or its equivalent in money.

19   30. **Consent to Waive Statute of Limitation** – By one's overt acts and verbal

20   manifestations indicate consent. On March 12, 2007, Plaintiff sent a demand letter

21   to Defendants McKesson, for completion of compensating individual class members'

22   retirement accounts in the class action settlement, Plaintiff's severance pay, and interest

23   (**EXHIBIT G**). By April Plaintiff had had no response, therefore, contacted Defendants

24   McKesson speaking with the Vice President Human Resources Erik Sprotte, who asked

25   for extension to reply Plaintiff's demands. When Plaintiff indicated that the statute of

26   limitation was at stake and Plaintiff required immediate attention, Mr. Sprotte consented

27   that McKesson would not hold the statute of limitation against Plaintiff, and the statute

28                                              8

1  should started from March 12, 2007 of Plaintiff's demand letter (**EXHIBIT H**).  Plaintiff

2  accepted Mr. Sprotte's consent and extended the response time to the end of April.  In

3  mid April Plaintiff received the denial letter from Defendants McKesson, and it did not

4  reiterate Mr. Sprotte's consent of waiving the statute of limitation.

5      31. **Defendants McKesson's Bill of Costs** – Defendants McKesson intend to charge

6  Plaintiff for its filing fee of $350 and service/delivery fees of $1167.45 for a total of

7  $1517.45.  Plaintiff finds it enormous unjust.

8      Plaintiff was discriminated and harassed by Defendant McKesson's senior management

9  staffs without justification.  Plaintiff suffered migraine and tention headaches caused by the

10  discrimination and harassment.  No sooner than filing the grievance and appeal Plaintiff

11  was laid off without notice, cause, and severance pay, let alone the back/vacation/sick

12  leave/disability/overtime pays starting 1996.  The Defendants McKesson have ripped off

13  Plaintiff's employment (property) and incurred ten of thousands of dollars in loss, and

14  the costs of filing this present complaint.  But it intends to charge Plaintiff for its filng,

15  service, and delivery fees.

16      Plaintiff's complaint against Defendants McKesson is **not a meritless claim**, and is

17  firmly believe that Defendants McKesson are unjustly enriched and owe Plaintiff

18  Quantum Meruit on the benefits Plaintiff conferred during and after employment to this

19  date.

20      32. **Due Process Right** – Plaintiff has been deprived of property interest by the

21  Defendants McKesson without Due Process of Law.  The Defendants McKesson have

22  intentionally violated the Federal and State Employment and Labor Laws against public

23  policy.  Because Defendants McKesson acted willfully in bad faith, punitive is available.

24                    <u>**ISSUES TO BE DECIDED**</u>

25      33. Should Plaintiff recover under the Doctrine of Unjust Enrichment, *Billfish, Inc. v*

26  *Richard Campbell,* (1999 U.S. App. LEXIS 14871), *Gonzales Communications, Inc. v.*

27  *Titan Wireless,* (2007 U.S. Dist. LEXIS 29273).

28                                9

1    34. Should Plaintiff recover under the Doctrine of Quantum Meruit, *Galaxy Networks*

2    *v. Kenan Systems Corporation*, (2000 U.S. App. LEXIS 12588), *Douglas Arrison v.*

3    *Information Resources* (1999 U.S. Dist. Lexis 11471), *Trumbo v. Bank of Berkeley*,

4    77 Cal. App. 2d 704 (1947).

5    35. Should Plaintiff recover under the Doctrine of **Unjust Enrichment** and **Quantum**

6    **Meruit** for back, vacation, sick, disability, overtime pays, and interest.

7    36. Should Plaintiff hold Defendant McKesson accountable by the Vice President

8    Erik Sprotte's **consent in statute of limitation** started by Plaintiff's demand letter dated

9    March 12, 2007, for the severance pay.

10    37. Should Plaintiff recover the **costs** of filing and service fees for the present

11    complaint.

12    38. Should Plaintiff recover property interest by the **Due Process Protection and**

12    **Rights of the Constitution**.

13                              **CONCLUSION**

14    39. Plaintiff has a property interest protected by the Constitution.  The Court cannot

15    dismiss Plaintiff's property interest without affording Plaintiff the Protection of Due

16    Process of Law.

17    DATED:  March 31, 2008

18

19

20                              *Christine H. Chang*

21                              Christine H. Chang, Plaintiff

22

23

24

25

26

27

28                              10

## CERTIFICATE OF SERVICE

I, CHRISTINE CHANG, hereby certify that on April 1, 2008, I forwarded

a true and correct copy of RECONSIDERATION OF ORDER GRANTING

MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT and exhibits,

And DECLARATION IN SUPPORT OF RECONSIDERATION OF ORDER

GRANTING MOTION TO DISMISS to Allison B. Moser, by placing a true copy

thereof in a sealed envelope with first class postage prepaid and addressed as

follows:

> Allison B. Moser
> Seyfarth Shaw LLP
> 560 Mission Street,
> Suite 3100
> San Francisco, California 94105

I caused such envelopes to be placed for collection and mailing in the United

States Mail at San Francisco, California.

Dated: April 1, 2008


By _____
Christine Chang, Plaintiff

# EXHIBIT A

November 18, 1998

To: Christine Chang

From: Tom Von

Subject: Retroactive Pay Adjustment

After our meeting on October 15, I reviewed the issues you raised with Rich Soublet, Tom Puthuff and Donna Draher to be certain that I understood their perspectives . I understand that you have exercised your right to appeal and have had several meetings with Tom, Donna and Rich; and on October 9, 1998 they responded to the various issues you had shared with Rich in your meeting with him on September 19. You were not satisfied with the answers given to you and appealed their decision to me.

There were several issues you raised. In order to help make sure we address each issue, I will refer back to your cc:mail message of October 9.

In the introduction of the issues from the above mentioned message, you stated that you were denied a merit increase due you November , 1997. As was previously communicated to you by Tom, Donna and Rich , our position regarding the retroactive merit increase is that you were not entitled to such an increase because your performance was rated as needing refinement. Our salary administration guidelines clearly indicate that no merit increase is warranted when performance does not meet expectations. Therefore we are not in a position to grant a retroactive merit increase. In responding to the items from the message, each issue is recorded and responded to in *italics* below.

1. The performance appraisal I signed in December 1977 was acknowledgment of seeing it not agreeing with it.

   *The performance appraisal was actually signed in November of 1997.*

   Rich confirmed that it is the company policy.

   *Rich confirmed that signing the review indicates you have seen the review and that the contents have been discussed with you, not that you necessarily agree with the ` contents.*

**Christine Chang - Page 2.**

2. When Kevin was my manager I had problems with my PC not having
   enough disk space, memory space, broken floppy drive in different
   incidents and couldn't get a replacement from Kevin. Until one
   day Network upgraded the network environment and my PC ran out of
   memory space. I couldn't access any application icon. He finally
   had the secretary brought me a used CPU to replace the old one so
   I could be working.

   *A scan through the Problem Management System reveals the following problems
   reported by Christine related to her desktop.*

   *Q0208481    Reported 4/12/96    Marked fixed 4/16/96*
   *Insufficient memory - Needed to re-install CTTWIN*

   *Q0210151    Reported 4/17/96    Marked fixed 4/18/96*
   *Missing ICON group - using evaluation software, removed REM stmt. in SYS.INI*

   *Q0216413    Reported 5/1/96    Marked fixed 5/7/96*
   *Hinge problem with Thinkpad - repaired per user*

   *Q0237945    Reported 6/13/97    Marked fixed 6/14/97*
   *Second network port not working - no resolution recorded*

   *Q0321039    Reported 11/7/96    Marked fixed 11/7/96*
   *Insufficient Memory - too many applications open, made Config.sys changes to boost
   files and buffers*

   *Q0330850    Reported 11/21/96    Marked fixed 11/22/96*
   *Changed wallpaper, couldn't get into machine - re-boot solved problem*

   *Q0367227    Reported 1/15/97    Marked fixed 1/16/97*
   *Defective floppy drive - defective drive replaced*

   *Q0423492    Reported 4/2/97    Marked fixed 4/3/97*
   *CD Read application not running - cross-linked file problem, re-installed CD driver*

   *Q0558508    Reported 2/6/98    Marked fixed 3/12/98*
   *Conflict with new software - vendor problem, no resolution recorded*

Christine Chang - Page 3.

3. I requested training several times from Kevin in the past year who told me there wasn't budget or it wasn't available to me.

*According to Tandem invoices and confirmation letters, you attended the following courses:*

*Open System Services Operations and Management*            *11/4/96 -*

*11/5/96*

*Pathway Performance Workshop                    3/25/97 - 3/27/97*
*Data Communications Concepts                    5/12/97 - 5/15/97*

*The Employee Development Plan dated 2/27/98 identified two classes that Kevin had agreed to sponsor, Pathway/XM training and TACL Programming. The class for Pathway/XM was deemed unnecessary when the Company made the decision to defer implementation of this technology. You were scheduled to attend the TACL programming class November 9 - 13.*

4. I requested second phone line for troubleshooting from home which was offered to the employees who were responsible to log-in to the system and troubleshoot. He denied it.

*In your discussion with Rich Soublet, you indicated that the phone line was finally installed. If this is not the case please advise us.*

5. Kevin and a co-worker on my team conspired against me not providing necessary info to perform my job. Such as the Saturday Tandem Install info to backup/restore production and ITE files after each installations.

I have submitted cc:mail messages and hard copies of evidence to Tom earlier.

*Status reports of the weekend change activity began early this year. As the attached copies will show, you were included in their distribution. The reports were temporarily discontinued in June of this year. Given this information, We do not believe that anyone conspired against you in any way·*

6. I was having medical problems for 5-6 months before the annual performance appraisal in October 1977 which was the first time I heard from Kevin that he had problem with my performance.

*According to the Performance Improvement Plan documentation dated November 19, 1997, you and Kevin discussed your performance deficiencies during the past six months. The results from the performance review should not have been a*

*surprise.*

Christine Chang Page 4.

How does McKesson policy apply to the performance appraisal problem being brought up
the first time to a employee who barely came back from a surgery and 4 weeks
medical                    leave, and was never notified performance problem throughout the year.

Rich answered he didn't know if the medical condition was included in the performance
appraisal by Kevin.

In reviewing this situation, It became very apparent to me that you will never agree with the
performance review given to you by Kevin.   Additionally, you want us to change Kevin's review
merely because you see it differently.  Unfortunately, we are not in a position to accommodate
your wishes in this regard.  The performance review process requires that other managers review
information contained in the performance review prior to the time a review is administered to an
employee.  Based on the records, Kevin consulted with his management team and shared the
review with them prior to giving you the feedback. This process of review is intended to insure
fairness and consistency in administration of our performance management process.

Finally, the timing of your performance review was based on your normal review date.   It was
not associated with your medical leave.

**EXHIBIT B**

**McKesson HBOC, Inc.**
One Post Street, 20th Floor
San Francisco, CA 94104-5296
tel 415-983-8570
fax 415-983-8549
chris.maher@mckhboc.com
www.mckhboc.com



**Christopher R. Maher**
Vice President
Compensation and Benefits

March 1, 2001

*Via Facsimile and U.S. Mail*

Peter S. Meyers, Esq.
The Meyers Law Firm
260 California Street, Suite 801
San Francisco, CA 94111

Re:  Christine Chang's Benefit Claim Appeal

Dear Mr. Meyers:

This letter serves as the response of the Plan Administrator of the McKesson HBOC, Inc. Severance Pay Plan (the "Plan") to Christine Chang's appeal of the denial of her claim for benefits under the Plan. As discussed with Kevin Urbatsch of your office by telephone, we are sorry for the delay in the response to you. However, for the reasons set forth below, the Plan Administrator upholds its earlier determination that Ms. Chang is not entitled to benefits under the Plan.

In her benefit appeal correspondence, Ms. Chang asserts two additional arguments as to her right to benefits under the Plan, both of which relate to the nature of the release that McKesson HBOC (the "Company") requested Ms. Chang execute as a condition for participating in the Plan. First, your July 21, 2000 letter asserts that Ms. Chang "was required to sign a general release as to the circumstances of her termination. She was instead presented with a release which required her to waive all claims, including claims she has as a participant in the Employee Stock Participation Plan." The gist of this argument appears to be that Ms. Chang was promised Plan participation for agreeing to waive any termination-related claims, but was then requested to agree to a broader release. The appeal correspondence provides no support for this proposition, and both the Plan and the information provided to the employees in connection with the 1999 ITD Reduction in Force Program (the "Program") illustrate that the waiver at issue was appropriate under the Plan.

The release required for participation in the Plan in conjunction with the Program was provided to employees in the materials announcing the Program. See Waiver and General Release of Claims (the Program offer). As a result, the Company did not make representations about the Program that omitted any terms of the release upon which Plan

participation was conditioned. In addition, the Plan document states that the Company may request an employee to agree to a release in order to receive benefits under the Plan and notes that, at a minimum, such a release will require the employee to waive all claims "arising out of his or her employment," in addition to those relating to "the termination of his or her employment." See Plan at p. 5, § 3.4. Thus, the Plan discloses that if a release is required, it will be broader than simply waiving claims relating to the termination of employment with the Company. In any event, as discussed below, the Plan permits the Company to request a release as it sees fit, including a release of claims relating to other benefit plans.

The second argument asserted in support of Ms. Chang's appeal is that the Plan document "does not permit or require" the Company to request that an employee release claims he or she may have under ERISA, and that requesting such a release is unlawful. No support is offered for this argument.

The Plan provides that the Company may, in its sole discretion, require an employee to execute a waiver and general release as a requisite for Plan participation, and sets no restraint on requesting a release of claims arising under ERISA. Specifically, the Plan provides, in relevant part:

> The Company,[1] in its sole discretion, may require that each Eligible Employee execute a 'Waiver and General Release' as a condition of participation in the Plan. If the Company so requires, ... an Eligible Employee shall not become a Participant and shall not be eligible for Severance Pay unless he or she properly completes and executes the Waiver and General Release in exactly the form provided to the Eligible Employee by the Company, without altering or adding to the Waiver and General Release in any way. The Waiver and General Release shall ... provide that execution of such Waiver and General Release by the Eligible Employee will constitute a waiver and release of every claim the Eligible Employee might otherwise have arising out of his or her employment or the termination of his or her employment....

Plan at p. 5, § 3.4.

While the Plan does specify some of the items that must be released—e.g., all claims arising out of the employee's employment and the termination of that employment—it does not purport to enumerate all terms of the release. In addition, the Plan does not, in any way, limit the authority or discretion of the Company to require the release of any matter not specified in the Plan. Thus, even assuming, arguendo, that ERISA claims are not inherently encompassed in the Plan's requirement that a waiver include the release of all claims relating to the employee's employment (an assumption which Ms. Chang appears to be making in her appeal correspondence), the Plan neither purports to provide an exhaustive list of the items which must be included in any requested waiver, nor places any constraints on the Company's discretion to include

[1] Initial capitalization indicates that the Plan defines the term so capitalized.

#33261

matters within such waivers. Instead, the Plan focuses its waiver qualifications on the employee's conduct, requiring that if the Company makes a release a precondition for participating in the Plan, the employee must execute the release in order to receive benefits from the Plan. Plan at p. 5, § 3.4. <u>The Plan Administrator is not aware of anything in ERISA that prohibits this provision and, in fact, believes that it is lawful.</u>

For these reasons, the arguments set forth in the correspondence constituting Ms. Chang's appeal do not alter the Plan Administrator's conclusions as to Ms. Chang's benefit entitlement. In addition, the Plan Administrator also confirms its denial of Ms. Chang's benefit claim for all the reasons set forth in its initial letter discussing her claim, a copy of which is attached and which is incorporated into this letter by this reference.

For the reasons stated above, the Plan Administrator confirms its earlier denial of Christine Chang's claim for benefits under the McKesson HBOC, Inc. Severance Pay Plan.

Very truly yours,

McKesson HBOC, Inc. Employee
Benefits Committee,
Plan Administrator of the McKesson
HBOC, Inc. Severance Pay Plan

By: _____

Christopher R. Maher
Vice President, Compensation &
Benefits

cc:    Mr. Kevin Urbatsch

**EXHIBIT C**

# M·Kesson

**Intra Company**

**Correspondence**

| TO: | Christine Chang |
| FROM: | Kevin Myrick |
| DATE: | March 23, 1998 |
| SUBJECT: | Results from 11/19/97 Performance Improvement Plan |

On November 19, 1997 we began a Performance Improvement Plan, designed to help improve your job performance and bring your Performance evaluation up from '2' (development needed) to at least a '3' (meets objectives). Congratulations on achieving this goal. The areas listed below were taken from your Performance Evaluation as areas that were unsatisfactory or needed development. Your plan included the description of the competency in question and what you needed to do to improve that competency. I have added the results paragraph to each, describing your improvements.

1. Problem Solving

Problem solving and analysis skills are crucial to performing your production support duties. You are expected to reply promptly to any call or page, learn by questioning and/or direct examination what the problem is, and what the impact of the problem is to McKesson and our Business Partners, escalate by informing the appropriate managers of the problem and impacts in a timely manner, manage the support efforts by working to find a resolution and/or calling in the appropriate resources to resolve the problem. You should be engaged in the support process until a resolution or workaround is in place, then manage the problem until it is closed.

Deliverables;

Place all information about the problem and the resolution process in the problem log. Keep the log updated as the process progresses. When you are on-call, provide a daily written report of all support activities over the last 24 hours. Deliver that report to me with an oral summary every weekday at 10:30am. When a problem is resolved, check the completeness of the problem log, mark it fixed and inform me so I can review the log and close it.

Results;

During this period you were the primary support for six logged problems, and participated in the resolution of 4 other problems. The updates to the problem logs were timely, accurate and complete. Your analysis of the problem cause, impact and resolution was verified by your

teammates. Your oral reports to me about ongoing problems were also timely, accurate and complete.

2. Pathway Resource Management

Managing Pathway resources and configurations is a key assignment. You are expected to monitor pathway resource utilization statistics on a daily basis, and keep the pathway configurations adequate to handle the current and expected loads. It is crucial that you understand the applications that are supported by these pathways in order to properly and proactively manage them.

Deliverables;

Provide a weekly summary of pathway utilization statistics, clearly stating their relationship to the application and any implications or trends that may require action. Maintain a matrix of all relevant parameters for pathway servers and TCPs, and coordinate this with the weekly report. The report should also show thresholds which, when reached, indicate that adjustments must be made.

Results;

Your summaries of our pathway statistics has given you and the team a better understanding of how these stats relate to the applications they are drawn from. You have correctly identified some trends related to growth and lack of maintenance, and recommended or installed changes to correct these trends. Your analysis of these statistics has identified thresholds that allow us to automate reporting on these stats, to give us some early warnings without the manual process involved in daily monitoring and resetting of these statistics. This automation is a work in progress, and will be installed this spring.

3. Product Management

Management of third party software installed on Tandem systems is split between the members of this team. You have been assigned Disk Files Manager and SQL/DBM II. Installation and configuration management of these products is crucial to the application production support and user support efforts.

Deliverables;

Provide a detailed description of the capabilities of these tools and their ability to satisfy the needs of our business and application development partners. Work with the applications support team to develop a detailed written plan for using these products, install, configure and maintain these tools. Work with the vendor support group to keep the products up to date and manage any support issues that arise. Provide a weekly report detailing your progress during the installation of the products, and any support, resource or utilization issues that may arise.

Results;

Your work with these products has allowed us to evaluate and reject the use of Disk Files Manager in our environment. I have seen copies of all your communications with the vendors and support staff involved (copied in email), and they have also improved. Both of the products you

were assigned have proved be a challenge, and you have done well in working out problems with the vendors.

Though it was not part of this plan, your support of the ITE environment in preparation for El Nino testing was comprehensive and appreciated by the ITE team (in writing!).

You have made significant improvement in your performance during this 90 day period in the areas indicated in this document. Now that your performance has improved to an acceptable level (meets objectives) we can work on maintaining your performance and developing your skills as outlined in your Employee Development Plan.

Your signature below acknowledges receipt of this document, showing successful completion of your Performance Improvement Plan.

Christine Chang

3/23/98
Date

Kevin E. Myrick

3/23/98
Date

**EXHIBIT D**

1  SEYFARTH SHAW LLP
   Patricia H. Cullison (State Bar No. 101636)
2  pcullison@seyfarth.com
   Allison B. Moser (State Bar No. 223065)
3  amoser@seyfarth.com
   560 Mission Street, Suite 3100
4  San Francisco, California 94105
   Telephone: (415) 397-2823
5  Facsimile: (415) 397-8549

6  Attorneys for Defendant
   MCKESSON CORPORATION, formerly
7  known as MCKESSON HBOC, INC.

8  Christine H. Chang, *Pro Se*
   341 Tideway Dr., #214
9  Alameda, CA 94501
   Telephone: (510) 769-8232
10

11                   UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13  CHRISTINE H. CHANG,                    )  Case No. C 07-03981 MJJ
                                           )
14           Plaintiff,                     )  **DEFENDANT'S [JOINT] CASE**
                                           )  **MANAGEMENT STATEMENT**
15      v.                                  )
                                           )
16  MCKESSON HBOC, INC; MCKESSON           )
    HBOC CEO JOHN HAMMERGREN;              )  Date: November 27, 2007
17  MCKESSON HBOC EXECUTIVE VICE           )  Time: 2:00 p.m.
    PRESIDENT PAUL KIRINCIC; MCKESSON      )  Judge: Hon. Martin J. Jenkins
18  HBOC SENIOR VICE PRESIDENT JERRY       )  Dept.: Courtroom 11, 19th Floor
    WARREN; MCKESSON HBOC VICE             )
19  PRESIDENT CHRISTOPHER MAHER;           )
    MCKESSON HBOC VICE PRESIDENT TOM )
20  VON; MCKESSON HBOC VICE PRESIDENT)
    TOM CAPIZZI; MCKESSON HBOC             )
21  DIVISION MANAGER DONNA DRAHER;         )
    MCKESSON HBOC DIVISION MANAGER         )
22  TOM PUTHUFF; MCKESSON HBOC             )
    DIVISION MANAGER KEVIN MYRICK;         )
23  MCKESSON HBOC HUMAN RESOURCE           )
    RICH SOUBLET; and DOES 1 through 100,  )
24  inclusive,                              )
                                           )
25           Defendants.                    )
                                           )
26  _____)

27      Defendant MCKESSON CORPORATION submits the following Case Management

28  Statement pursuant to this Court's Order Setting Initial Case Management Conference.

                                    1
        Defendant's [Joint] Case Management Statement – Case No. C 07-03981 MJJ

1   Defendant met and conferred with Plaintiff regarding filing a Joint Case Management

2   Conference Statement. Plaintiff, however, declined to provide Defendant with a statement of her

3   positions, and insisted upon filing a separate case management conference statement.

4   **1.    Jurisdiction and Services**

5        Jurisdiction and Venue

6        Defendant does not contest jurisdiction or venue.

7        Service

8        Defendant asserts that none of the individually named defendants in this action was

9   personally served.

10  **2.    Facts**

11       Brief Chronology of the Facts

12       Plaintiff Christine Chang worked at McKesson as a System Programmer from October

13  16, 1995 to March 30, 1999. On March 30, 1999, Plaintiff's employment was terminated, and

14  she was provided with a copy of the McKesson HBOC, Inc. Severance Plan SPD. In 1999,

15  Plaintiff filed an Employee Retirement Income Security Act ("ERISA") action against

16  McKesson in the United States District Court, Northern District of California (*Chang v.

17  McKesson HBOC*, U.S.D.C., N.Dist. Cal. C99-5075). Plaintiff Christine Chang was the class

18  representative in that action. Plaintiff's then counsel, Peter Myers, made written requests to

19  McKesson indicating that it was a violation of ERISA to demand a waiver from Plaintiff in order

20  to obtain severance pay and that the waiver was overly broad requiring Plaintiff to waive all

21  claims.

22       On or about June 28, 2007, Plaintiff filed her Complaint in this action. Defendant filed a

23  motion to dismiss, which was granted in part and denied in part. On or about October 11, 2007,

24  Plaintiff filed an Amended Complaint. The Amended Complaint contains the following claims

25  for relief: (1) breach of implied contract; (2) wrongful termination; (3) fraud; and (4) intentional

26  infliction of emotional distress. Plaintiff also asserted the equitable estoppel doctrine.

27  Defendant has filed another motion to dismiss, set for hearing on December 4, 2007.

28

1     Principal Factual Issues In Dispute

2     Among other issues, Defendant disputes the following factual issues: (1) Whether
3 Plaintiff personally served the individually named defendants; (2) whether Plaintiff was coerced
4 to sign McKesson's waiver and general release in exchange for severance pay; (3) whether
5 Plaintiff adequately performed her job duties; (4) whether Plaintiff was unable to raise her
6 individual claims against McKesson due to a conflict of interest because of her role as the class
7 representative in a class action alleging ERISA violations against McKesson; (5) whether
8 McKesson prevented Plaintiff from asserting her claims; (6) whether extraordinary
9 circumstances beyond Plaintiff's control made it impossible for her to file her individual claims
10 on time; (7) whether McKesson actively misled Plaintiff in coercing the execution of the
11 severance plan's waiver and release in an attempt to prevent the ERISA class action from going
12 forward.

13 **3.   Legal Issues**

14     Defendant reserves the right to raise additional legal issues and defenses other than those
15 stated below.

16     The principal legal issues presented by the Amended Complaint are as follows: (1)
17 Whether the Amended Complaint and every cause of action are barred by the statutes of
18 limitations; (2) Whether Plaintiff is entitled to any relief under her breach of implied contract
19 claim; (3) whether Plaintiff is entitled to any relief under her wrongful termination claim; (4)
20 whether Plaintiff is entitled to any relief under her fraud claim; (5) whether Plaintiff is entitled to
21 any relief under her intentional infliction of emotional distress claim; (6) whether the equitable
22 estoppel doctrine applies to Plaintiff's claims; (7) whether Plaintiff was discriminated against by
23 Manager Kevin Myrick; (8) whether Plaintiff was laid off in retaliation for filing grievances and
24 an appeal against management staff; (9) as to all causes of action, whether and to what extent any
25 damages should be imposed as to any violation alleged; (10) whether Plaintiff is entitled to
26 punitive damages; (11) whether the individually named defendants were properly served.

27

28

**4.    Motions**

On August 9, 2007, Defendant filed a Motion to Dismiss Plaintiff's Complaint. On September 20, 2007, the Court issued an order granting Defendant's Motion to Dismiss with leave to amend on Plaintiff's first, second, third and fourth causes of action. The Court granted Defendant's motion without leave to amend on the Plaintiff's fifth cause of action, and concluded that Plaintiff could not plead equitable tolling with the facts alleged.

On October 11, 2007, Plaintiff filed an Amended Complaint. On October 30, 2007, Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint. The hearing date on Defendant's Motion to Dismiss is currently scheduled for December 4, 2007.

Assuming any portion of Plaintiff's Amended Complaint survives, Defendant anticipates filing a motion for summary judgment.

**5.    Amendment of Pleadings**

On or about June 28, 2007, Plaintiff filed her Complaint. On or about October 11, 2007, Plaintiff filed an Amended Complaint.

**6.    Evidence Preservation**

Defendant represents that it has taken reasonable measures to preserve evidence relevant to the issues reasonably evident in this action.

**7.    Disclosures**

Defendant served its Fed. R. Civ. Proc. 26(a)(1) initial disclosures to Plaintiff on October 26, 2007, which contained potential witnesses, documents, damage computations and insurance agreements.

Defendant has not received a F.R.C.P. 26(a)(1) initial disclosure from Plaintiff.

**8.    Discovery**

No discovery has been conducted to date. The parties intend to conduct discovery in compliance with the Federal Rules of Civil Procedure. On October 26, 2007, Plaintiff and Defendant filed with the Court their Rule 26(f) Report.

**9.    Related Cases**

Not applicable.

4

**10.   Relief**

Defendant disputes that Plaintiff is entitled to any form of relief.

**11.   Settlement and ADR**

The parties have agreed to participate in early neutral evaluation. The parties participated in an initial conference call with Howard Herman, the ADR/early neutral evaluation coordinator. The parties agreed that the conference call was premature based on Defendant's pending Motion to Dismiss Plaintiff's Amended Complaint. Therefore, the parties agreed to participate in a conference call with the early neutral evaluation coordinator on December 19, 2007 at 9:30 a.m., during which they will schedule a further conference call assuming any portion of this case still exists after the hearing on Defendant's motion to dismiss.

If any of Plaintiff's causes of action survive Defendant's Motion to Dismiss, the parties will file a stipulation requesting an extension of the Court's 90-day deadline for early neutral evaluation.

**12.   Consent to Magistrate Judge For All Purposes**

Defendant does not consent to have a magistrate judge conduct proceedings.

**13.   Other References**

Defendant does not believe the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

**14.   Narrowing of Issues**

If this case survives Defendant's pending Motion to Dismiss the Amended Complaint, Defendant anticipates a motion for summary judgment to eliminate certain causes of action.

**15.   Expedited Schedule**

Defendant does not believe this case can be handled on an expedited basis.

**16.   Scheduling**

Defendant does not believe that scheduling discovery cutoffs and related pretrial dates and deadlines is premature at this juncture, based on Defendant's pending Motion to Dismiss. Defendant requests that case scheduling be deferred until the next case management conference.

Case 3:07-cv-03981-MJJ    Document 42    Filed 11/20/2007    Page 6 of 7

1    In the event that the court is inclined to schedule the case at this time, Defendant proposes the

2    following schedule:

3          Non-expert discovery completed by September 16, 2008;

4          Discovery motions filed by October 14, 2008.

5          All other motions filed by November 11, 2008.

6          If any of Plaintiff's causes of action survive Defendant's Motion to Dismiss, the parties

7    will file a stipulation requesting an extension of the Court's 90-day deadline for early neutral

8    evaluation. All other deadlines shall be set in compliance with the Federal Rules of Civil

9    Procedure or pursuant to Court order.

10   **17.    Trial**

11         Defendant requests a trial date no earlier than January, 2009. Defendant estimates that

12   trial time would be 5 days.

13   **18.    Disclosure of Non-party Interested Entities or Persons**

14         Defendant has filed the "Certification of Interested Entities or Person" required by Civil

15   Local Rule 3-16. Other than the named parties, there is no such interest to report.

16   **19.    Such other matters as may facilitate the just, speedy and inexpensive disposition of
     this matter**

17

18         None at this time.

19   DATED: November 20, 2007                    SEYFARTH SHAW LLP

20

21                                               By
                                                    Patricia H. Cullison
22                                                  Allison B. Moser
                                                 Attorneys for Defendant
23                                               MCKESSON CORPORATION. formerly
                                                 known as MCKESSON HBOC, INC.
24

25   SFI 28307110 1 / 56248-000002

26

27

28
                                             6
     Defendant's [Joint] Case Management Statement – Case No. C 07-03981 MJJ

1

**PROOF OF SERVICE**

2    STATE OF CALIFORNIA          )
                                  )  ss
3    COUNTY OF SAN FRANCISCO      )

4        I am a resident of the State of California, over the age of eighteen years, and not a party
     to the within action. My business address is Seyfarth Shaw LLP, 560 Mission Street, Suite 3100,
5    San Francisco, California 94105. On November 20, 2007, I served the within documents:

6        DEFENDANT'S [JOINT] CASE MANAGEMENT STATEMENT

7    ☐    I sent such document from facsimile machine (415) 397-8549 on August 2, 2007. I
          certify that said transmission was completed and that all pages were received and that
8         a report was generated by facsimile machine (415) 397-8549 which confirms said
          transmission and receipt. I, thereafter, mailed a copy to the interested party(ies) in this
9         action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the
          parties listed below.
10

11   ☒    by placing the document(s) listed above in a sealed envelope with postage thereon
          fully prepaid, in the United States mail at San Francisco, California addressed as set
          forth below.
12

13   ☐    by personally delivering the document(s) listed above to the person(s) at the
          address(es) set forth below.

14   ☐    by placing the document(s) listed above, together with an unsigned copy of this
15        declaration, in a sealed Federal Express envelope with postage paid on account and
          deposited with Federal Express at San Francisco, California, addressed as set forth
16        below.

17   ☐    by transmitting the document(s) listed above, electronically, via the e-mail addresses
          set forth below.
18

         CHRISTINE H. CHANG, Pro Se
19       341 Tideway Dr., #214
         Alameda, CA 94501
20

21       I am readily familiar with the firm's practice of collection and processing correspondence
     for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same
22   day with postage thereon fully prepaid in the ordinary course of business. I am aware that on
     motion of the party served, service is presumed invalid if postal cancellation date or postage
23   meter date is more than on day after the date of deposit for mailing in affidavit.

24       I declare that I am employed in the office of a member of the bar of this court whose
     direction the service was made.

25       Executed on November 20, 2007, at San Francisco, California.

26                                          _Patricia K. Messender_
                                            _____
27                                          Patricia K. Massender

28

**EXHIBIT E**

# WAIVER AND GENERAL RELEASE OF CLAIMS

### McKesson HBOC, Inc.
### Corporate Headquarters
### Information Technologies Division
### 1999 Reduction in Force Program

**Dear Christine Chang:**

As you know, your employment with McKesson HBOC, Inc. will end on March 31, 1999. In order to receive benefits under the 1999 ITD Reduction in Force Program (the "Program"), including benefits under the McKesson HBOC, Inc. Severance Pay Plan (the "Severance Pay Plan"), you must sign this Waiver and General Release of Claims ("Waiver") in the exact form provided, without altering, deleting from, or adding to it, and return it to your Human Resources Director no later than 5:00 p.m. on May 17, 1999.

This Waiver is an important document which you should examine carefully before signing. You may take up to forty-five (45) days to think about it before signing it. This period is intended to allow you time to think about whether you want to sign the Waiver, and to seek the advice of anyone you need to consult in order to make an informed decision. You should consult with your attorney about this document.

This Waiver will not become effective or enforceable until seven (7) days after you sign it. You may revoke the Waiver at any time during this seven-day period. If you do revoke the Waiver, you will not be entitled to the benefits under the Program.

Under federal law, we are required to inform you of the job titles and ages of all employees eligible for the Program, and the ages of all employees in the same job classification or organizational unit who are not eligible for the Program. This information is included in the attached schedule.

-------------------------------------------------------------------------------------------------

1.  I have been offered benefits under the Program in exchange for signing this Waiver. These benefits include:

    (a)   Severance benefits under the McKesson HBOC, Inc. Severance Pay Plan.

    (b)   $500.00 in TAP credits.

    (c)   Three months' COBRA premiums, if I elect COBRA continuation coverage.

ID 0036

(d)    A three-day outplacement workshop.

2.    I understand that, in order to receive benefits under the Program, I must sign, date and return this Waiver on or before May 17, 1999. I acknowledge that I have been offered a period of at least forty-five (45) calendar days to consider this Waiver.

3.    I understand that, if I elect to sign this Waiver, I have seven (7) days thereafter to change my mind and revoke my agreement to the terms of this Waiver. I understand that if I decide to revoke during this seven-day period, I may do so by delivering a written notice to my Human Resources Director not later than 5:00 p.m. on the seventh calendar day after I have signed the Waiver.

4.    This Waiver covers both claims that I know about and those that I may not know about that exist as of the date of signing this form. I am aware of the provisions of California Civil Code Section 1542, which provides that:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

I am aware of this provision and its effect upon my rights, and I expressly waive any rights I may have under section 1542 or under any statutes or common law principles of similar effect.

5.    I agree not to disclose any information relating to the existence and terms of this Waiver and shall take every precaution to prevent disclosure of such information to third parties other than members of my immediate family and my personal financial and legal advisors, unless such disclosure is required by law.

6.    I acknowledge that, in the course of my work as an employee of the Company, I have had access to Proprietary Information (as defined below) concerning the Company, its products, customers and methods of doing business. I acknowledge that the Company has developed, compiled and otherwise obtained, often at great expense, this information, which has great value to the Company's business. I agree to hold in strict confidence and not disclose any Proprietary Information, directly or indirectly, to anyone outside of the Company, or use, copy, publish, summarize, or remove from Company premises such information. I agree to deliver promptly to Company all tangible Proprietary Information which is in my possession or under my control. For purposes of this Waiver, the reference to "Proprietary Information" means all information and any idea in whatever form, tangible or intangible, whether disclosed to or learned or developed by me, pertaining to

–

or affecting the business of the Company or other affiliated companies or their clients, consultants, or business associates unless:

(a)    the information is or becomes publicly known through lawful means not requiring the permission or license of the Company;

(b)    the information was rightfully in my possession or part of my general knowledge prior to my employment by the Company or by virtue of my activities not related to my employment by the Company; or

(c)    the information was disclosed to me without confidential or proprietary restriction by a third party who rightfully possesses the information (without confidential or proprietary restriction for the benefit of the Company) and did not learn it, directly or indirectly, from the Company on a confidential basis.

I further agree that the following information is included, without limitation, in the definition of Proprietary Information if the same is encompassed by the preceding sentence:

(i) processes, trade secrets, electronic codes, computer software, source codes, proprietary techniques, inventions, improvements and research projects;

(ii) information about costs, budgets, profits, markets, employees, sales and lists of customers or vendors;

(iii) plans for future development and new product concepts and marketing; and

(iv) all documents, books, papers, drawings, models, sketches, studies, consultant's reports and other data of any kind and description, including electronic data recorded or retrieved by any means, that have been given to me by the Company or other affiliated companies, as well as written or oral instructions or comments.

7.    I agree that I will not solicit or assist in the solicitation of any employees or customers of Company for the twelve (12) month period following my last day of employment with the Company.

8.    By signing this Waiver, I knowingly and voluntarily agree to release the Company (which includes its subsidiaries, affiliates, directors, officers, employees, agents, representatives and related entities) from all claims or demands I may have against the Company, including, but not limited to, claims based on my employment with the Company or the termination of that employment (other than claims for vested benefits in

accordance with the terms of the Company's written benefit plans). This includes, but is not limited to, a release of any rights or claims I may have under the Civil Rights Acts of 1964 and 1991, as amended, the Age Discrimination in Employment Act of 1967, as amended, ERISA, or any other federal state or local laws. This Waiver also includes a release by me of any claims for wrongful discharge or claims that the Company has dealt with me unfairly or in bad faith.

9.  I understand that this Waiver and all transactions hereunder shall be governed by, interpreted and enforced in accordance with the laws of the State of California without reference to principles of conflict of laws.

10. I understand that if any provision of this Waiver or the application thereof is held invalid in a court of law, the invalidity shall not affect other provisions or applications of this Waiver which can be given effect without the invalid provisions or applications. To this end, the provisions of this Waiver are declared to be severable.

11. The provisions of this Waiver set forth the entire agreement between me and the Company concerning my termination of employment. Any other promises, written or oral, are replaced by the provisions of this Waiver, and are no longer effective unless they are contained in this document.

12. I acknowledge that I have been advised to consult with an attorney prior to signing this Waiver. I understand that whether or not to consult with an attorney is my own decision.

**I ACKNOWLEDGE THAT I HAVE READ THIS WAIVER AND GENERAL RELEASE OF CLAIMS, UNDERSTAND IT AND THAT I AM VOLUNTARILY SIGNING IT.**

_____    _____
Christine Chang                      Date

**EXHIBIT F**

McKesson Corp.
One Post Street. San Francisco, CA 34104-5296 Tel 415 983 8300

**M·Kesson**

March 31, 1999

Dear Perspective Employer:

This is to introduce Christine Chang. Christine was most recently employed by McKessonHBOC's Health Care Supply Management Information Technologies Division in San Francisco, California as a Systems Programmer. Christine commenced employment with McKessonHBOC on October 16, 1995. Due to a reduction in force, Christine was separated from McKessonHBOC's employ on March 31, 1999.

Please give Christine consideration for employment opportunities within your company.

Sincerely,

Tom Capizzi
Vice President, Human Resources

ID 0004

## ATTACHMENT A

## McKESSON HBOC, INC. CORPORATE HEADQUARTERS

### McKESSON HBOC, INC. SEVERANCE PLAN SPD

Employee's Name: **Christine Chang**

**Severance Payment**

Based on an expected termination date of **March 31, 1999**, your severance benefit

is **$4,466.54** which represents **four (4)** weeks' pay.

In addition, you will receive the following:

1. TAP credits up to a maximum of $500 to help with your transition

2. COBRA premium payments for 3 months

3. Membership with Alumnae Resources

4. Outplacement assistance with Interim Career Solutions
   - A 3 day "Job Preparation Workshop"

**EXHIBIT G**

**RECEIVED**

Christine H. Chang
341 Tideway Drive #214
Alameda, CA 94501
Tel: (510) 769-8232

MAR 1 4 2007

Exec. Vice President
General Counsel & Secretary

March 12, 2007

John H. Hammergren
Chairman, President and
Chief Executive Officer
McKesson Corporation
1 Post Street
San Francisco, CA 94104-5296

<u>Reference: Demand Letter for Severance Pay</u>

Dear Mr. Hammergren:

On March 31, 1999, McKesson released me of my employment due to work force reduction. At the separation meeting, McKesson Vice President, Tom Von, coerced me to sign the "promissory not to sue statement" before I could receive severance pay.

McKesson gave no advance notice in terminating my employment, and withheld the severance pay unless I signed the "promissory not to sue statement" at the separation meeting. I had worked for McKesson in a full time position as system programmer starting 10/16/1995 until 3/31/1999 at the time of separation.

It is against the law for McKesson to:

1) Give no notice to release employee without severance pay - I was released on 3/31/1999 without advance notice.
2) Coerce employee into signing the "promissory not to sue statement".
3) Withhold severance pay unless employee signs "promissory not to sue statement".
4) Deny my several requests for the severance pay between April 1999 and 2002.
5) Deny my right to the severance pay because I am the head representative in the McKesson HBOC ERISA Litigation (Case No. C00-20030 RMW) starting 1999. As of now, the settlement process is still incomplete pending on McKesson compensating individual class members. It was scheduled for January 2007 and postponed to February. But it still hasn't been done as to this date. I am unable to comply with McKesson's demand to sign the "promissory not to sue statement" starting 1999 since I represent the interest of McKesson sub-class action members.
6) Withhold severance pay from separated employee for 8 years.

Based on all of the above, I am demanding my severance pay of $4500 plus fair-market-return of 10% interest annually from March 1999 through March 2007, for a total balance of $9646, be paid to me within 2 weeks from the date of this letter, to avoid incurring legal actions. Thank you.

Truthfully yours,

Christine H. Chang

attachment

cc. Paul E. Kirincic
    Executive Vice President
    Human Resources
    McKesson Corporation

ID 0002

**EXHIBIT H**

April 9, 2007

Eric Sprotte called at 12:15 PM on 4/9/07 stating that McKesson experts are looking at my demand letter if there is MERIT. Since McKesson has denied my requests for severance pay several times he doesn't know if situation has changed.

He requested for extension until the end of April to reply my demand. He implied that the statute-of-limitation should be inclusive (considered) of March 12, 2007 when I sent the demand letter. McKesson is a large corporation which will not default on my severance pay if there is merit, and will not use statute-of-limitation against me.

Eric Sprotte indicated that he may reply tomorrow by a letter, it is not necessary until the end of April before I hear from him.

**EXHIBIT I**

**McKesson Corporation**
One Post Street
San Francisco, CA 94104
415.983.8689 Tel
415.983.8549 Fax

**Jerry D. Warren**
Senior Vice President
Compensation and Benefits

April 10, 2007

**MᶜKESSON**
Empowering Healthcare

*Via FedEx*

Christine H. Chang
341 Tideway Drive #214
Alameda, California 94501

Re: Demand For Severance Pay

Dear Ms. Chang:

This is in reply to your March 12, 2007 letter to John Hammergren regarding your
demand for severance pay under the McKesson Corporation Severance Pay Plan (the
"Plan"). After careful review, we have reconfirmed the Plan Administrator's 2001
determination that you are not entitled to benefits under the Plan.

As you know, on or about March 20, 2000, your attorney, Peter S. Meyers, submitted a
formal claim for severance benefits under the Plan. That claim was denied in a May 1,
2000, letter from Chris Maher, Vice President, Compensation and Benefits, to Mr.
Meyers. Mr. Meyers appealed the denial of your claim in a letter dated July 21, 2000. A
March 1, 2001 letter to Mr. Meyers from Mr. Maher confirmed that you were not entitled
to severance benefits under the Plan. A copy of each of these letters is attached for your
reference.

The arguments you made in your March 12, 2007 letter were raised by your attorney in
his claim and appeal letters on your behalf, and were addressed in the above-referenced
letters from Mr. Maher. The Plan Administrator's response to these arguments has not
changed, and will therefore not be addressed again in this letter. For all of the reasons
stated in Mr. Maher's letters dated May 1, 2000 and March 1, 2001, the Plan
Administrator confirms its earlier denial of your claim for benefits under the Plan.

Very truly yours,

McKesson Corporation Employee Benefits Committee
Plan Administrator of the McKesson Severance Pay Plan

By:     Jerry D. Warren
        Senior Vice President
        Compensation and Benefits

cc:     John Hammergren
        Paul Kirincic

Enc.

**EXHIBIT J**

AO 133    (Rev. 8/06) Bill of Costs

# UNITED STATES DISTRICT COURT

Northern    District of    California

Christine H. Chang, Plaintiff

## BILL OF COSTS

V.

Case Number: C 07-3981 MJJ

McKesson Corporation, et al., Defendants,

Judgment having been entered in the above entitled action on    3/3/2008    against    Plaintiff Christine H. Chang  ,
                                                                    Date

the Clerk is requested to tax the following as costs:

| | | |
|---|---|---|
| Fees of the Clerk ............................................................. | $ | 350.00 |
| Fees for service of summons and subpoena ..................................... | | |
| Fees of the court reporter for all or any part of the transcript necessarily obtained for use in the case | | |
| Fees and disbursements for printing .......................................... | | |
| Fees for witnesses (itemize on page two) ..................................... | | 0.00 |
| Fees for exemplification and copies of papers necessarily obtained for use in the case ............. | | |
| Docket fees under 28 U.S.C. 1923 ........................................... | | |
| Costs as shown on Mandate of Court of Appeals ............................... | | |
| Compensation of court-appointed experts ..................................... | | |
| Compensation of interpreters and costs of special interpretation services under 28 U.S.C. 1828 ..... | | |
| Other costs (please itemize) ................................................. | | 1,167.45 |
| | TOTAL  $ | 1,517.45 |

SPECIAL NOTE: Attach to your bill an itemization and documentation for requested costs in all categories.

## DECLARATION

I declare under penalty of perjury that the foregoing costs are correct and were necessarily incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this bill has been served on all parties in the following manner:

☐    Electronic service by e-mail as set forth below and/or.

☐    Conventional service by first class mail, postage prepaid as set forth below.

s/ Attorney: _____

Name of Attorney:    Allison B. Moser

For:    Defendants McKesson Corp., J. Hammergren, P. Kirincic, J. Warren, D. Draher    Date: 3/14/08
                                Name of Claiming Party

Costs are taxed in the amount of    $1,517.45 _____ and included in the judgment.

_____    By: _____    _____
Clerk of Court                              Deputy Clerk                              Date